# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-05836 |
| | ) | |
| KEYSTONE ORTHOPEDIC | ) | Judge Robert M. Dow, Jr. |
| SPECIALISTS, S.C., WACHN, LCC, | ) | |
| MARTIN R. HALL, M.D., IRA K. | ) | |
| DUBIN LTD. d/b/a GREEN DUBIN | ) | |
| & CO., and IRA K. DUBIN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are motions to dismiss [36, 37] Plaintiff's first amended complaint [11] pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), filed by Defendants Keystone Orthopedic Specialists, S.C. ("Keystone"), WACHN, LLC ("WACHN"), and Martin R. Hall, M.D. ("Hall") (collectively, "Hall Defendants") [36], and Ira K. Dubin Ltd. d/b/a Green Dubin & Co. ("Green Dubin") and Ira K. Dubin ("Dubin") (together, "Dubin Defendants") [37], respectively. For the reasons set forth below, the Court denies Defendants' motions to dismiss [36, 37].

### I. Background[1]

Dr. Nicholas Angelopoulos ("Angelopoulos") alleges that his former business partner, Dr. Martin Hall ("Hall"), breached two of their business contracts, and then tried

---

[1] The facts are drawn from Plaintiff's first amended complaint. For the purposes of Defendants' motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

to extort the monies rightfully owed to Angelopoulos pursuant to those contracts. According to Angelopoulos, when the extortion attempt failed, Hall and his accountant, Ira Dubin ("Dubin"), filed fraudulent documents with the Internal Revenue Service ("IRS") as a way to exact revenge on Angelopoulos.

Angelopoulos and Hall's business relationship began "in or around late 2002 or early 2003" when Angelopoulos joined Keystone – a medical practice of which Hall served as president and secretary – as an anesthesiologist. According to Angelopoulos, he and Hall (on behalf of Keystone) entered into an implied-in-fact employment contract at that time, the terms of which "are readily inferred from the facts and circumstances." Relevant here, Angelopoulos would pay 26.5 percent of Keystone's reasonable and appropriate expenses and would receive a $25,000/month salary, plus 25% of other revenues generated by Keystone. If Angelopoulos's revenue from patient care exceeded his 26.5 percent share of expenses, those excess funds would spill into Keystone's cash reserves. Once Angelopoulos' total contribution to Keystone's cash reserves reached $100,000, any revenue in excess of his 26.5 percent share of Keystone's expenses would be paid to him as a bonus. Finally, if/when Angelopoulos resigned from Keystone, Keystone would repay him the full amount of his contribution to the practice's cash reserves, any monies he invested in the practice's equipment, and any unpaid patient care revenue that he had generated.

"In or around 2004," Angelopoulos and Hall started a side venture, when they – along with Drs. Daniel Weber ("Weber"), Mark Chang ("Chang"), and Phillip Narcissi – formed WACHN, a real estate company formed to buy properties and collect rental income from tenants. Each of the five doctors owned 20 percent of WACHN and made

equal investments in the company, including contributing $110,000 each towards the purchase of medical condominiums. Although the doctors owned equal shares, Hall was responsible for the company's accounting, rental collection, contract negotiations, and property maintenance. With these responsibilities, Angelopoulos contends, came a number of fiduciary duties that Hall blatantly ignored. Angelopoulos alleges that Hall breached these duties by failing to conduct member meetings, refusing to disclose material company information (such as lease agreements and revenue figures) to WACHN's other members, keeping the company's profits for himself, and generally acting as though he was the sole proprietor of WACHN. Although the WACHN members did not enter into an operating agreement (and, according to Angelopoulos, WACHN should therefore be governed by the default provisions of the Illinois Limited Liability Company Act, 805 ILCS 180/1, *et seq.*), Hall allegedly forged Angelopoulos's signature on an operating agreement without Angelopoulos's knowledge.

