## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-05836 |
| | ) | |
| KEYSTONE ORTHOPEDIC SPECIALISTS, | ) | |
| S.C., WACHN, LLC, MARTIN R. HALL, | ) | Hon. Robert M. Dow, Jr. |
| M.D., IRA K. DUBIN LTD. d/b/a GREEN | ) | Magistrate Daniel G. Martin |
| DUBIN & CO., and IRA K. DUBIN, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM TO COUNTS III, IV AND V OF PLAINTIFF'S THIRD AMENDED COMPLAINT

Keystone Orthopedic Specialists, S.C. ("Keystone"), WACHN, LLC ("WACHN"), and

Dr. Martin R. Hall ("Hall") (collectively, "Defendants") by and through their attorneys, and for

their Answer, Affirmative Defenses and Counterclaim to Counts III, IV and V of Plaintiff's Third

Amended Complaint, submit as follows:

### NATURE OF THE ACTION

1.       This is an action for fraudulent filing of a federal information tax return, common law fraud, breach of fiduciary duty, breach of contract, and relief under the Illinois Limited Liability Company Act, 805 ILCS § 180/1, et seq.

**ANSWER:**       Defendants admit that Plaintiff has filed such an action, but denies that Plaintiff is entitled to any relief sought.  Defendants deny the remaining allegations of Paragraph 1.

2.       Defendant Hall was the architect of a long-term, pervasive fraud scheme against Dr. Angelopoulos in connection with the operations of two medical businesses in which both were partners, Keystone and WACHN. That fraud scheme cost Dr. Angelopoulos huge sums of money to which he was entitled. Defendants Keystone and WACHN participated in the fraud.

**ANSWER:**       Defendants deny the allegations of Paragraph 2.

3.       For years, Hall fraudulently concealed the various aspects of the scheme from Dr.

1

Angelopoulos, and the nature of the scheme has only come to light through discovery in this case.

**ANSWER:**     Defendants deny the allegations of Paragraph 3.

4.     The scheme was executed through multiple entities controlled by Dr. Hall, some of which Dr. Angelopoulos had an ownership interest in, including Keystone and WACHN.

**ANSWER:**     Defendants deny the allegations of Paragraph 4.

5.     The scheme perpetrated by the Defendants involved at least the following major components: (a) Defendants misrepresented the ownership interests of Hall, Dr. Angelopoulos and others in Keystone and WACHN; (b) Defendants obtained Dr. Angelopoulos's capital investments in Keystone and WACHN through fraudulent means; (c) Defendants arbitrarily and fraudulently inflated expenses of Keystone and WACHN which were charged to Dr. Angelopoulos; (d) Defendants fraudulently under-reported the income to which Dr. Angelopoulos was entitled; (e) Defendants failed to purchase Dr. Angelopoulos's share in WACHN upon his dissociation and substitute his personal guaranty of WACHN's loans with other collateral.

**ANSWER:**     Defendants deny the allegations of Paragraph 5.

6.     The fraud continued after Dr. Angelopoulos left Keystone and WACHN in late 2007. Instead of paying Dr. Angelopoulos moneys rightfully due him, Hall filed a phony 1099-MISC with the Internal Revenue Service ("IRS"), fraudulently claiming that Dr. Angelopoulos had received income from Keystone that he had never received, initiating a claim by the Internal Revenue Service against Dr. Angelopoulos personally that has since been proved false.

**ANSWER:**     Defendants admit that they asked Ira Dubin to file a Form 1099-MISC for tax year 2007 on behalf of Keystone for Dr. Angelopoulos for debt that he owed to Keystone, which Keystone forgave or cancelled.  Defendants deny the remaining allegations of Paragraph 6.

7.     The fraud scheme continues today. After failing to compensate Dr. Angelopoulos for his investment in WACHN, Hall has kept Dr. Angelopoulos as a personal guarantor on over $1.3 million in loans which were used to finance the purchase and construction of a medical building owned by WACHN. Since Dr. Angelopoulos's attempted dissociation, Hall pledged WACHN's medical building as collateral for a substantial bank loan to another business he owned and controlled, for his own benefit, while Dr. Angelopoulos continues to remain personally liable.

**ANSWER:**     Defendants admit that Plaintiff remains personally liable for certain of WACHN's debts.  The Defendants deny the remaining allegations of Paragraph 7.

## PARTIES

8.      Plaintiff Dr. Angelopoulos is a resident of Illinois and is a medical doctor licensed to practice in Illinois. Dr. Angelopoulos is board certified in anesthesiology by the American Board of Anesthesiology. From 2004 to late 2007, he practiced medicine as a part of Defendant Keystone.

**ANSWER:**      Defendants admit that, from 2004 through 2007, Plaintiff was a resident of Illinois, a medical doctor licensed to practice in Illinois, board certified in anesthesiology and was employed at Keystone.  Defendants lack information with which to admit or deny whether certain of these allegations are still true today, such as whether is currently licensed to practice in Illinois or whether he is current with his medical board requirements for anesthesiology.  As such, Defendants deny the remaining allegations of Paragraph 8.

9.      Defendant Keystone is an Illinois professional service corporation and partnership with its principal place of business located in Hazel Crest, Illinois.

**ANSWER:**      Defendants admit that Keystone is an Illinois professional service corporation with its principal place of business located in Hazel Crest, Illinois.  Defendants deny the remaining allegations of Paragraph 9.

10.      Defendant WACHN is an Illinois limited liability company with its principal place of business located in Flossmoor, Illinois, which is managed by its members.

**ANSWER:**      Defendants admit that WACHN is an Illinois limited liability company, which is managed by its members, but denies that its principal place of business is located in Flossmoor, Illinois.  Defendants further state that WACHN's principal place of business is in Hazel Crest, Illinois.

11.      Defendant Hall is an individual who resides in Flossmoor, Illinois.  Hall is licensed to practice medicine in Illinois. At all relevant times, Hall was the president, secretary, and an owner of Keystone and an owner and the managing member of WACHN.

**ANSWER:**      Defendants admit that Dr. Hall is an individual who resides in Flossmoor, Illinois, is licensed to practice medicine in Illinois, and at all relevant times was the president, secretary

3

and sole owner of Keystone and managing member of WACHN. Defendants deny the remaining allegations of Paragraph 11.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1367. Specifically, Dr. Angelopoulos is seeking damages under 26 U.S.C. § 7434 for the fraudulent filing of false information returns. (See Count One below.) This Court has original jurisdiction over Count One under 28 U.S.C. § 1331, as it arises under the laws of the United States. This Court has supplemental jurisdiction over the remaining state law claims against the Defendants under 28 U.S.C. § 1367 as they are so related to Count One that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**     Defendants admit that this Court has original subject matter jurisdiction under 28 U.S.C. 1331 and 1367 over Count One as it arises under the laws of the United States. Defendants further admit that Plaintiff seeks damages under Count One for a purported violation of 26 U.S.C. 7434 for the alleged fraudulent filing of a false information return, but deny that Plaintiff's claim is meritorious or that he is entitled to relief. Defendants further deny that this Court has supplemental jurisdiction over the remaining state law claims against the Defendants under 28 U.S.C. 1367. Defendants deny any remaining allegations of Paragraph 12.

13.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Keystone, WACHN, and Hall reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because a substantial part of the property that is the subject of this action is situated in this judicial district.

**ANSWER:**     Defendants admit the allegations of Paragraph 13.

## FACTUAL BACKGROUND

### Keystone

14.     Keystone is registered with the Illinois Secretary of State as a professional service corporation in Illinois. According to Forms K-1 filed with the IRS, Keystone has a single shareholder, Defendant Hall, owning 100% of the shares.

**ANSWER:**     Defendants admit the allegations of Paragraph 14.

15.     Hall's filings with the IRS were, in reality, false and fraudulent. Between 2004 and 2007, Keystone operated in fact and by estoppel as a multi-shareholder corporation and/or partnership among several physicians, including Hall and Dr. Angelopoulos, as well as Dr. Daniel Weber and Dr. Mark Chang.

**ANSWER:**     Defendants deny the allegations of Paragraph 15.

16.     Keystone has two locations – 3330 West 177th St. Hazel Crest, Illinois 60429 and 801 MacArthur Boulevard, Suite 304, Munster, Indiana 46321.

**ANSWER:**     Defendants admit the allegations of Paragraph 16.

17.     Keystone physicians specialized in orthopedics, a medical field relating to the treatment of conditions affecting the muscular-skeletal system.

**ANSWER:**     Defendants admit that Keystone Orthopedic Specialists, S.C. is a practice which generally specializes in orthopedics.  Defendants deny, however, that each and every Keystone physician specialized in the practice of orthopedics during the relevant time period.  Further answering, Defendants state that Dr. Angelopoulos did not specialize in orthopedics during the relevant time period.

18.     Keystone was controlled at all relevant times by Hall, who served as Keystone's president and secretary.

**ANSWER:**     Defendants admit the allegations of Paragraph 18.  Defendants further state that Dr. Hall was the owner of Keystone at all relevant times.

19.     In or around December 2003, Dr. Angelopoulos met with Hall about Dr. Angelopoulos joining Keystone. At the time, Dr. Angelopoulos had a successful anesthesiology practice with an extensive list of patients he treated. Hall expressed interest in the business that Dr. Angelopoulos could generate for Keystone. At this meeting, Hall and Dr. Angelopoulos agreed that Dr. Angelopoulos would join Keystone as a partner. As part of that agreement, Hall told Dr. Angelopoulos that Dr. Angelopoulos would receive his own patient billings and other non-physician revenues generated by the company, and would be responsible for his share of the expenses with a guaranteed monthly draw of $25,000. Hall represented that the total Keystone expenses would be around $1,000,000 shared between Angelopoulos, Hall, and the two other doctors who were partners at Keystone at that time. However, Keystone's annual expenses over the next four years were, in reality, about four times that amount.

**ANSWER:**     Defendants admit that in or around December 2003, Plaintiff met with Dr. Hall

for the purposes of discussing Plaintiff's potential employment with Keystone. It was eventually decided that Plaintiff would be employed with Keystone as an employee. The terms of Plaintiff's employment agreement, included but were not limited to the following: Plaintiff would receive $25,000.00 per month as a salary and would also be responsible for his share of the expenses. The Defendants deny the remaining allegations of Paragraph 19.

20.     At all relevant times, Drs. Weber and Chang were physicians practicing at Keystone as partners or shareholders in Keystone.

**ANSWER:**     Defendants admit that Drs. Weber and Chang were physicians and employees who practiced at Keystone, as well as being members of WACHN. Defendants deny the remaining allegations of Paragraph 20.

21.     In or around January 2004, Dr. Angelopoulos began practicing at Keystone as an anesthesiologist.

**ANSWER:**     Defendants deny the allegations of Paragraph 21. Defendants further state that Dr. Angelopoulos began practicing at Keystone as an anesthesiologist in or around July 2004.

22.     Hall controlled the finances and recordkeeping of Keystone, controlled the relationship with Keystone's accountant, determined what expenses of Hall's other companies Keystone would pay, determined the amount of money Dr. Angelopoulos and the other doctors paid in expenses, and determined the amount of money Dr. Angelopoulos received in income. As a result, Dr. Angelopoulos placed trust and confidence in Hall to manage these matters honestly, fairly, and accurately.

**ANSWER:**     Defendants admit that Dr. Hall played a role in Keystone's finances, including expenses and recordkeeping, communicating with Keystone's accountant, Ira K. Dubin Ltd. d/b/a/ Green Dubin & Company and determining the percentage of expenses paid by Keystone physicians, including Dr. Angelopoulos. Defendants lack sufficient information from which to admit or deny the remaining allegations of Paragraph 22, and therefore, deny same.