Throughout this time, Angelopoulos alleges, Hall exploited his position as Keystone's president and secretary, as well. For example, Hall and Dubin (his accountant) mischarged Angelopoulos for a variety of "unreasonable and inappropriate expenses." Specifically, Hall (on behalf of Keystone) contracted with companies that he or his family owned, inflated the costs charged to Keystone, and then passed on those expenses to Angelopoulos and Keystone's other physicians. Further, in the summer of 2007, Hall and Dubin unilaterally and improperly increased Angelopoulos's share of Keystone's expenses from 26.5 percent to 34.8 percent. As he did in his management of WACHN, Hall kept Angelopoulos in the dark with respect to his financial management of Keystone.

In 2007, Angelopoulos's frustrations with Hall came to a head. After Drs. Chang and Weber left the businesses for similar reasons, Angelopoulos resigned from Keystone and disassociated from WACHN, giving notice of both to Hall around October 2007. Upon his resignation, however, Hall refused to pay Angelopoulos any of the monies that Angelopoulos believed he was owed, including his $100,000 cash reserve contribution to Keystone. Likewise, Hall resisted Angelopoulos's claim to 20% of WACHN. Although the Illinois Limited Liability Company Act, which Angelopoulos contends governs WACHN in the absence of an operating agreement, requires that WACHN buy out a disassociating member, Hall and WACHN disavowed any statutory obligations in that regard. Angelopoulos believes that Keystone and WACHN appropriately compensated Chang and Weber upon their departures.

According to Angelopoulos, Hall and Dubin hatched an illegal scheme designed to allow Keystone and WACHN to keep the monies owed to Angelopoulos. The scheme was quite rudimentary and involved four simple steps: 1) fabricate debts that Angelopoulos supposedly owed to Hall and Keystone, 2) communicate the fake debts to Angelopoulos, 3) offer to call it even (*i.e.*, forgive these fake debts if Angelopoulos would abandon his claims against Keystone and WACHN), and 4) if Angelopoulos refused the offer, threaten to report forgiveness of the made-up debts to the IRS. Naturally, Angelopoulos – who believed he was entitled, at a minimum, to his $100,000 cash reserve contribution to Keystone and his $110,000 equity investment in WACHN – refused to play ball. When he did, Hall and Dubin executed the threat, sending a Form 1099-MISC to the IRS that falsely reported that Angelopoulos earned $159,577.45 of miscellaneous income in 2007. In turn, the IRS issued a Notice of Deficiency to

Angelopoulos on June 7, 2011, alleging that he failed to pay taxes on the income. In September 2011, Angelopoulos fought the Notice by filing a Petition in the Unites States Tax Court. Angelopoulos subpoenaed Hall, Dubin, and Keystone, seeking documentation that proved the reported amount. On August 16, 2012, counsel for Angelopoulos and the IRS met to discuss the produced documentation. A month later, the IRS and Angelopoulos submitted a Joint Status Report to the Tax Court, in which the IRS agreed that "of the total $159,577.45 in non-employee compensation reported on Keystone's Form 1099-MISC, petitioner did not earn and/or receive non-employee compensation in the amount totaling $121,657.00 during the 2007 tax year." Angelopoulos seemingly does not contest the $37,920.45 difference between the amount reported on the 1099-MISC and the amount that the IRS determined to be unsupported. Angelopoulos admits that he received a $38,045.10 bonus in 2007, and that it was appropriately reported by Hall as part of the $159,577.45. The complaint does not reconcile the slight difference ($124.65) between the bonus received and the amount recognized by the IRS as actual earned income, but regardless, it appears from the complaint that some portion of the $159,577.45 was, in fact, legitimate.

After sending two unsuccessful demand letters to Defendants in October and November 2011, respectively, Angelopoulos filed a complaint in this case on July 24, 2012. On October 31, 2012, Angelopoulos filed a five-count first amended complaint, which Defendants' now move to dismiss [36, 37]. Count I alleges the filing of a fraudulent information return with the IRS in violation of 26 U.S.C. § 7434 against Keystone, Hall, Green & Dubin, and Dubin. Count II alleges a breach of Angelopoulos's implied-in-fact employment agreement, resulting both from Hall's mismanagement of

Keystone and his refusal to pay Angelopoulos the monies owed to him upon resignation from the company. Count III, pled as an alternative to Count II, alleges that Keystone was unjustly enriched by Angelopoulos, such that it would be inequitable for Keystone to keep the benefits that he bestowed on them. Count IV is a claim against WACHN to enforce the buyout provisions proscribed by 805 ILCS § 180/35-65. Count V alleges breaches of statutory fiduciary duties against Hall, stemming from his failures in his management of WACHN.