23.     The key terms of the agreement among Keystone and Dr. Angelopoulos were the same as the terms of the agreement between Keystone and Dr. Weber and Dr. Chang, and were as follows: Each physician was to be an owner or partner in the business. Drs. Angelopoulos,

Weber and Chang were each told by Hall in or around the beginning of 2004 that they would be responsible for paying 25 percent of appropriate ordinary-course expenses. Hall represented to Dr. Angelopoulos that these expenses would total about $1 Million split before the four physicians. Once Dr. Angelopoulos began practicing at Keystone, Dr. Hall informed the partners that he had decided to change the agreement, and required Dr. Angelopoulos, Dr. Weber, and Dr. Chang each to pay 26.5 percent of Keystone's expenses. For his part, Hall paid a reduced share of expenses – 20.5 percent – in consideration, he claimed, of his "administrative work" for Keystone. As it turned out, that administrative work was little but a cover for Hall to shift a portion of his share of the expenses to the other physicians.

**ANSWER:** Defendants deny the allegations of Paragraph 23.

24. Under the terms of the agreement, Drs. Angelopoulos, Weber, and Chang would receive revenues generated by their patient billings plus 25 percent of certain other revenues generated by Keystone, less their 25 (and later, 26.5) percent share of the expenses. Each, however, was guaranteed a fixed monthly draw from Keystone of $25,000 per month.

**ANSWER:** Defendants deny the existence of any agreement which stated that each physician was to be an owner or partner in the business. Defendants admit that the physicians were to receive revenues generated by their patient billings plus 25 percent of certain other revenues generated by Keystone less their 25 percent share of the expenses (which later increased to 26.5 percent). Defendants further admit that each Keystone physician was to receive a salary of $25,000.00 per month. Defendants deny the remaining allegations of Paragraph 24.

25. In the first quarter of 2006, Hall required Drs. Angelopoulos, Weber, and Chang to each contribute $100,000 to a "cash reserve" that Hall claimed was necessary to avoid certain unidentified bank fees. Hall had originally claimed that each doctor was required to contribute about $250,000 to these cash reserves, but when Drs. Angelopoulos, Weber, and Chang objected, Hall reduced the required contribution to $100,000.

**ANSWER:** Defendants admit that Drs. Angelopoulos, Weber and Chang were each required to contribute $100,000.00 to a cash reserve for Keystone. Further answering, Defendants state that Drs. Weber and Chang each contributed $100,000 as required, but Dr. Angelopoulos did not. Defendants deny any remaining allegations of Paragraph 25.

26. Separately, at the end of 2004, Hall told Great Lakes Bank a different story. Hall represented to the bank that as of January 1, 2005, a majority of Keystone would be owned by its practicing physicians and that each new "25% owner" of Keystone would submit a $100,000

buy-in to the company.

**ANSWER:**    Defendants deny the allegations of Paragraph 26.

27.    Dr. Angelopoulos and Hall agreed that as soon as Dr. Angelopoulos's share of the "cash reserve" pool equaled $100,000, revenues generated from patient billings and non-physician revenues over and above his expenses would cease going into cash reserves and would be distributed to Dr. Angelopoulos. The same arrangement was reached with Dr. Weber and Dr. Chang.

**ANSWER:**    Defendants admit that Paragraph 27 accurately describes the arrangement Dr. Hall reached with Drs. Angelopoulos, Weber and Chang.  Further answering, Defendants deny that Dr. Angelopoulos ever contributed his share or $100,000 of the cash reserve.

28.    Dr. Angelopoulos contributed $100,000 to Keystone in Q1 2006 by having it debited from his account.

**ANSWER:**    Defendants deny the allegations of Paragraph 28.

29.    Under the terms of the agreement, upon his resignation from Keystone, Keystone would pay Dr. Angelopoulos the full amount of his equity/contribution to cash reserves, revenues generated by Dr. Angelopoulos's patient care at Keystone, equivalent value for funds invested by Dr. Angelopoulos in any of Keystone's equipment, and any other funds due and owing by Keystone to Dr. Angelopoulos. Keystone had the same agreement with Dr. Weber and Dr. Chang.

**ANSWER:**    Defendants deny the allegations of Paragraph 29.

## WACHN

30.    In or around 2004, WACHN LLC was formed. The name – WACHN – derives from the first letter of the last names of each member: doctors Weber, Angelopoulos, Chang, Hall and Phillip Narcissi. WACHN is a limited liability company registered in Illinois. WACHN's primary purpose was to purchase and maintain a series of medical suites where Keystone would operate its medical practice and to rent remaining space to tenants for profit.

**ANSWER:**    Defendants admit that WACHN LLC is a limited liability company that was formed and registered in Illinois around 2004, and that the WACHN name derives from the first letter of the last name of each WACHN member at that time: Doctors Weber, Angelopoulos, Chang, Hall and Phillip Narcissi.  Defendants further admit that WACHN's primary purpose was

to purchase and maintain a medical suite where Keystone would operate its medical practice.

Defendants deny the remaining allegations of Paragraph 30.

31.     According to filings with the Illinois Secretary of State, the only members of WACHN were Hall and his brother-in-law, Merritt Roalsen. (See Ex. B.) However, Hall's filings with the Secretary of State were false. In fact and by estoppel WACHN is a limited liability company with five members, each of whom owned 20% of the company.

**ANSWER:**     Defendants deny the allegations of Paragraph 31.

32.     Hall advised Dr. Weber, Dr. Angelopoulos, Dr. Chang, Hall and Dr. Narcissi (as well as the Internal Revenue Service) that each of the five physicians was a 20% member of WACHN.

**ANSWER:**     Defendants admit the allegations of Paragraph 32.

33.     The WACHN members discussed drafts of an Operating Agreement, but were unable to agree to certain terms and, therefore, there is not an executed operating agreement. It was agreed, however, by all the members that to be an owner of WACHN a physician needed to also be in the Keystone practice.

**ANSWER:**     Defendants deny the allegations of Paragraph 33.

34.     WACHN purchased medical condominiums located on one floor of a larger medical building at 3330 West 177th Street, Hazel Crest, Illinois. WACHN purchased this real estate in part with a promissory note and mortgage in the amount of $1,448,000 with Great Lakes Bank, located in Blue Island, Illinois. In addition, WACHN obtained a construction loan from Great Lakes Bank in the amount of $593,740 to build out the space (collectively, the "WACHN loan").

**ANSWER:**     Defendants admit that WACHN purchased medical condominiums located on one

floor of a medical building located at 3330 West 177th Street, Hazel Crest, Illinois.  Defendants

further admit that WACHN had two mortgages which totaled the sum of $1,448,000 and

$593,740.  Defendants deny the remaining allegations of Paragraph 34.

35.     To obtain the WACHN loan, Dr. Angelopoulos and the other physicians contributed an equal share of the down payment – $111,000 each. Each also signed a personal guarantee of the entire amount of the loan, which was consideration for their 20% investment and ownership of WACHN. In addition, unbeknownst to the other doctors, WACHN and/or Hall told Great Lakes Bank that Keystone would now be owned by its practicing physicians. As a result, WACHN obtained the mortgage and construction loan from Great Lakes Bank.

**ANSWER:**      Defendants admit that in order to obtain the two WACHN mortgages, the Keystone physicians, other than Dr. Angelopoulos, each contributed an equal share of the down payment - $111,000.  Dr. Angelopoulos only contributed $83,000, although he was required to contribute $111,000.  Each Keystone physician also signed a personal guaranty of the entire amount of the loan. As a result, WACHN obtained the two mortgages from Great Lakes Bank. Defendants deny the remaining allegations of Paragraph 35.

36.      After closing on the purchase of the real estate, WACHN leased space to Keystone, and leased other offices to other companies, including Accelerated Physical Therapy and Vertical Plus MRI.  WACHN collected rents from its tenants.

**ANSWER:**      Defendants deny the allegations of Paragraph 36.

37.      Hall undertook responsibility for WACHN's accounting, including calculation of revenues and expenses, collection of rents, payment of expenses and debt, negotiation of rental contracts, negotiation of contracts with other service providers, and ensuring the maintenance of the property, among other things. As a result, Dr. Angelopoulos placed trust and confidence in Hall to manage these matters honestly, fairly, and accurately.

**ANSWER:**      Defendants deny the allegations of Paragraph 37.

## THE SCHEME

38.      From about January 2004 through about February 2014, Defendant Hall, along with and through Defendants Keystone and WACHN and their agents and representatives, including their accountants, devised, executed, and concealed a scheme to defraud Dr. Angelopoulos and the other physicians associated with Keystone and WACHN of millions of dollars, through false and fraudulent pretenses, representations and promises.

**ANSWER:**      Defendants deny the allegations of Paragraph 38.

### The Keystone Scheme

39.      As part of the scheme, Hall represented to Dr. Angelopoulos, his bank and the other physicians that each was a partner in Keystone. However, Hall and Keystone filed K-1s with the IRS in 2004, 2005, 2006, and 2007 representing that Hall was the sole shareholder in Keystone.

**ANSWER:**      Defendants admit that Keystone through the Dubin Defendants filed K-1s with

the IRS for Keystone for years 2004-2007 representing that Dr. Hall was the sole shareholder in

Keystone.  Defendants deny the allegations of Paragraph 39.

40.     It was further part of the scheme that following each quarter, Hall submitted to Dr. Angelopoulos and his colleagues false and fraudulent profit and loss ("P&L") statements, prepared by Hall for the purpose of charging to Keystone certain phony, unsubstantiated and inflated expenses, and expenses that had nothing to do with the practice of Dr. Angelopoulos and the others. Dr. Angelopoulos personally was charged $3,485,251.23 in Keystone expenses from January 2004 through September 2007. Angelopoulos's share of these expenses constituted 79% of his total income over that period.

**ANSWER:**     Defendants deny the allegations of Paragraph 40.

41.     It was further part of the scheme that Hall would take the QuickBooks files kept by Hall for Keystone and alter and inflate certain supposed expenses prior to presenting the "P&Ls" to Dr. Angelopoulos and the others. In some cases, there are no records at all in the QuickBooks files (or anywhere else) as the basis for significant expenses that were charged to Dr. Angelopoulos in the P&Ls.

**ANSWER:**     Defendants deny the allegations of Paragraph 41.

42.     It was further part of the scheme that Hall also underreported income due and owing to Dr. Angelopoulos for his patient care and for other items of income shared among the four Keystone partners to which Dr. Angelopoulos was entitled.

**ANSWER:**     Defendants deny the allegations of Paragraph 42.

43.     It was further part of the scheme that Hall paid himself an "administrative fee" in the form of reduced expenses that amounted to $539,933.69 during the time Dr. Angelopoulos practiced at Keystone, for which fee Hall did little else but prepare the false and fraudulent "P&Ls."

**ANSWER:**     Defendants deny the allegations of Paragraph 43.

44.     It was further part of the scheme that Hall received his share of the Keystone income and supposedly paid his share of the Keystone expenses through Hall's personal corporation, Martin R. Hall M.D., S.C. ("Hall M.D., S.C."), and kept the Hall M.D., S.C. accounting a secret from Dr. Angelopoulos and his partners. Unlike the other doctors, Hall did not list the income his medical practice generated as income in the P&Ls provided to Dr. Angelopoulos and his partners.