## II.     Legal Standard

Defendants' bring their motions to dismiss pursuant to Rules 12(b)(1) (lack of subject matter jurisdiction) and 12(b)(6) (failure to state a claim). They assert that 12(b)(1) motions permit the court to consider extrinsic evidence, including the affidavits attached to their motions, to determine if subject matter jurisdiction exists. This is not entirely true. There are two types of 12(b)(1) challenges – factual and facial – and they have a "critical difference." *Apex Digital Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). When a defendant argues (as Defendants in this case appear to do) that "the plaintiffs' complaints, even if true, were purportedly insufficient to establish injury-in-fact," the challenge is a facial one. *Id.* at 443-44. "Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction." *Id.* at 443 (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). Factual challenges, however, lie "where 'the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction.'" *Id.* (citing *United Phosphorus, Ltd. v. Angus Chem. Co.*, 332 F.3d 942, 946 (7th Cir. 2003)). Courts may look beyond the complaint only when a defendant

brings a factual attack against jurisdiction, such as claim that a plaintiff lacks standing. *Id.* This distinction does not matter in this case, however, because Defendants' motion cannot properly be characterized as a 12(b)(1) motion at all.

Defendants contend that the Court lacks subject matter jurisdiction to hear Plaintiff's federal claim, because a Form 1099-MISC does not fall within the definition of "information return" in 26 U.S.C. § 7434. This is not a challenge to the Court's jurisdiction, but an attack on the merits of Plaintiff's case. See *Miller v. Herman*, 600 F.3d 726, 731 (7th Cir. 2010). In *Miller*, the Seventh Circuit addressed this very issue, noting that "[t]he conflation of jurisdictional and non-jurisdictional limitations on causes of action is not an uncommon occurrence." *Id.* There, defendants argued that the district court lacked subject matter jurisdiction because windows installed on a home did not fit within the definition of "consumer products" in the federal Magnuson-Moss Act. *Id.* The Seventh Circuit determined that this was not a jurisdictional attack; "because [plaintiff] must show that the windows are a consumer product to prevail, and not just to get into federal court . . . the [defendants'] Rule 12(b)(1) motion was in fact an indirect attack on the merits of Miller's case." *Id.* Thus, the Seventh Circuit construed the defendants' motion under Rule 12(b)(6), instead of Rule 12(b)(1), which "must be decided solely on the face of the complaint and any attachments that accompanied its filing." *Id.* at 733.

Here, Angelopoulos must show that a 1099-MISC is an "information return" to prevail, not just to get into federal court. Defendants' motion is therefore an indirect attack on Angelopoulos's case, not a challenge to subject matter jurisdiction.

Accordingly, as *Miller* instructs, the Court will evaluate Defendants' motions under the standards of Rule 12(b)(6) and will ignore all attachments, except for those of which the Court properly may take judicial notice and those attached to Plaintiff's complaint. *Adkins v. Vim Recycling, Inc.*, 644 F.3d 483, 493 (7th Cir. 2011) (noting that courts may take judicial notice of matters within the public record at the 12(b)(6) stage); *Reger v. Development LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729 (7th Cir. 1999)) ("We consider documents attached to the complaint as part of the complaint itself.").

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiffs' complaint and draws all reasonable inferences in their favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chicago*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

**III.    Analysis**

Defendants seek dismissal of Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). They argue that Count I fails to state a federal claim for which relief may be granted for three reasons: (1) Plaintiff's allegation that the 1099-MISC contained incorrect information does not state a claim for "fraud," (2) even if Plaintiff has stated a claim for fraud, he has not submitted "proof" of fraud, and (3) even if Plaintiff has sufficiently proved fraud at this juncture, a 1099-MISC is not an "information return" and thus falls outside the purview of 26 U.S.C. § 7434. Defendants argue that if Count I if dismissed, the Court should decline to exercise supplemental jurisdiction over Counts II-V, which are state law claims. In the alternative, if Count I is not dismissed, Defendants' argue that the state law claims should be dismissed because they "predominate" over Count I.