**ANSWER:**     Defendants deny the allegations of Paragraph 44.

45.     It was further part of the scheme that Hall fraudulently charged to Dr. Angelopoulos and the other Keystone physicians certain expenses that pertained to other

businesses affiliated with Hall.

**ANSWER:**     Defendants deny the allegations of Paragraph 45.

46.     It was further part of the scheme that Hall unilaterally decided to charge the Keystone physicians for certain expenses without their prior knowledge or their consent.

**ANSWER:**     Defendants deny the allegations of Paragraph 46.

47.     It was further part of the scheme that Hall commingled Keystone and WACHN funds with those of Hall's other companies, including Hall M.D., S.C., MedStaff Supply, Inc. ("MedStaff"), Vertical Plus MRI of America, LLC ("Vertical Plus"), and Midwest Diagnostics Imaging ("Midwest Diagnostics").

**ANSWER:**     Defendants deny the allegations of Paragraph 47.

48.     It was further part of the scheme that Hall caused Keystone to pay the expenses of Hall's other companies and work out a set-off later on, without any written promissory notes, agreements, records or other documentation of Keystone's receivables from these companies or the appropriate allocation of the expenses Keystone fronted.

**ANSWER:**     Defendants deny the allegations of Paragraph 48.

49.     It was further part of the scheme that Hall, through Hall M.D., S.C., charged unsubstantiated, phony, and inflated expenses of Hall M.D., S.C. to Keystone and, thus, to Dr. Angelopoulos, including the salaries and benefits of Hall's wife, Diane Hall, and Hall's brother-in-law, Merritt Roalsen.

**ANSWER:**     Defendants deny the allegations of Paragraph 49.

50.      It was further part of the scheme that Hall charged Dr. Angelopoulos and the other physicians false and inflated expenses that were not properly charged to Keystone for MedStaff, which corporation Hall and/or family members or other nominees created, owned and operated, and which supposedly provided medical staffing and health insurance for Keystone. These expenses included 1) inflated payroll and payroll taxes for the Keystone staff, which at times included over 40 staff personnel and which staff included friends and family members of Hall, and 2) misallocated health insurance costs to Keystone that were purported to be for MedStaff employees that were actually for employees of Hall's other companies, including Vertical Plus and Midwest Diagnostics.

**ANSWER:**     Defendants deny the allegations of Paragraph 50.

51.     It was further part of the scheme that Hall did not obtain competitive bids for medical staffing services and that he concealed, misrepresented and hid from Dr. Angelopoulos and the other physicians MedStaff's invoices to Keystone and back-up documents justifying the amounts billed to Keystone by MedStaff.

**ANSWER:**     Defendants deny the allegations of Paragraph 51.

52.     It was further part of the scheme that Hall negotiated and entered into a lease or leases on Keystone's behalf with Vertical Plus. Keystone's lease or leases with Vertical Plus permitted Keystone to rent a magnetic resonance imaging ("MRI") machine.

**ANSWER:**     Defendants deny the allegations of Paragraph 52.

53.     It was further part of the scheme that Hall individually and through his family was the owner and controlling principal in Vertical Plus. In particular, Hall was one of two managers of Vertical Plus, with the second manager of Vertical Plus being, at all relevant times, Merritt Roalsen, Hall's brother-in-law. (See Ex. C, Illinois Secretary of State Report on Vertical Plus.)

**ANSWER:**     Defendants deny the allegations in Paragraph 53 as being inconsistent with

Exhibits to the Third Amended Complaint (*see* Doc. No. 215-2, pp.22-23).   Such exhibit

purports to be Vertical Plus' Illinois Secretary of State filing for year 2014 and lists Dr. Hall and

Catherine A Kielborn as LLC managers of Vertical Plus.   Defendants deny any remaining

allegations in Paragraph 53.

54.     It was further part of the scheme that Hall was solely responsible for negotiating this lease for Keystone with Vertical Plus.

**ANSWER:**     Defendants deny the allegations of Paragraph 54.

55.     It was further part of the scheme that under the lease, Hall negotiated for Vertical Plus to charge Keystone $600-700 per hour for MRI time, despite the fact that Vertical Plus charged all other lessees a lower amount per hour. Hall accepted this arrangement on behalf of Keystone and Hall did not seek or obtain approval from Dr. Angelopoulos and the other physicians for this inflated charge to Keystone.

**ANSWER:**     Defendants deny the allegations of Paragraph 55.

56.     It was further part of the scheme that Hall never obtained competitive bids for Keystone from other MRI companies.

**ANSWER:**     Defendants deny the allegations of Paragraph 56.

57.     It was further part of the scheme that the bills submitted by Vertical Plus to Keystone for its "Facility Fee" were improperly and fraudulently inflated, unfair to Keystone, and exploitative of Dr. Angelopoulos and other Keystone physicians.

**ANSWER:**     Defendants deny the allegations of Paragraph 57.

58.     It was further part of the scheme that Hall misrepresented, concealed and hid from Dr. Angelopoulos: (1) the terms of the lease negotiated for Keystone with Vertical Plus and the premium rates charged to Keystone; (2) the terms of Hall's and Roalsen's ownership interests in Vertical Plus; (3) Vertical Plus's invoices to Keystone; and (4) other materials justifying the amounts billed to Keystone for use of the MRI machine.

**ANSWER:**     Defendants deny the allegations of Paragraph 58.

59.     It was further part of the scheme that Hall improperly used Keystone as a source to pay personal expenses that were not incurred by Keystone.

**ANSWER:**     Defendants deny the allegations of Paragraph 59.

60.     It was further part of the scheme that in 2004, Hall, without explanation or justification, did not pay Dr. Angelopoulos for any of Keystone's revenues (other than his own billings) to which Dr. Angelopoulos was entitled, despite the fact that Dr. Angelopoulos paid for over $750,000 in Keystone's expenses for that year.  Hall also, without justification, withheld $150,000 of Dr. Angelopoulos's guaranteed draw for the year.

**ANSWER:**     Defendants deny the allegations of Paragraph 60.

61.     On or about the end of every quarter from 2004 until the end of 2007, Defendants provided Dr. Angelopoulos with reports titled "Profit & Loss" ("P & L") statements, which were not the actual profit and loss statements of Keystone, but rather, were documents created by Hall and his accountants which showed allocation of Keystone expenses and income for the sole purpose of distribution to doctors Chang, Weber and Angelopoulos.  In actuality, these reports were referred to as "bucket reports" and did not include Dr. Hall's income.

**ANSWER:**     Defendants deny the allegations of Paragraph 61.

62.     It was further part of the scheme that on or about the end of each quarter of 2004, Defendants Hall and Keystone provided to Dr. Angelopoulos Keystone "P&L" summaries which misrepresented and charged inflated and improper expenses to Dr. Angelopoulos, including at least the following: telephone, cellular, and data expenses; auto expenses; payroll and salary; asset acquisitions; "office function" expenses; and a profit-sharing expense.

**ANSWER:**     Defendants deny the allegations of Paragraph 62.

63.     It was further part of the scheme that in 2004, and likely in subsequent years, Keystone paid for retirement benefits for Hall and certain other employees that were not offered to Plaintiff, his partners, and the majority of Keystone staff.

**ANSWER:**     Defendants deny the allegations of Paragraph 63.

64.     It was further part of the scheme that Defendants Hall and Keystone provided to Dr. Angelopoulos Keystone "P&Ls" for 2005 which misrepresented and charged inflated and improper expenses. Those misrepresentations occurred on the January-March 2005 P&L given to Dr. Angelopoulos on or about May 31, 2005; on the January-June 2005 P&L given to Dr. Angelopoulos on or about September 6, 2005; and on the January-December 2005 P&L given to Dr. Angelopoulos on or about March 1, 2006. The misrepresentations included at least the following: telephone, cellular, and data expenses; auto expenses; payroll and salary; asset acquisitions; "office function" expenses; real estate taxes and other expenses relating to a house in Homewood, Illinois owned by Hall and/or his wife; computer expenses; health insurance expenses; construction costs; WACHN rent; loan repayments of Dr. Narcissi's WACHN capital contribution; and malpractice insurance.

**ANSWER:**     Defendants deny the allegations of Paragraph 64.

65.     It was further part of the scheme that Defendants Hall and Keystone provided to Dr. Angelopoulos Keystone "P&Ls" for 2006 which misrepresented and charged inflated and improper expenses.  Those misrepresentations occurred on the January-March 2006 P&L given to Dr. Angelopoulos on or about June 2, 2006; on the January-June 2006 P&L given to Dr. Angelopoulos on or about August 3, 2006; on the January-September 2006 P&L given to Dr. Angelopoulos on or about December 4, 2006; and on the January-December 2006 P&L given to Dr. Angelopoulos on or about February 20, 2007. The misrepresentations included at least the following: telephone, cellular, and data expenses; auto expenses; payroll and salary; asset acquisitions; "office function" expenses; real estate taxes and other expenses relating to a house in Homewood, Illinois owned by Hall and/or his wife; computer expenses; health insurance expenses; construction costs; and WACHN rent.

**ANSWER:**     Defendants deny the allegations of Paragraph 65.

66.     It was further part of the scheme that, in 2006, Hall fraudulently charged Dr. Angelopoulos and the others a $100,000 "contribution" to Keystone "cash reserves," falsely claiming and misrepresenting that these cash reserves were required to be held on deposit to avoid certain banking fees. Hall never provided proof that the bank required such a deposit and there was no accounting of it. Dr. Angelopoulos contributed $100,000 to Keystone's "cash reserves" in Q1 2006 by having it debited from his account, which neither Keystone nor Hall has returned to him.

**ANSWER:**     Defendants deny the allegations of Paragraph 66.

67.     It was further part of the scheme that Defendants Hall and Keystone provided to Dr. Angelopoulos Keystone "P&Ls" for 2007 which misrepresented and charged inflated and improper expenses. Those misrepresentations occurred on the January-March 2007 P&L given to Dr. Angelopoulos on or about June 4, 2007; the January-June 2007 P&L given to Dr. Angelopoulos on or about October 15, 2007; and the January-September 2007 P&L given to Dr. Angelopoulos on or about November 28, 2007. The misrepresentations included at least the following: telephone, cellular, and data expenses; auto expenses; payroll and salary; asset acquisitions; "office function" expenses; real estate taxes and other expenses relating to a house

in Homewood, Illinois owned by Hall and/or his wife; computer expenses; health insurance expenses; construction costs; the Vertical Plus "facility fee"; and an overpaid escrow refund for WACHN that was not reimbursed.

**ANSWER:**     Defendants deny the allegations of Paragraph 67.

68.     It was further part of the scheme that Defendants fraudulently underreported and misrepresented Dr. Angelopoulos's income earned from his patient care in at least 2007. The P&Ls report that he earned $204,336.57 in Q2 2007. By contrast, Dr. Angelopoulos was reported to have earned $289,035.98 in Q1 2007 and, on average, $262,000 in each of the previous five quarters from patient care. The reduction in his reported income was simply the result of Defendants Hall and Keystone arbitrarily and fraudulently deflating those numbers.

**ANSWER:**     Defendants deny the allegations of Paragraph 68.

69.     It was further part of the scheme that Hall did not pay Dr. Angelopoulos for Dr. Angelopoulos's receivables for work Dr. Angelopoulos performed while at Keystone that was collected after he left Keystone.

**ANSWER:**     Defendants deny the allegations of Paragraph 69.

70.     It was further part of the scheme that in or about the summer of 2007, when Dr. Chang left Keystone, Hall and Keystone, unilaterally and fraudulently increased Dr. Angelopoulos's share of Keystone's expenses from 26.5 percent to 34.8 percent. Dr. Angelopoulos never agreed to this increased share of expenses. He did not receive any increase in his percentage ownership of the company of the company corresponding to this increase in his supposed share of expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 70.