### A. Federal Claim

Plaintiff's federal claim is premised on an alleged violation of 26 U.S.C. § 7434, which states that, "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434 (2012). Angelopoulos argues that Defendants violated this statute when they filed a 1099-MISC with the IRS, fraudulently reporting income in the form of false debts that Hall and Dubin concocted in retaliation for Angelopoulos's resignation from Keystone and withdrawal from WACHN. Defendants do not seem to dispute that the 1099-MISC contained an incorrect dollar amount. Instead, Defendants argue that a fraudulent Form 1099-MISC is not actionable under 26 U.S.C. § 7434. They cite *Cavoto v. Hayes*, 634 F.3d 921 (7th Cir. 2011) as the sole support for this contention.

In *Cavoto*, a plaintiff brought a claim under 26 U.S.C. § 7434, alleging that the defendant filed a false Form 1099-C with the IRS. *Id.* at 922. Prior to bringing suit, Cavoto's mother-in-law Hayes let him put $30,000 on her credit card to help Cavoto during a tough financial time. *Id.* When it became clear to Hayes that Cavoto was incapable of repaying her, she filed a Form 1099-C to report the cancellation of the debt. *Id.* at 923. Because financial institutions are required to file a Form 1099-C with the IRS when a debt is discharged, Cavoto argued that the filing of this form by someone other than a financial institution is fraudulent *per se*. At trial, the district court determined that the filing was not fraudulent – finding that Hayes was permitted, though not required (as a financial institution would be), to file the form – and ruled in Hayes's favor. *Id.* On

appeal, the Seventh Circuit made clear that "the types of false 'information returns' for which an insured taxpayer may recover are limited to the nine listed in 26 U.S.C. § 6724(d)(1)(A)," as 26 U.S.C. § 7434(f) dictates. *Id.* at 924. Because "those nine do not include returns relating to the cancellation of indebtedness, i.e., a Form 1099-C," the district court should have dismissed the claim at the motion to dismiss stage and never should have reached the question of fraud. *Id.* at 924.

Defendants are adamant that *Cavoto* stands for the proposition that any form filed with the IRS that relates to the cancellation of a debt is not actionable under 26 U.S.C. § 7434. Defendants argue that because they filed the 1099-MISC for the purpose of cancelling a debt – fabricated or not – *Cavoto* precludes Angelopoulos's lawsuit. The Court disagrees. In *Cavoto*, the Seventh Circuit merely reiterated the language of 26 U.S.C. § 7434(f), which is clear that "for purposes of [26 U.S.C. § 7434], the term 'information return' means any statement described in section 6724(d)(1)(A)." The first of the nine categories listed in 26 U.S.C. § 6724(d)(1)(A) is "any statement of the amount of payments to another person required by section 6041(a) or (b) (relating to certain information at source)." 26 U.S.C. § 6041(a) states that, "All persons engaged in a trade or business and making payment in the course of such trade or business to another person . . . of $600 or more in any taxable year . . . shall render a true and accurate return to the Secretary [of the IRS] . . . setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment." Treasury Regulations instruct that the form to be used to report payments under § 6041(a) is a 1099. Treas. Reg. § 1.6041-1(a)(2). And Form 1099-MISC itself instructs that it is to be used to report "miscellaneous income for each person to whom you have paid during the year: . . .

11

[a]tleast $600 . . . when payments are made in the course of your trade or business." A Form 1099-MISC, therefore, falls within the nine categories of information returns implicated by 26 U.S.C. § 7434.