71.     It was further part of the scheme that in the fall of 2007, when Dr. Weber left Keystone, Hall and Keystone, unilaterally and fraudulently increased Dr. Angelopoulos's share of Keystone's expenses from 34.8 percent to 51 percent. Dr. Angelopoulos never agreed to this increased share of expenses. He did not receive any increase in his percentage ownership of the company of the company corresponding to this increase in his supposed share of expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 71.

72.     It was further part of the scheme that in Q2 2007, Dr. Angelopoulos and his partners were charged $88,462.92 for a Vertical Plus "Facility Fee."   This, however, bore no relation to any fee negotiated between Keystone and Vertical Plus, or invoiced by Vertical Plus to Keystone. Rather, Hall fraudulently manufactured this "Facility Fee" payment in order to recapture income that Drs. Angelopoulos, Weber, and Chang had realized from the MRI facility since 2005.

**ANSWER:**     Defendants deny the allegations of Paragraph 72.

73.     It was further part of the scheme that in Q2 and Q3 2007, Hall retroactively changed each partner's allocation of the income and expenses for Keystone Physical Therapy. Instead of allocating income and expenses equally between the partners, as had been the agreed practice of Keystone, Hall unilaterally recalculated the allocation from 2005 through 2007 so that it was based on the number of referrals each doctor made to physical therapy. This retroactive unilateral "therapy adjustment" resulted in a loss to Dr. Angelopoulos of $132,361.64, and a significant profit to Hall.

**ANSWER:**     Defendants deny the allegations of Paragraph 73.

74.     Hall implemented these "adjustments" in Q2 and Q3 as a result of Dr. Angelopoulos's, Dr. Chang's, and Dr. Weber's resignation from Keystone, for the purpose of reducing any amounts that Keystone would pay out to them upon their departure.

**ANSWER:**     Defendants deny the allegations of Paragraph 74.

75.     It was further part of the scheme that Hall and Keystone charged other unreasonable, inflated and inappropriate expenses to Dr. Angelopoulos over the years.

**ANSWER:**     Defendants deny the allegations of Paragraph 75.

76.     It was further part of the scheme that Hall concealed these activities by refusing to allow Dr. Angelopoulos and the other Keystone partners access to the books and records of Keystone and to the backup for the Keystone "P&Ls" or to otherwise provide documentation for the income and expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 76.

### The WACHN Scheme

77.     Hall also defrauded Dr. Angelopoulos concerning WACHN.

**ANSWER:**     Defendants deny the allegations of Paragraph 77.

78.     It was part of the scheme that Defendants, including Hall, defrauded Dr. Angelopoulos in connection with his initial equity contribution of $111,000 to WACHN as well as his payment of his portion of WACHN's supposed expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 78.

79.     It was further part of the scheme that while Hall represented to Dr. Angelopoulos and the other physicians that they were each 20% members in WACHN, and obtained an equity contribution from Dr. Angelopoulos on that basis, Hall filed papers with the Illinois Secretary of State falsely indicating that Hall and his brother-in-law, Merritt Roalsen, were the only members of WACHN. Hall treated WACHN as exclusively his own company, except for the expenses and assets Dr. Angelopoulos and the others were required to contribute to the company.

17

**ANSWER:**    Defendants deny the allegations of Paragraph 79.

80.    It was further part of the scheme that Hall defrauded Dr. Angelopoulos, the other physicians, and the bank from whom WACHN obtained a $2 million loan. In particular, Hall submitted to the bank an operating agreement for WACHN purporting to be signed by Dr. Angelopoulos and the other physicians as a condition for obtaining the loan. Hall forged the signatures of Dr. Angelopoulos and the other physicians by obtaining the signature stamps they used for writing prescriptions and embossing their stamped signatures on the spurious operating agreement without the knowledge of Dr. Angelopoulos, the other physicians, or the bank.

**ANSWER:**    Defendants deny the allegations of Paragraph 80.

81.    It was further part of the scheme that Hall instructed Dr. Angelopoulos to personally guarantee the full $2 million loan to WACHN as a condition of his investment in WACHN, even though Hall did not disclose to Dr. Angelopoulos the forged operating agreement or the fact that Dr. Angelopoulos was not listed with the Secretary of State as a member of WACHN, and even though Dr. Angelopoulos would be given no access to any of the business records and would have no role in its operation.

**ANSWER:**    Defendants deny the allegations of Paragraph 81.

82.    It was further part of the scheme that Hall had no intention of making Dr. Angelopoulos a shareholder of Keystone, despite the understanding among all of the WACHN partners that partnership in WACHN was contemporaneous with partnership in Keystone.

**ANSWER:**    Defendants admit that Dr. Hall had no intention of ever making Dr. Angelopoulos a shareholder or owner in Keystone, but deny that this was an act in furtherance of an alleged scheme.  Defendants further answer that Dr. Angelopoulos was indeed never made a shareholder or owner in Keystone.  Defendants deny the remaining allegations of Paragraph 82.

83.    It was further part of the scheme that in or around 2006, Hall orchestrated expensive physical improvements for the WACHN real estate, which included new tile floors, cabinets, countertops and ceiling tiles. Hall did not seek or receive approval for these improvements from Dr. Angelopoulos or the other WACHN members, nor did Hall receive competitive bids for them. Hall, through Keystone, charged each WACHN physician significant sums for these improvements, including Dr. Angelopoulos.

**ANSWER:**    Defendants deny the allegations of Paragraph 83.

84.    It was further part of the scheme that these charges were arbitrary, unsubstantiated, falsely inflated and fraudulent.

**ANSWER:**     Defendants deny the allegations of Paragraph 84.

85.     It was further part of the scheme that one of the contractors that Hall hired to do these expensive improvements without the approval of Dr. Angelopoulos and without soliciting competitive bids was Qvation, Inc., which is a shareholder in Hall's company, Vertical Plus, and is owned and operated by Hall's sister.

**ANSWER:**     Defendants deny the allegations of Paragraph 85.

86.     It was further part of the scheme that in 2005, Hall double-charged Dr. Angelopoulos and the other physicians in WACHN rent and expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 86.

87.     It was further part of the scheme that from 2005-2007, Dr. Angelopoulos and the other physicians were charged for payments made by Keystone to WACHN, which payments exceeded the gross amount deposited to the WACHN accounts.

**ANSWER:**     Defendants deny the allegations of Paragraph 87.

88.     It was further part of the scheme that Hall concealed, misrepresented and hid from Dr. Angelopoulos and the other physicians in WACHN, and refused to produce to them, any backup supporting the work or the expenses charged to them.

**ANSWER:**     Defendants deny the allegations of Paragraph 88.

### The Departure of Dr. Angelopoulos and his Colleagues

89.     In 2007, Dr. Chang, Dr. Weber and eventually Dr. Angelopoulos resigned from Keystone and dissociated from WACHN.

**ANSWER:**     Defendants admit that in 2007, Drs. Chang, Weber and Angelopoulos resigned from Keystone.   Defendants further admit that Drs. Chang and Weber sought to and did withdraw from WACHN in 2007.  The Defendants deny the remaining allegations of Paragraph 89.

90.     On or around May 8, 2007, Dr. Chang withdrew from Keystone and WACHN, citing frustrations with management. Keystone and WACHN reached a final settlement with Dr. Chang for distribution of Dr. Chang's accounts receivable and cash reserves from Keystone, as well as the value of his interest in WACHN. However, Hall never disclosed to Chang the nature of his fraudulent scheme or how and how much he had fraudulently obtained from Chang. In addition, WACHN did not seek a release of Chang's personal guaranty of the WACHN loan and Hall never disclosed to Chang that Chang remained a personal guarantor on WACHN's loans

with Great Lakes Bank.

**ANSWER:**   Defendants admit that in 2007, Dr. Chang resigned from Keystone and withdrew from WACHN.  Defendants further admit that an agreement was reached with Dr. Chang for any amounts owed to him from Keystone and WACHN.  Defendants deny the remaining allegations of Paragraph 90.

91.     Similarly, in 2007, Dr. Weber dissociated from Keystone and WACHN, also citing frustrations with management. Keystone and WACHN reached a final settlement for the distribution of Dr. Weber's accounts receivable and cash reserves in Keystone, and the value of his interest in WACHN. However, Hall never disclosed to Weber the nature of the fraudulent scheme or Weber's personal guaranty of the WACHN loan Hall never disclosed to Weber that Weber remained a personal guarantor on WACHN's loans with Great Lakes Bank.

**ANSWER:**   Defendants admit that in 2007, Dr. Weber resigned from Keystone and withdrew from WACHN.  Defendants further admit that an agreement was reached with Dr. Weber for any amounts owed to him from Keystone and WACHN.  Defendants deny the remaining allegations of Paragraph 91.

92.     In late 2007, Dr. Angelopoulos provided notice to Hall that he was resigning from Keystone as of October 1, 2007. Dr. Angelopoulos also informed WACHN that he was dissociating at or around the same time.

**ANSWER:**   Defendants admit that Plaintiff provided a letter to Dr. Hall dated October 10, 2007, which informed that Plaintiff would no longer bill under Keystone's tax identification number as of October 1, 2007, but would bill under his own.   The Defendants deny the remaining allegations of Paragraph 92.

93.     Dr. Angelopoulos continued to practice within the WACHN-owned building until November 30, 2007, when Dr. Angelopoulos moved his practice to a new location. Since around the time of his resignation from Keystone in late 2007 to the present, Dr. Angelopoulos has practiced under the corporate name Nicholas Angelopoulos, D.O.S.C.

**ANSWER:**   Defendants admit that Plaintiff continued to practice within the WACHN-owned building until on or around November 30, 2007.  Defendants lack sufficient information with

which to admit or deny the veracity of the remaining allegations. To the extent that an answer is required, Defendants deny the remaining allegations of Paragraph 93.

94.     Since on or around October 2007, WACHN has treated Dr. Angelopoulos as dissociated. Dr. Angelopoulos has not received any Form K-1 statements from WACHN, information about WACHN's finances or other affairs, requests for capital contributions or other communications from WACHN.

**ANSWER:**     Defendants admit that Dr. Angelopoulos is no longer a member of WACHN as his interest in WACHN was forfeited pursuant to the Amended Operating Agreement dated January 10, 2008. Because Dr. Angelopoulos ceased being a member of WACHN on or around that date, he has not been entitled to information about WACHN's finances, taxes and other affairs since that time. Defendants deny any remaining allegations in Paragraph 94.

95.     Upon his resignation from Keystone, Hall and Keystone were required to pay Dr. Angelopoulos the value of his interest in Keystone, return to Dr. Angelopoulos the full value of his contributions toward Keystone's "cash reserves" ($100,000), the value of Dr. Angelopoulos's investments in Keystone's equipment and income accrued through the date of his departure, plus any unpaid accounts receivable from Dr. Angelopoulos's treatment of his own patients. Additionally, at the time of Dr. Angelopoulos's resignation from Keystone, Keystone owed Dr. Angelopoulos refunds for the significant amounts of money that Keystone overcharged Dr. Angelopoulos over the years.