The Seventh Circuit did not, as Defendants argue, declare a blanket rule that any information returns relating to debt cancellation fall outside of 26 U.S.C. § 7434's scope when the court noted that "those nine do not include returns relating to the cancellation of indebtedness, i.e., a Form 1099-C." *Cavoto*, 634 F.3d 924. A 1099-C is *titled* "Cancellation of Debt," whereas a Form 1099-MISC is titled "Miscellaneous Income." See Hall Defendants' Reply Br. Ex. 1 [48-1], of which the Court has taken judicial notice. This explains the Seventh Circuit's use of the signal "*i.e.*" instead of "*e.g.*," and confirms the narrowness of *Cavoto's* holding.

The Court is not persuaded by Defendants' argument that the 1099-MISC in this case was the functional equivalent of a 1099-C because as a non-financial institution they were prohibited from reporting a cancelled debt on a 1099-C. The district court in *Cavoto* determined that non-financial institutions *may* file 1099-C's, whereas financial entities *must* file them. *Id.* at 923. Besides, the instructions for Form 1099-MISC explicitly state that "[a] cancelled debt is not reportable on Form 1099-MISC. Canceled debts are required to be reported on Form 1099-C." Moreover, *Cavoto* does not instruct the Court to look to Defendants' underlying purpose in filing a form. The case merely requires courts to look to the nine categories of information returns in the statute when determining whether an allegedly fraudulent filing may serve as the basis for a claim under 26 U.S.C. § 7434. Having done that here, the Court concludes that a Form 1099-

MISC falls within one of the nine categories. And the Court notes that the only other federal courts that have considered whether a Form 1099-MISC is an information return within the meaning of Section 7434 have reached the same conclusion. See *Seijo v. Casa Salsa, Inc.*, 2013 WL 6184969 at *7 (S.D. Fla. Nov. 25, 2013) ("To establish a claim of tax fraud under 26 U.S.C. § 7434, [Plaintiff] must prove (1) that [Defendant] issued an information return . . . [Plaintiff] satisfies the first element because a 1099-MISC is considered an information return."); *Vandenheede v. Vecchio*, 2013 WL 692876 at *2 (E.D. Mich. Feb. 26, 2013) ("A 1099-MISC is considered an information return which is used to report to the IRS payments made under 26 U.S.C. § 6041(a) . . . ."); *Pitcher v. Waldman*, 2012 WL 5269060 at *5 (S.D. Ohio Oct. 23, 2012) (where it was "undisputed" by the parties that a 1099-MISC is an information return within the meaning of Section 7434); *Byers v. Edina Couriers, LLC*, 2011 WL 8780388 at *2 (D. Minn. Nov. 17, 2011) (same).

Defendants argue that even if Angelopoulos's claim is actionable under 26 U.S.C. § 7434, he has failed to state a claim that the inaccurate filing was *fraudulent*. They direct the Court to Hall's affidavit, in which he attests to his belief that the Form 1099-MISC was not a fraud, and point to district court cases in the Northern District of Indiana and the Northern District of Texas that held that mere allegations of falsity are insufficient to state a claim under Section 7434. As discussed *supra*, the Court may not consider Hall's affidavit; a 12(b)(6) motion to dismiss may argue that Plaintiff has failed to state a claim, but it may not challenge the merits of Plaintiff's case by submitting affidavits that refute Plaintiff's factual allegations. And Defendants' citations to *Jacobs v. Ocwen Fed. Bank, FSB*, 311 F. Supp. 2d 766, 769-770 (N.D. Ind. 2004), and *Bailey v.*

*Shell Western E&P*, *Inc.*, 1998 WL 185520 at \*2 (N.D. Tex. April 14, 1998), are inapposite here, as those cases dismissed Section 7434 claims due to a lack of evidence of fraud at *summary judgment*.