**ANSWER:**     Defendants deny the allegations of Paragraph 95.

96.     Upon dissociation from WACHN, Dr. Angelopoulos was entitled to a buyout of his interest in WACHN.

**ANSWER:**     Defendants deny the allegations of Paragraph 96.

97.     Further, upon dissociation from WACHN, WACHN had a statutory obligation to deliver a purchase offer to Dr. Angelopoulos not later than 30 days after the date of his dissociation, including a statement of the company's assets and liabilities as of the date of dissociation, the latest available balance sheet and income statement and an explanation of how the estimated amount of the payment was calculated. (See 805 ILCS 180/35-60.) WACHN never delivered such a purchase offer or supporting financial records to Dr. Angelopoulos.

**ANSWER:**     Paragraph 97 states a legal conclusion to which no answer is required. To the extent that an answer is required, Defendants deny the allegations of Paragraph 97.

98.     It was further part of the scheme that Hall, Keystone and WACHN did not make any of these required payments or disclosures to Dr. Angelopoulos. Instead, Keystone, Hall, and WACHN have wrongfully withheld these funds from Dr. Angelopoulos.

**ANSWER:**     Defendants deny the allegations of Paragraph 98.

99.     It was further part of the scheme that on January 10, 2008, without providing notice to Dr. Angelopoulos, Hall and Phillip Narcissi attempted to hold a members' meeting and to amend the spurious WACHN operating agreement in order to cause Dr. Angelopoulos to forfeit his interest in WACHN. Specifically, Hall attempted to amend the agreement to provide that "Any member upon Vacating the WACHN, LLC premises at 3330 117th street [sic] and failing to monetarily contribute to the financial responsibility of WACHN, LLC including but not exclusive to the Mortgage, Taxes and association responsibilities shall immediately forfeit any cash contribution and any share ownership set forth in this agreement." (See Ex. H.)

**ANSWER:**     Defendants deny the allegations of Paragraph 99.

100.     Hall's attempted elimination of Dr. Angelopoulos's financial interest in WACHN violated 805 ILCS 180/35-60. Alternatively, while Dr. Angelopoulos never signed any WACHN operating agreement, under Section 13.10 of the draft agreement, any amendment to the operating agreement requires the written consent of all members. Even if Dr. Angelopoulos had been a signatory to the agreement, the amendment was ineffective under its very terms.

**ANSWER:**     Paragraph 100 states a legal conclusion to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations of Paragraph 100.

101.     It was further part of the scheme that despite never having repurchased Dr. Angelopoulos' interest in WACHN, and despite the fact that Dr. Angelopoulos unknowingly remained a guarantor on the WACHN loan, in August 2010, Hall caused WACHN to pledge the real property owned by WACHN at 3310 W. 177th St. in Hazel Crest to the Centier Bank of Merrillville, Indiana, as collateral for a $4.69 million loan made by Centier Bank to Varsity Medical Center, LLC, a medical center in Bolingbrook, Illinois owned and controlled by Hall and in which Dr. Angelopoulos had no interest.

**ANSWER:**     Defendants deny the allegations of Paragraph 101.

102.     Said pledge was an impairment to any ownership interest Dr. Angelopoulos still had in the WACHN building and was solely for Hall's benefit, not WACHN's.

**ANSWER:**     Defendants deny the allegations of Paragraph 102.

**Hall's Extortion of Dr. Angelopoulos and Fraudulent Filing of IRS 1099-MISC**

103.     It was further part of the scheme that Hall (acting on behalf of Keystone) concocted false debts purportedly owed by Dr. Angelopoulos to Keystone in 2007, and

fraudulently manipulated Keystone's accounting records to provide bogus support for those alleged "debts." Hall did this intentionally, and for improper purposes, including, most particularly, to claim that those false debts offset the funds due from Keystone to Dr. Angelopoulos.

**ANSWER:**     Defendants deny the allegations of Paragraph 103.

104.     It was further part of the scheme that in or around late 2007 or early 2008, in violation of the Hobbs Act, 18 U.S.C. § 1951 (extortion) and Section 12-6(a)(4) of the Illinois Criminal Code, 720 ILCS 5/12-6(a)(4) (intimidation), Hall made unlawful threats to Dr. Angelopoulos in an attempt to pressure Dr. Angelopoulos into agreeing that Keystone and WACHN owed him nothing and that, contrary to fact, Dr. Angelopoulos owed Hall money.

**ANSWER:**     Defendants deny the allegations of Paragraph 104.

105.     Hall instructed Dr. Angelopoulos to transfer Dr. Angelopoulos's "twenty percent ownership interest in WACHN LLC to Martin Hall." (See Ex. D). In exchange, Hall said he would use Dr. Angelopoulos's $111,000 equity investment in WACHN to offset Dr. Angelopoulos's non-existent "expense debt owed to Keystone Orthopedics." *(Id.)* In fact, Dr. Angelopoulos's equity investment in WACHN was actually significantly more than $111,000, given that Dr. Angelopoulos had also paid significant funds for physical improvements, and given the market value of the building and its future income stream.

**ANSWER:**     Defendants deny the allegations of Paragraph 105.

106.     It was further part of the scheme that Hall, on or about March 3, 2008, in his own handwriting, provided Dr. Angelopoulos a spurious tabulation of Dr. Angelopoulos's phony "expense debt" to Keystone in the amount of $151,769.02. *(Id.)* Applying the $111,000 equity investment in WACHN to the alleged "expense debt" left a supposed unpaid balance of $40,769.02, according to Hall's handwritten tabulations. *(Id.)* Hall offered to "forget" the remaining $40,769.02 as long as Dr. Angelopoulos signed the agreement to transfer Dr. Angelopoulos's interest in WACHN to Hall. In sum, the agreement would have required Dr. Angelopoulos to give up all of his significant financial interests in WACHN and Keystone, and to dissociate from both entities with nothing.

**ANSWER:**     Defendants deny the allegations of Paragraph 106.

107.     No accurate and true accounting records existed at Keystone that justified the "expense debt" that Hall sought to charge Dr. Angelopoulos. Lacking any real accounting records to justify the alleged $151,769.02 "expense debt," Hall attached to his "proposal" a document on which Hall hand-wrote Hall's purported tabulations of the made-up debt. *(Id.)* Despite requests, Hall and Keystone have refused to discuss the bases for these calculations or provide documentary support for them.

**ANSWER:**     Defendants deny the allegations of Paragraph 107.

108.    The paper is littered with scratch-outs, hand-drawn arrows and notes in the margin – facially not any kind of legitimate "accounting record." In fact, the numbers are false.

**ANSWER:**    Defendants deny the allegations of Paragraph 108.

109.    Dr. Angelopoulos rejected Hall's proposal out of hand, as it was extortionate and based on false "expenses" that had no basis in reality.

**ANSWER:**    Defendants deny the allegations of Paragraph 109.

110.    It was further part of the scheme that after Dr. Angelopoulos rejected Hall's proposals, Hall and Keystone reported to Dr. Angelopoulos and to the IRS on a Form 1099-MISC that Dr. Angelopoulos had earned $159,577.45 in miscellaneous income for 2007 while at Keystone. (Ex. E.) This is the exact amount set out on Hall's hand-written document – Ex. D.

**ANSWER:**    Defendants admit that Keystone reported through the Dubin Defendants to the IRS on a Form 1099 for tax year 2007 for Dr. Angelopoulos that he earned $159,577.45 in miscellaneous income as Plaintiff had owed this amount to Keystone, but Keystone forgave or cancelled it. Defendants deny the remaining allegations of Paragraph 110.

111.    This amount was false and fraudulent. In 2007, the amount that Dr. Angelopoulos received from Keystone over and above his salary was one distribution in the amount of $38,010.45, not $159,577.45, as Hall and Keystone reported to the IRS.

**ANSWER:**    Defendants deny the allegations of Paragraph 111.

112.    The remaining income over and above the $38,045 distribution that Hall reported on the 2007 Form 1099 for Dr. Angelopoulos – $121,567 – was not income earned by Dr. Angelopoulos in 2007.

**ANSWER:**    Defendants deny the allegations of Paragraph 112.

113.    Specifically, the amounts reported to the IRS as miscellaneous income ($159,577.45) included the following sums, according to Hall's handwritten tabulations: $138,010.45 – a combination of Dr. Angelopoulos's obligation to pay $100,000 into Keystone's cash reserves (which Dr. Angelopoulos had already paid) and his $38,010.45 distribution; $12,122 of a "loan share" to WACHN for November and December 2007; and a $9,445 payment for "4/07 share of Midwest Diagnostics money." These income amounts set forth in Hall's handwriting on Exhibit D are false, fraudulent, and lack any basis for several reasons.

**ANSWER:**    Defendants deny the allegations of Paragraph 113.

114.    First, the amount reported on the 1099-MISC was false and fraudulent because it

failed to account for all of the false and inflated expenses billed by Hall and Keystone to Dr. Angelopoulos and the underreported income withheld from Dr. Angelopoulos over numerous years, as described above. Had these items been properly included, they would have – and should have – dramatically increased Keystone's final payout to Dr. Angelopoulos and eliminated any so-called "expense debt."

**ANSWER:**     Defendants deny the allegations of Paragraph 114.

115.     Second, the amount reported on the 1099-MISC was false and fraudulent because it failed to account for the value of Dr. Angelopoulos's remaining accounts receivable generated by Dr. Angelopoulos's patient care.

**ANSWER:**     Defendants deny the allegations of Paragraph 115.

116.     Third, the amount reported on the 1099-MISC was false and fraudulent because it contended that Dr. Angelopoulos owed a $100,000 contribution toward cash reserves (and that the resulting forgiven debt of $100,000 by Keystone constituted income to Dr. Angelopoulos) when Dr. Angelopoulos had fully paid this $100,000 amount in Q1 2006 by having it debited from his account. Dr. Angelopoulos's payment of $100,000 to the cash reserves is recorded in the 2006 P&Ls, prepared by Hall. Accordingly, Hall and knew that including this amount as a debt Dr. Angelopoulos owed to Keystone was false and fraudulent.

**ANSWER:**     Defendants deny the allegations of Paragraph 116.

117.     Dr. Angelopoulos's payment of the $100,000 is also evident in the fact that he received a distribution of $38,045.10 in the second quarter of 2007; under the terms of his arrangement with Keystone, Dr. Angelopoulos would not have received this distribution if he had not fully paid his $100,000 contribution toward cash reserves.

**ANSWER:**     Defendants deny the allegations of Paragraph 117.

118.     Nevertheless, Hall fraudulently claimed that Dr. Angelopoulos still owed the full $100,000 toward cash reserves even though they knew that Dr. Angelopoulos had previously paid this $100,000 toward cash reserves in full.

**ANSWER:**     Defendants deny the allegations of Paragraph 118.

119.     Fourth, the amount reported on the 1099-MISC was false and fraudulent as to the$12,122 "loan share" for WACHN that Keystone, Hall characterized as "income" to Dr. Angelopoulos. Hall's handwritten notes claim that Dr. Angelopoulos owed $6,061 for "WACHN loan share" for November and December 2007. (Ex. D.) That amount is improperly charged as income to Dr. Angelopoulos. He had resigned from Keystone as of October 1, 2007, and thus could not have been liable to pay funds to Keystone for rent to WACHN thereafter. Despite requests, Hall and Keystone have failed to provide any justification for these amounts.

**ANSWER:**     Defendants deny the allegations of Paragraph 119.

120.    Fifth, the amount reported on the 1099-MISC was false and fraudulent as to the $9,445 charged as income to Dr. Angelopoulos for "4/07 share of Midwest Diagnostics money." No agreement required Dr. Angelopoulos to pay this amount, and Hall and Keystone have never provided any justification for this amount.