At this juncture, Angelopoulos is not required to prove his claim, nor were the plaintiffs in *Jacobs* and *Bailey* required to do so at the motion to dismiss stage. Instead, he must merely advance allegations that support a plausible inference that Hall and Dubin willfully filed a fraudulent return, which he has done. Angelopoulous alleges that Hall and Dubin concocted false debts and reported these fraudulent amounts to the IRS on a form that falls within the scope of Section 7434. In his thirty-eight page complaint and in the thirty six pages of attachments (which the Court treats as part of the complaint), Angelopoulos lays out in great detail the exact amounts that he alleges are fraudulent, the way in which he believes that Hall derived these false figures, the date on which Hall and Dubin submitted the fraudulent filing to the IRS, and the motives that Defendants had in submitting them. He makes out far more than the "short and plain statement of the claim" that Rule 8(a) requires, and he gives Defendants ample notice of his claims and the grounds on which they rest. Drawing all reasonable inferences in Plaintiff's favor, he has more than made out a violation of Section 7434 in his complaint.

In addition to the arguments addressed above, Dubin argues that Count I should be dismissed as to him, because Ira. K. Dubin, Ltd. d/b/a Green Dubin & Co. did not exist at the time of the allegedly fraudulent IRS filing. Dubin contends that his firm was not incorporated until 2012, and that prior to 2012, "Green Dubin & Co." was a sole proprietorship owned by his now-deceased father, Samuel Dubin. Because

Angelopoulos's complaint concerns events that took place in 2007 and 2008, Dubin argues that he (sued as an agent for his firm) and his firm must be dismissed from the case. Plaintiff disagrees with Dubin's assertions and argues that even if Dubin did not take over Green Dubin & Co. until 2012, Dubin still filed the fraudulent return at issue in this case while working as an employee of his father's firm, such that Green Dubin & Co. is the proper Defendant in this case. But this dispute is irrelevant at this juncture; the merits of Plaintiff's allegations are not before the Court on a motion to dismiss. Whether Dubin was actually employed by his father's firm or acted as its agent in filing a fraudulent information return with Hall, and whether Dubin and his current firm can be held liable for that filing, are matters for another day. At present, the Court must assume that Plaintiff's well-pleaded allegations are true. Doing so, the Court has determined that Angelopoulos has stated a claim for which relief may be granted. Accordingly, Defendants' motions to dismiss [36, 37] with respect to Count I are denied.

### B. State Claims

Defendants argue that even if Plaintiff has stated a claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims because those claims predominate the federal claim. Where a district court has original jurisdiction over one claim, it may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution." 28 U.S.C. § 1367(a). Supplemental jurisdiction is a "doctrine of discretion, not of plaintiff's right," (*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)), but

"judicial power to hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts." *Ammerman v. Sween*, 54 F.3d 423 (7th Cir. 1995) (citing *Gibbs*, 383 U.S. at 725). Although courts may decline to exercise supplemental jurisdiction over a state claim if it "substantially predominates over the claim or claims over which the district court has original jurisdiction," (28 U.S.C. § 1367(c)(2), the justification for the court's power over state claims "lies in considerations of judicial economy, convenience and fairness to litigants." *Gibbs*, 383 U.S. at 726.

Here, Angelopoulos's federal claim is based on Hall and Dubin's allegedly fraudulent filing, and his state claims – breach of contract, unjust enrichment, failure to buyout his interests in WACHN, and breach of fiduciary duty –arise out of the same narrative. At bottom, this case involves the soured business relationship between two men, one of whom is alleged to have breached their agreements and taken retaliatory action against the other. At this stage of the case, the Court finds no reason not to exercise supplemental jurisdiction over the state claims – including those brought against WACHN, which is not named in the federal claim – in the interests of judicial economy, convenience, and fairness. Otherwise, Angelopoulous would be forced to bring a parallel suit in state court involving a significant amount of evidentiary overlap with his federal case, which would defeat the very purpose that underlies the Court's supplemental jurisdiction. As this is only argument that Defendants make for the dismissal of Plaintiff's state law claims, Defendants' motions to dismiss those claims also is denied.

## V.    Conclusion

For the reasons stated above, Defendants' motions to dismiss [36, 37] are denied. The Court grants Plaintiff's motion for leave to file sur-reply in opposition to Defendants' motion to dismiss [51], which it considered in ruling on Defendants' motions.

Dated:  January 23, 2013

_____
Robert M. Dow, Jr.
United States District Judge