**ANSWER:**    Defendants deny the allegations of Paragraph 120.

121.    It was further part of the scheme that despite the lack of foundation for the $159,577 reported to the IRS, and despite Hall's full knowledge that the amount was false, fraudulent and grossly inflated, Hall intentionally and fraudulently reported the total to the IRS anyway, with the sole aim of harming Dr. Angelopoulos and causing him injury, among other damages. The 1099-MISC submitted by Hall for Dr. Angelopoulos for tax year 2007 violated their duty to truthfully and accurately inform the IRS of Dr. Angelopoulos's income.

**ANSWER:**    Defendants deny the allegations of Paragraph 121.

122.    This type of fraudulent filing is a part of Hall's practice to retaliate against associates who defect. Hall has previously filed false information returns to the IRS. Counsel has learned in its investigation that Hall also filed a false information returns as to a former MedStaff employee, George Cloud and to Merritt Roalsen.

**ANSWER:**    Defendants deny the allegations of Paragraph 122.

123.    Keystone and Hall were responsible for reporting these fraudulent amounts to the IRS. Keystone and Hall reported the fraudulent amounts for the purpose of penalizing Dr. Angelopoulos for withdrawing from WACHN and Keystone, and for rejecting Hall's proposal for Dr. Angelopoulos to transfer to Hall his interests in Keystone and WACHN for no compensation. Keystone, WACHN and Hall also attempted to avoid paying to Dr. Angelopoulos his rightful funds from Keystone and WACHN, so that Keystone and Hall could wrongfully retain these funds and thereby enrich themselves at Dr. Angelopoulos's expense.

**ANSWER:**    Defendants deny the allegations of Paragraph 123.

124.    On June 7, 2011, the IRS issued a Notice of Deficiency to Dr. Angelopoulos, alleging, among other things, that Dr. Angelopoulos had failed to pay taxes due and owing on the $159,577.45 in miscellaneous income that Hall and Keystone told the IRS Dr. Angelopoulos had earned.

**ANSWER:**    Defendants lack information with which to admit or deny the veracity of the allegations in Paragraph 124.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 124.

125.    On September 2, 2011, Dr. Angelopoulos filed a Petition in the United States Tax Court, challenging the IRS's Notice of Deficiency. Among other things, Dr. Angelopoulos

alleged that the miscellaneous income reported to the IRS was significantly inflated, by at least $121,567.

**ANSWER:**    Defendants admit that in or around September 2011, Plaintiff filed a petition in the United States Tax Court regarding the IRS's Notice of Deficiency.    Defendants deny that Plaintiff's claims were meritorious or that he was entitled to the relief he sought.    Defendants further deny the remaining allegations of Paragraph 125.

126.    On August 16, 2012, the IRS and Dr. Angelopoulos met to review and discuss the documents obtained through petitioner's subpoenas. Based on this documentation, the IRS and Dr. Angelopoulos resolved all issues in this case. Specifically, the parties reached the following resolution: (a) of the total $159,577.45 in non-employee compensation reported on Keystone's Form 1099-MISC, petitioner did not earn and/or receive non-employee compensation in the amount totaling $121,567.00 during the 2007 tax year. (Ex. A (Sept. 19, 2012 Joint Status Report submitted by the IRS and Dr. Angelopoulos to the United States Tax Court, Docket No. 20335-11).) The IRS therefore concluded that Dr. Angelopoulos "did not earn" the miscellaneous income that Hall and Keystone claimed he had in their official information report to the IRS regarding Dr. Angelopoulos.

**ANSWER:**    Defendants lack sufficient information with which to admit or deny the veracity of the allegations of Paragraph 126.    To the extent that an answer is required, Defendants deny the allegations of Paragraph 126.

127.    Keystone and Hall's actions have directly and proximately caused significant harm to Dr. Angelopoulos. By way of example and not limitation, Dr. Angelopoulos has incurred significant accounting and legal fees in challenging the audit, defending the Tax Court case, investigating Keystone and Hall's misconduct and accounting gimmicks, bringing this action and otherwise. Dr. Angelopoulos has suffered lost wages from the significant time he has spent attempting to rectify the false report.

**ANSWER:**    Paragraph 127 states a legal conclusion to which no answer is required.    To the extent that an answer is required, Defendants deny the allegations of Paragraph 127.

### October 25, 2011 Letter and Response

128.    In an October 25, 2011 letter to Defendants, Dr. Angelopoulos demanded that Keystone and WACHN pay him the sums rightfully due to him. (See Ex. F.)

**ANSWER:**    Defendants admit that Plaintiff's counsel sent a letter dated October 25, 2011 to

counsel for Defendants alleging that Plaintiff was owed certain sums. Defendants deny that Plaintiff is owed such sums and deny the remaining allegations of Paragraph 128.

129.    In the October 25, 2011 letter, Dr. Angelopoulos requested a response by November 8, 2011 or he would have seek appropriate relief from the courts. *(Id.)*

**ANSWER:**    Defendants admit the allegations of Paragraph 129.

130.    On November 8, 2011, David L. Anders, an attorney for Hall, sent a fax to Dr. Angelopoulos's counsel promising to "formulate a response" to the October 25, 2011 letter and "forward same to you in the near future." (See Ex. G.)

**ANSWER:**    Defendants lack sufficient information with which to admit or deny the veracity of the allegations of Paragraph 130. To the extent that an answer is required, Defendants deny the allegations of Paragraph 130.

131.    On November 17, 2011, having received no response from Mr. Anders, counsel for Dr. Angelopoulos sent a follow-up letter seeking a date certain when Hall would respond to the demand for payment.

**ANSWER:**    Defendants lack sufficient information with which to admit or deny the veracity of the allegations of Paragraph 131. To the extent that an answer is required, Defendants deny the allegations of Paragraph 131.

132.    Neither Hall nor Keystone responded. (See Ex. I.)

**ANSWER:**    Defendants lack sufficient information with which to admit or deny the veracity of the allegations of Paragraph 132. To the extent that an answer is required, Defendants deny the allegations of Paragraph 132.

### Fraudulent Concealment

133.    From 2004 to the present Defendants and their agents and representatives have fraudulently and actively concealed the nature and existence of the fraudulent scheme from Dr. Angelopoulos.

**ANSWER:**    Defendants deny the allegations of Paragraph 133.

134.    Among the acts of fraudulent concealment committed by the Defendants and their

agents and representatives are the following.

**ANSWER:**     Defendants deny the allegations of Paragraph 134.

135.     Throughout the period 2004-2007, Defendants refused to provide justification or backup for the expenses charged to Dr. Angelopoulos in the Keystone "P&Ls" and refused to provide access to the computerized ledger for Keystone and for Keystone's bank records, despite Drs. Angelopoulos's Weber's and Chang's repeated requests for this backup and other information supporting these expenses.

**ANSWER:**     Defendants deny the allegations of Paragraph 135.

136.     Throughout the period 2004-2007, Hall concealed the nature of his and his family members' interest in companies which did business with Keystone and WACHN, including MedStaff, Vertical Plus, Midwest Diagnostics, Hall M.D.S.C. and others, and concealed the nature of the relationship between Hall's other companies and Keystone.

**ANSWER:**     Defendants deny the allegations of Paragraph 136.

137.     Throughout the period 2004-2007, Defendants concealed their accounting practices of shifting expenses from Hall's other companies to Keystone.

**ANSWER:**     Defendants deny the allegations of Paragraph 137.

138.     Throughout the period 2004-2007, Defendants concealed their practice of Keystone paying the expenses for Hall's other companies and/or providing interest-free loans to Hall's other companies by fronting these expenses and then engaging in undocumented set-offs and credits many months later.

**ANSWER:**     Defendants deny the allegations of Paragraph 138.

139.     From 2004-2013, Defendants concealed from Dr. Angelopoulos that he had filed false documents concerning the ownership of Keystone with the IRS.

**ANSWER:**     Defendants deny the allegations of Paragraph 139.

140.     From 2006-2013, Defendants concealed from Dr. Angelopoulos that he was not in fact listed as a member of WACHN on the records of the Illinois Secretary of State, although he was being treated as a member for the purpose of charging WACHN's expenses to him.

**ANSWER:**     Defendants deny the allegations of Paragraph 140.

141.     In 2008, unbeknownst to Drs. Angelopoulos, Weber, and Chang, Hall and WACHN requested Great Lakes Bank to remove Drs. Angelopoulos, Chang and Weber as personal guarantors on the $2 million in loans to WACHN on the grounds that they were no longer members of WACHN. After Great Lakes Bank denied this request, Hall and WACHN

took no further steps to refinance the debt to remove the doctors as personal guarantors, but rather, continued to conceal from Drs. Angelopoulos, Chang and Weber that they remained guarantors on the loan even though, according to Hall, Dr. Angelopoulos and the other physicians had no interest in or association with WACHN.

**ANSWER:**     Defendants deny the allegations of Paragraph 141.

142.     In 2010, Hall caused WACHN to pledge the medical condominium building for which Angelopoulos remained a personal guarantor for a $4.69 million loan from Centier Bank issued to Varsity Medical Center, LLC, a company owned by Hall, concealing the entire transaction from Dr. Angelopoulos, thereby benefitting himself.

**ANSWER:**     Defendants deny the allegations of Paragraph 142.

143.     In November 2011, Hall caused his counsel to represent that they would be responding to the October 25, 2011 letter in the near future when in fact Hall had no such intention and never did respond to the letter.

**ANSWER**:     Defendants lack sufficient information from which to admit or deny the veracity of the allegations of Paragraph 143.  To the extent that an answer is required, Defendants deny the allegations of Paragraph 143.

**COUNT THREE**
**Breach of Fiduciary Duty (Hall)**

160.     Dr. Angelopoulos incorporates and re-alleges the foregoing allegations.

**ANSWER:**     Defendants restate and reallege their objections and answers to the foregoing allegations.

161.     Hall owed a fiduciary duty to Dr. Angelopoulos in Keystone and WACHN as follows:

   a.   Hall owed a fiduciary duty to Dr. Angelopoulos in both Keystone and WACHN due to the special circumstances of Hall and Dr. Angelopoulos's relationship. Hall had a significant degree of dominance and superiority over Dr. Angelopoulos in that Hall controlled the finances of Keystone and WACHN, determined the amount of money Dr. Angelopoulos was required to pay in expenses, and determined the amount of money Dr. Angelopoulos was entitled to in income. As a result, Dr. Angelopoulos reposed trust and confidence in Hall to conduct himself with the utmost honesty and fidelity for the benefit of Keystone and WACHN. This disparity in power was even greater because Hall did not allow Dr. Angelopoulos access to the books and records of Keystone or WACHN or to the backup to the income and expenses listed in the "P&Ls" to determine whether the

income and expenses allocated to Dr. Angelopoulos were accurate.

   b.   As a matter of law as to WACHN pursuant to 805 ILCS 180/15-3 and the common law because Dr. Angelopoulos and Dr. Hall were members of WACHN.

   c.   As a matter of law as to Keystone because Dr. Angelopoulos was a de facto partner of Keystone based on 1) Hall's agreement with Dr. Angelopoulos at their initial meeting in December 2003 that he would be a Keystone partner, 2) Hall's representations to Dr. Angelopoulos throughout his association with Keystone that he was a partner, 3) Hall's representations that members of WACHN would be partners in Keystone and Dr. Angelopoulos's investment of capital as a member of WACHN in reliance upon such representation, 4) Dr. Angelopoulos' investment in Keystone, 5) Dr. Angelopoulos's share in Keystone's income and profits, and 6) Dr. Angelopoulos's payment of Keystone's expenses, including expenses relating to the purchase of expensive medical equipment for Keystone and physical improvements to its facility, Keystone was a de facto partnership, and Dr. Angelopoulos was a partner of Keystone notwithstanding the corporate filings.

   d.   As a matter of law as to Keystone because Dr. Angelopoulos was a de facto shareholder of Keystone based on 1) Hall's representations that Dr. Angelopoulos would be an owner of Keystone, 2) Hall's representations that members of WACHN would be owners of Keystone and Dr. Angelopoulos's investment of capital as a member of WACHN in reliance upon such representation; 3) Dr. Angelopoulos' investment in Keystone, 4) Dr. Angelopoulos's share in Keystone's income and profits, and 5) Dr. Angelopoulos's payment of Keystone's expenses, including expenses relating to the purchase of expensive medical equipment for Keystone and physical improvements to its facility, Dr. Angelopoulos was a shareholder of Keystone

**ANSWER:**    Paragraph 161 states a legal conclusion, to which no answer is necessary.  To the extent that an answer is required, Defendants deny the allegations in Paragraph 161.

    162.    These fiduciary duties include the duty of care, the duty to act in good faith, the duty of loyalty, the duty of honesty, the duty of fairness in all dealings and transactions related to the partnership, and the duty to disclose all information relating to the fiduciary relationship.

**ANSWER:**    Defendants deny that they owed any fiduciary duties to Plaintiff.  Defendants further deny the remaining allegations of Paragraph 162.

    163.    Hall knowingly and intentionally breached these duties to Dr. Angelopoulos by conduct described in detail in Paragraphs 39-124 including but not limited to the following:

   a.   Mischarging and inflating Keystone and WACHN expenses; underreporting income;

b.   mischarging an exorbitant "administrative fee" for Hall's role in Keystone;

c.   commingling funds between Keystone and WACHN and Hall's various other companies;

d.   engaging in transactions where Hall represented Keystone or WACHN on one side and his other companies on the other that were unfair to Keystone (and, therefore, to Dr. Angelopoulos);

e.   failing to offer Plaintiff employee benefits available to other employees of an affiliated service group consisting of Keystone, WACHN, or Hall MDSC;

f.   concealing financial records from Dr. Angelopoulos bearing on Dr. Angelopoulos's compensation and interest in the companies;

g.   withholding amounts due and owing to Dr. Angelopoulos upon his departure from Keystone and WACHN;

h.   continuing to reap the benefits of Dr. Angelopoulos's personal guaranty of the WACHN loan while knowing that Dr. Angelopoulos was no longer a member of WACHN.

**ANSWER:**   Defendants deny that they owed any fiduciary duties to Plaintiff and consequently further deny that they breached any such duties.  Defendants deny the remaining allegations of Paragraph 163.

164.   Hall's acts or omissions were willful and wanton and were committed or omitted with conscious indifference to existing circumstances and conditions.

**ANSWER:**   Paragraph 164 states a legal conclusion to which no answer is required.  To the extent that an answer is required, Defendants deny the allegations of Paragraph 164.

165.   Dr. Angelopoulos suffered damages proximately caused by these breaches in unpaid income, expenses that were wrongly charged to him; and in his interest in Keystone, including, its equipment, and its facilities, and in his interest in WACHN, for which he was not compensated.

**ANSWER:**   Defendants deny the allegations of Paragraph 165.

## COUNT FOUR
### 805 ILCS § 180/35-65 Action to Determine the Buyout Price of Dr. Angelopoulos's Interest in WACHN (WACHN)

166.   Dr. Angelopoulos incorporates and re-alleges the foregoing allegations.

**ANSWER:**     Defendants restate and reallege their objections and answers to the foregoing

allegations.

167.     Dr. Angelopoulos had an ownership stake in WACHN.

**ANSWER:**     Defendants admit that Plaintiff at one time held an ownership interest in

WACHN.

168.     In or around October 2007, Dr. Angelopoulos exercised his right to dissociate
from WACHN.

**ANSWER:**     Defendants deny the allegations of Paragraph 168.

169.     Dr. Angelopoulos's dissociation was legal and proper.

**ANSWER:**     Defendants deny the allegations of Paragraph 169.

170.     WACHN is a limited liability company. At relevant times, WACHN did not have
an operating agreement. WACHN thus operated at relevant times under the terms of the Illinois
Limited Liability Company Act, 805 ILCS 180/1, et seq. (the "Act").

**ANSWER:**     Defendants admit that WACHN is a limited liability company.  Defendants deny

the remaining allegations of Paragraph 170.

171.     Under Section 35-60(a) of the Act, the company "shall purchase a distributional
interest of a member for its fair value determined as of the date of the member's dissociation if
the member's dissociation does not result in a dissolution and winding up of the company's
business . . ."

**ANSWER:**     Paragraph 171 states a legal conclusion to which no answer is required.  To the

extent that an answer is required, Defendants deny the allegations of Paragraph 171.

172.     Dr. Angelopoulos's dissociation did not result in WACHN's dissolution or a
winding up of the company's business. Nevertheless, WACHN failed to purchase Dr.
Angelopoulos's distributional interest for fair value determined as of the date of Dr.
Angelopoulos's dissociation.

**ANSWER:**     Defendants admit that WACHN has not dissolved or wound up its business at any

time.  Defendants deny that Plaintiff dissociated from WACHN.  Further answering, Defendants

33

state that Plaintiff forfeited his ownership interest in WACHN on or around January 10, 2008.

Defendants deny any remaining allegations of Paragraph 172.

173.    WACHN has never made an offer to purchase Dr. Angelopoulos's distributional interest in WACHN that complies with 805 ILCS 180/35-60.

**ANSWER:**    Paragraph 157 states a legal conclusion to which no answer is required.  To the

extent that an answer is required, Defendants deny the allegations of Paragraph 173.

174.    Hall and WACHN have acted and continue to act in a manner that is oppressive and fraudulent with respect to Dr. Angelopoulos.

**ANSWER:**    Defendants deny the allegations of Paragraph 174.

175.    Hall and WACHN acted arbitrarily, vexatiously and not in good faith.

**ANSWER:**    Defendants deny the allegations of Paragraph 175.

## COUNT FIVE
### Alternative Count for Breach of the WACHN Contract (Hall and WACHN)

176.    Dr. Angelopoulos incorporates and re-alleges the foregoing allegations.

**ANSWER:**    Defendants restate and reallege their objections and answers to the foregoing

allegations.

177.    In the alternative, if the Court finds that the WACHN Operating Agreement, or portions of it, were valid (contrary to the allegations in ¶¶ 33 and 80), then Weber, Chang, Narcissi, Hall, and Plaintiff entered into a contract, the salient terms of which appear in a document entitled Operating Agreement, attached hereto as Exhibit J.

**ANSWER:**    Defendants admit that Drs. Weber, Chang, Narcissi, Hall and Plaintiff, as

members of WACHN, entered into an Operating Agreement which was later amended on

January 10, 2008.  Defendants deny that Exhibit J is the amended version of the WACHN

Operating Agreement.  Defendants deny the remaining allegations of Paragraph 177.

178.    In the event the Court finds that the Operating Agreement or some portion of it was the controlling agreement for WACHN, Dr. Angelopoulos seeks relief for breach of paragraph 9.1(f) of the Operating Agreement (Ex. J) because WACHN and/or its members failed to purchase Dr. Angelopoulos's shares within sixty days of his dissolution from WACHN.

**ANSWER:**     Defendants admit that Drs. Weber, Chang, Narcissi, Hall and Plaintiff, as members of WACHN, entered into an Operating Agreement which was later amended on January 10, 2008. Defendants deny that Exhibit J is the amended version of the WACHN Operating Agreement. Defendants deny the remaining allegations of Paragraph 178.

179.    As a direct and proximate result of WACHN's and/or Hall's breaches, Dr. Angelopoulos has suffered damages in an amount to be proved at trial.

**ANSWER:**     Defendants deny the allegations of Paragraph 179.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (UNCLEAN HANDS)

Plaintiff is barred from obtaining any recovery on his allegations on the basis of the doctrine of unclean hands.

### Second Affirmative Defense
### (LACHES)

Plaintiff is barred from obtaining any recovery on his allegations on the basis of the doctrine of laches.

### Third Affirmative Defense
### (FAILURE TO STATE A CLAIM)

Plaintiff has failed to state a claim upon which relief may be granted.

### Fourth Affirmative Defense
### (PLAINTIFF'S OWN CONDUCT)

Damages or injuries, if any, suffered by Plaintiff are attributable to Plaintiff's own conduct, deeds, acts, words and omissions, and not to any conduct, deeds, acts, words or omissions of the Defendants.

### Fifth Affirmative Defense
### (FAILURE TO MITIGATE)

Plaintiff is barred from obtaining any recovery on the basis that he failed to mitigate his damages.

WHEREFORE, Defendants, KEYSTONE ORTHOPEDIC SPECIALISTS, S.C., WACHN, LLC and MARTIN R. HALL, M.D. respectfully request that this Court enter a judgment in their favor and against Plaintiff, NICHOLAS ANGELOPOULOS, D.O., dismissing Counts III, IV and V of Plaintiff's Third Amended Complaint, and for any other relief this Court deems just and appropriate in Defendants' favor.

## COUNTERCLAIM

Counter-Plaintiffs KEYSTONE ORTHOPEDIC SPECIALISTS, S.C. ("Keystone"), WACHN, LLC ("WACHN"), and MARTIN R. HALL, M.D. ("Dr. Hall") (collectively referred to as the "Defendants"), by and through their attorneys, and for their counterclaim against Counter-Defendant Nicholas Angelopoulos, D.O., ("Counter-Defendant"), plead as follows:

### THE PARTIES

1.     On information and belief, Counter-Defendant is a resident of Illinois.

2.     Keystone is an Illinois professional service corporation with its principal place of business located in Hazel Crest, Illinois.

3.     Dr. Hall is a resident of Illinois.  Dr. Hall is licensed to practice medicine in Illinois and, at all relevant times, was the president and secretary of Keystone and managing member of WACHN.

4.     WACHN is an Illinois limited liability company with its principal place of business located in Hazel Crest, Illinois.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. §1367.

6.      Venue is proper under 28 U.S.C. §1391(b)(1) because Keystone, WACHN, Dr. Hall and Counter-Defendant reside in this judicial district.  Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the counterclaims occurred in this judicial district, or because a substantial part of the property that is the subject of this action is situated in this judicial district.

## BACKGROUND

### Keystone

7.      Dr. Hall established Keystone in 1992 as a professional service corporation offering medical services in Illinois.  Keystone specialized in orthopedics, a medical field relating to the treatment of conditions affecting the muscular-skeletal system.

8.      Keystone has at all relevant times had a single shareholder, Dr. Hall, who owns 100 percent of Keystone's shares.

9.      Neither Counter-Defendant, nor any other individual or entity ever held an ownership interest in Keystone.

10      From January 2004 through September 30, 2007, Counter-Defendant worked at Keystone as an anesthesiologist.  Counter-Defendant worked under Keystone's tax identification number as an employee.

11.      Dr. Weber and Dr. Chang, both physicians, were also employed at Keystone.

12.      In or around the beginning of 2004, Dr. Weber and Dr. Chang were each responsible for paying 25 percent of Keystone's expenses.  When Counter-Defendant began working at Keystone, he too was responsible for paying 25 percent of Keystone's expenses.  The

share of expenses for Counter-Defendant, Drs. Weber and/or Chang was increased to 26.5 percent in 2004, and Dr. Hall's share was decreased to 20.5 percent in consideration of the administrative matters he regularly handled for Keystone.

13.     When Dr. Chang left the practice in or around the third quarter of 2007, Counter-Defendant's share of the Keystone expenses rose to 34.83 percent.

14.     In or around November 2007, Counter-Defendant stopped working at Keystone and failed to pay approximately two months of Keystone's overhead expenses, which was required as a term of his employment at Keystone.

15.     Since Dr. Weber and Dr. Chang had already left Keystone by October 2007, Counter-Defendant was responsible for 51.5% of Keystone's overhead expenses for the period of October 1, 2007 through November 30, 2007.

16.     Further, Counter-Defendant also failed to pay his $100,000.00 Keystone share which the other Keystone physicians had paid on his behalf until he could repay them. Counter-Defendant also left Keystone with significant debt related to employees who were hired to work with Counter-Defendant and medical equipment that only Counter-Defendant used. Indeed, Counter-Defendant caused Keystone to incur debt for retaining an OEC C-arm worth approximately $125,000, a C-arm radiolucent procedure table worth approximately $50,000, and a Smith and Nephew radio frequency ablator worth approximately $50,000.

## WACHN

17.     In or around 2004, WACHN was formed. WACHN is a limited liability company registered in Illinois and its primary purpose was to purchase and maintain a series of medical suites where Keystone would operate its medical practice and rent remaining space to tenants.

18.     WACHN was, during most of the relevant time period, equally owned by Dr.

Weber, Counter-Defendant, Dr. Chang, Dr. Hall and Dr. Phillip Narcissi, which each member owning 20 percent of WACHN's assets. Each letter in WACHN's name stands for the first letter in each of its member's last names: W - Weber, A - Angelopoulos, C - Chang, H - Hall, N-Narcissi.

19.     Dr. Hall was the managing member of WACHN. As managing member, Dr. Hall required each of the physicians to contribute 20 percent of the purchase price of the building and 20 percent of the significant improvements to the building and further required that each member issue personal guarantees for the loan used to fund the purchase.

20.     WACHN purchased medical condominiums located at 3330 West 177th Street, Hazel Crest, Illinois. WACHN purchased this real estate with two mortgages in the amount of $1,448,000 and $593,740 with Great Lakes Bank. For WACHN to obtain these mortgages, Counter-Defendant and the other Keystone physicians were required to contribute $111,000 each. Each also signed a personal guaranty for the entire amount of the loan. WACHN was successful in obtaining the mortgages from Great Lakes Bank.

21.     Counter-Defendant provided Dr. Hall a letter dated October 10, 2007, in which he indicated that he would no longer bill under Keystone's tax identification number, but that he intended to continue working at Keystone on his own tax identification number and would remain a member of WACHN. However, Counter-Defendant ceased being a member of WACHN on or around January 10, 2008 when the WACHN Operating Agreement was amended.

22.     At the time he left Keystone and WACHN, Counter-Defendant failed to pay his full share of the WACHN loan to Great Lakes Bank, which equaled a sum of $111,000.00. Counter-Defendant previously contributed $83,000 and Keystone was erroneously charged for

the difference of $28,000.00.  Counter-Defendant understood that he had to repay Keystone, but never did.

23.     Counter-Defendant also failed to pay his share of WACHN expenses for October and November 2007 of $12,122.00, which was necessary to pay WACHN's mortgage, association dues, taxes and utilities.

24.     Under WACHN's Amended Operating Agreement dated January 10, 2008, a majority rule vote can be used to vote out any member resulting in a forfeiture of that member's ownership and deposit of $111,000.00.  A majority rule vote was used in the case of Counter-Defendant to vote him out, resulting in a forfeiture of his ownership and deposit.

## COUNT I
## BREACH OF OPERATING AGREEMENT

25.     Dr. Hall and WACHN incorporate and re-allege the foregoing allegations in Paragraphs 1 through 24.

26.     On January 1, 2005, an Operating Agreement of WACHN was made and entered into with Dr. Hall, Dr. Chang, Dr. Weber, Dr. Narcissi and Counter-Defendant, who were each considered a member of WACHN.  A true and correct copy of the Operating Agreement of WACHN, LLC (hereinafter "Original WACHN Operating Agreement") is attached as **Exhibit "A"**.

27.     On June 29, 2007, a meeting was held by and between the members of WACHN. Present at that meeting were Drs. Weber, Angelopoulos, Chang and Narcissi.  The members present at that meeting agreed, in relevant part, that Section 7.5 and other sections of the Original WACHN Operating Agreement, which referred to shareholder status in Keystone shall be declared null and void as not all members of WACHN were shareholders in Keystone.  The members further agreed that WACHN had, in fact, operated in violation of Section 7.5 of the

40

Original WACHN Operating Agreement since WACHN's inception, because not all members of WACHN were shareholders in Keystone. All members present at the meeting unanimously agreed to declare Section 7.5 and other sections of the Original WACHN Operating Agreement, which refer to shareholder status in Keystone null and void. A true and correct copy of the Summary of WACHN Member Meeting is attached as **Exhibit "B"**.

28. On January 10, 2008, an Amendment of the Operating Agreement of WACHN was passed. A true and correct copy of the Amendment of WACHN, LLC Operating Agreement (hereinafter "Amended WACHN Operating Agreement") is attached as **Exhibit "C"**.

29. Article 9.1(f) of the Amended WACHN Operating Agreement provided as follows:

> 9.1(f) Any member upon Vacating the WACHN, LLC premises at 3330 177th street and failing to monetarily contribute to the financial responsibility of WACHN, LLC including but not exclusive to the Mortgage, Taxes and association responsibilities shall immediately forfeit any cash contribution and any share ownership set forth in this agreement. The redistribution of ownership shall be decided by remaining Members.

> 9.2(f) Dissociated price, current language will be completely removed, voided and will state, A Member vacating WACHN, LLC premises without continuing to contribute financially to the expenses and Debt obligations of WACHN, LLC and continues to do so for 30 days beyond the date of vacating the premises immediately and irrevocably forfeits any and all cash contributions and ownership. This section supersedes any and all portions of this agreement pertaining to ownership and contributions. Per 8.5, the Member shall not be released from liability to the Company under this agreement and is in fact responsible for any and all debt accrued while Member occupied WACHN, LLC premises until that debt obligation has been completely met and retired and released by but not solely from Great Lakes Bank.

30. The Original WACHN Operating Agreement, Summary of WACHN Member Meeting and Amended WACHN Operating Agreement are legally valid, binding and enforceable

documents.

31.     Dr. Hall, Dr. Weber, Dr. Chang and Dr. Narcissi performed all of their obligations pursuant to the Original WACHN Operating Agreement and Amended WACHN Operating Agreement.

32.     Counter-Defendant materially breached the terms of the Amended WACHN Operating Agreement by failing to pay all debt accrued during the time Counter-Defendant occupied the WACHN premises, including but not limited to the Mortgage, Taxes and Association responsibilities of WACHN to Great Lakes Bank.

33.     As a result, Counter-Defendant has forfeited any ownership interest in WACHN.

34.     Counter-Defendant has no legally recognized justification or excuse for breaching the terms of the Amended WACHN Operating Agreement.

35.     As a direct and proximate cause of Counter-Defendant's breach of the Amended WACHN Operating Agreement, Dr. Hall and WACHN have suffered damages in an amount to be proven at trial.

36.     Counter-Defendant is also liable for Dr. Hall and WACHN's attorney's fees, costs and other expenses incurred in connection with enforcement of the Amended WACHN Operating Agreement.

WHEREFORE, Counter-Plaintiffs WACHN, LLC and MARTIN R. HALL, M.D. pray for the entry of judgment in their favor and against Counter-Defendant Dr. Angelopoulos as follows:

(a)     A finding that Counter-Defendant breached the terms of the Amended Operating Agreement of WACHN, LLC;

(b)     A damages award in an amount to be proven at trial, plus all additional fees, costs

and other expenses, including but not limited to, attorney's fees and costs until the entry of judgment; and

(b)     And for such other relief as the Court deems just and appropriate.

## COUNT II
## BREACH OF CONTRACT

37.     Keystone incorporates and re-alleges the foregoing allegations in Paragraphs 1 through 24 .

38.     Counter-Defendant was employed at Keystone during the relevant time period pursuant to the terms of the employment agreement with Keystone.

39.     The initial terms of Keystone's employment agreement with Counter-Defendant were as follows: Counter-Defendant agreed to pay 25 percent of Keystone's expenses, with the understanding that the percentage could increase or decrease based on the number of physicians employed at Keystone amongst whom the expenses would be divided; Counter-Defendant would receive revenues generated by his own patient billings plus 25 percent of certain other non-physician revenues generated by Keystone minus Counter-Defendant's 25 percent share of the expenses (which rose to 26.5 percent later in 2004); Counter-Defendant would receive a monthly salary of $25,000.00; and upon resignation, Keystone would pay to Counter-Defendant the following assuming he did not have any outstanding debt to Keystone:  Counter-Defendant's contribution amount to the cash reserves and any accounts receivables from Counter-Defendants' patients.

40.     In or around early 2004, Counter-Defendant accepted Keystone's terms of employment and informed Keystone of his acceptance of the terms.

41.     Keystone provided valuable consideration in exchange, including but not limited

to a generous monthly salary of $25,000.00.

42.     This agreement was in force at all times during Counter-Defendant's employment at Keystone.

43.     Keystone fully performed its obligations under the terms of the agreement.

44.     In or around the third quarter of 2007, Dr. Chang left Keystone and Counter-Defendant's share of the Keystone expenses rose to approximately 34.83 percent.  By October 2007, Dr. Weber had also left Keystone and Counter-Defendant's share again rose, this time to approximately 51.5 percent of Keystone's expenses for the months of October and November 2007.

45.     Counter-Defendant breached his agreement with Keystone by conduct including but not limited to the following: failing to pay his $100,000.00 share owed to Keystone which Dr. Hall and the other physicians agreed to pay with the understanding that Counter-Defendant would repay them; failing to pay $28,000.00 for his share of the WACHN mortages which Great Lakes Bank erroneously charged to Keystone; failing to pay $9,445 to Midwest Diagnostics that Counter-Defendant had been erroneously creditor for; failing to pay Keystone $151,769.02 for Counter-Defendant's share of expenses; and failing to pay for the equipment Counter-Defendant abandoned, including an OEC C-arm, C-arm radiolucent procedure table, and Smith and Nephew radio frequency ablator which cost Keystone approximately $225,000.

46.     As a direct and proximate result of Counter-Defendant's breach of his agreement with Keystone, Keystone has suffered damages in an amount to be proven at trial.

WHEREFORE, Counter-Plaintiff KEYSTONE ORTHOPEDIC SPECIALISTS, S.C. prays for the entry of judgment in its favor and against Counter-Defendant Dr. Angelopoulos as follows:

a.   A finding that Counter-Defendant breached the terms of his employment agreement with Keystone;

b.   A damages award in an amount to be proven at trial, plus all additional fees, costs and other expenses, including but not limited to, attorney's fees and costs until the entry of judgment; and

c.   Other such relief as the Court deems just and appropriate.

Respectfully submitted,

KEYSTONE ORTHOPEDIC SPECIALISTS, S.C., WACHN LLC, and MARTIN R. HALL, M.D.,

By:    _____*/s/ Naureen Amjad*_____
          One of Their Attorneys

Arthur Holtzman (#1252844)
Naureen Amjad (#6295770)
PEDERSEN & HOUPT
161 North Clark Street
Suite 2700
Chicago, Illinois 60601
(312) 641-6888
aholtzman@pedersenhoupt.com
namjad@pedersenhoupt.com