IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-5836 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| KEYSTONE ORTHOPEDIC SPECIALISTS, S.C., WACHN, LLC, and MARTIN R. HALL, M.D., | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Nicholas Angelopoulos ("Plaintiff"), an anesthesiologist, brings suit against his former business associate, Martin R. Hall ("Hall"), and the two businesses in which they were associates, Keystone Orthopedic Specialists, S.C. ("Keystone"), and Wachn, LLC ("WACHN") (collectively, "Defendants"), for their alleged participation in a fraud to deprive Plaintiff of money to which he was entitled.[1] In his governing Third Amended Complaint [222], Plaintiff alleges claims against Defendants for fraudulently filing an information return in violation of 26 U.S.C. § 7432 (Count One); common law fraud (Count Two); breach of fiduciary duty (Count Three); breach of contract (Counts Five and Six); and unjust enrichment (Count Seven). Plaintiff also seeks a determination of the fair value of his distributional interest pursuant to 805 ILCS § 180/35-65 (Count Four). Defendants bring counterclaims against Plaintiff for breach of the purported WACHN Operating Agreement (Count I) and breach of contract (Count II). Currently before the Court is Defendants' motion for summary judgment [269], which is directed at all counts except Count I of Defendants' counterclaims. For the reasons stated below, Defendants'

---

[1] Ira K. Dubin and Ira K. Dubin Ltd. d/b/a Green Dubin & Co. were also named as defendants in this action, but were dismissed from the case with prejudice on September 10, 2014. See [191].

motion [269] is denied in full. This case is set for further status on September 20, 2016 at 9:15 a.m. Plaintiff's motion to set a trial date [300] will be heard at the same time.

I. Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements: (1) Defendants' Local Rule 56.1(a)(3) Statement of Facts [274]; (2) Plaintiff's Local Rule 56.1 Response and Statement of Additional Facts [284]; and (3) Defendants' Response to Plaintiff's 56.1 Statement of Additional Facts [294]. The following facts are undisputed except where otherwise noted.

Plaintiff and Hall are both medical doctors who reside and are licensed to practice medicine in Illinois. Plaintiff is a board-certified anesthesiologist and Hall specializes in orthopedics. In or around December 2003, Plaintiff met with Hall about joining Keystone as a physician. Keystone is an Illinois professional corporation with its principal place of business in Hazel Crest, Illinois and locations in Hazel Crest and Munster, Indiana. At all times relevant to this opinion, Hall was the president, secretary, and owner of Keystone. Keystone's Schedule K-1s list Hall as the 100% owner of Keystone's shares. The parties agree that Hall controlled Keystone.

Plaintiff and Hall entered into an oral contract, under which Plaintiff practiced medicine at Keystone from 2004 until late 2007. Two other doctors, Dr. Daniel Weber ("Weber") and Dr. Mark Chang ("Chang") also worked at Keystone. Pursuant to their oral agreement, Plaintiff and Hall agreed that Plaintiff would receive $25,000 per month as a draw and would receive revenues generated by his patient billings plus 25 percent of certain other revenues generated by Keystone, less Plaintiff's percent share of certain expenses, including equipment. The parties dispute whether Keystone purchased certain equipment, purportedly worth $225,000, for

Plaintiff's use or for the use of the practice. When Plaintiff joined Keystone, his share of the expenses was 25 percent; Hall, Weber, and Chang each paid 25 percent, as well. Later in 2004, Plaintiff's share of expenses rose to 26.5 percent as part of an agreement with Hall wherein Hall would pay a reduced 20.5% of the expenses in exchange for handling certain administrative duties for Keystone. The parties dispute whether their oral agreement gave Hall a right to unilaterally change its terms.

The parties dispute whether Plaintiff was a shareholder or partner in Keystone (as Plaintiff contends) or an employee of Keystone (as Defendants contend). Defendants point to evidence, for instance, that Keystone is an S-Corp, and assert that an S-Corp cannot have partners. Plaintiff points to a variety of documents in the record, including deposition testimony from Plaintiff, Dr. Chang, and Dr. Weber that they thought they were partners in Keystone (Plaintiff's binder of deposition exhibits, Angelopoulos deposition at 155-56; Chang deposition at 8, 27; Weber deposition at 56 (filed under seal)); Dr. Chang's resignation letter demanding that Keystone "repurchase Dr. Chang's 25% interest in Keystone at fair market value" (Plaintiff's binder of document exhibits, Ex. 63 at NA000087 (filed under seal)); a draft shareholder agreement (*id.* at Ex. 67); Keystone meeting agendas showing discussion of a partnership agreement and shareholder agreement (e.g., *id.* at Ex. 71); an email discussing changes to the partnership agreement (*id.* at Ex. 73); and Keystone profit and loss statements showing Hall, Chang, and Weber sharing Keystone's income (*id*. at Ex. 14).

The parties also dispute how many other employees Keystone had; Defendants point to deposition testimony that there were 10 to 15, while Plaintiff points to deposition testimony suggesting that the number was substantially higher—for example, Dr. Weber's testimony that

3

he thought there were up to 25 or 30 employees between 2004 and 2007. See Plaintiff's binder of deposition exhibits, Ex. N at 91 (filed under seal).

In 2004, Weber, Plaintiff, Chang, Hall, and Dr. Phillip Narcissi ("Narcissi") formed an Illinois limited liability company called WACHN. At all times relevant to this opinion, Hall was managing member of WACHN. Each of the five physicians was a 20 percent member of WACHN. The parties dispute whether Plaintiff ever entered into a valid operating agreement with WACHN. Plaintiff acknowledges that a draft "WACHN Operating Agreement" was prepared, but disputes that he agreed to or signed a draft. Instead, Plaintiff contends that his signature was forged in a draft (in part using signature stamps kept by Hall's secretary) and disputes the veracity of deposition testimony from bank employee Anthony Carollo ("Carollo") about witnessing the execution of the WACHN Operating Agreement.

WACHN purchased medical condominiums in Hazel Crest, Illinois, using two promissory notes and a mortgage in the total amount of $1,448,000 from Great Lakes Bank. WACHN also obtained a $593,740 construction loan from Great Lakes Bank to build out the space. In order to obtain the mortgage and promissory notes, each of the Keystone physicians was required to contribute $110,000 and to sign a personal guaranty for the entire amount of the loan. Plaintiff and the other physicians complied with these requirements, and WACHN obtained the mortgage and construction loan. The parties dispute whether, in order to obtain the loan, Hall represented to the bank that Plaintiff and the other physicians were each 25 percent owners in Keystone.

Around 2006, each of the physicians at Keystone was required to contribute $100,000 to a "cash reserve" in Keystone's account at Great Lakes Bank. The parties dispute the purpose of this contribution. Defendants contend that it was necessary to avoid paying checking fees to

4

Great Lakes Bank, while Plaintiff points to evidence that the $100,000 from each physician was a capital contribution for ownership shares in Keystone. Hall agreed with the other three physicians that once their respective share of the "cash reserve" equaled $100,000, net revenues generated from patient billings and non-physician revenues over and above their respective share of expenses would cease going into cash reserves and would be distributed to each of the Keystone physicians.

Pursuant to its oral agreements with the physicians, Keystone calculated the amount that each physician was supposed to receive after subtracting his share of expenses from his patient billings and cut of other Keystone revenues. The parties dispute who was primarily responsible for making allocation decisions of income and expenses among the Keystone physicians. Plaintiff contends that Hall and his family members made all decisions and refused to provide him and the other physicians with any documentation backing up the allocations. Defendants contend that Karen Balata ("Balata") and Debbi Aprati ("Aprati"), neither of whom are relatives of Hall, were the Keystone billing and collection employees responsible for making allocation decisions.

Keystone prepared profit and loss statements (which the parties also refer to as "bucket reports") to support their allocation decisions. Hall and Merritt Roalsen (who was Keystone's practice manager and Hall's brother-in-law) distributed Keystone's profit and loss statements to Plaintiff, Weber, and Chang on a quarterly basis. The statements were discussed at quarterly meetings attended by the physicians. Plaintiff questioned certain categories of expenses in the statements. Plaintiff contended that Defendants did not provide appropriate justifications or backup documentation for expenses including but not limited to advertising; automobile

5

expenses; donations; insurance; legal fees; office equipment; payroll taxes; and moving expenses. Plaintiff also disputed whether he received credit for all of his patient billings.

In 2007, Chang and Weber resigned from Keystone and dissociated from WACHN. Both reached agreements with Hall for any amounts that they were owed from Keystone and WACHN. When Chang left Keystone, Keystone increased Plaintiff's share of expenses to 34.8 percent. Plaintiff disputes that this increase was provided for in the parties' oral contract or that he ever agreed to the increase.

On October 10, 2007, Plaintiff gave Hall a letter stating that effective October 1, 2007, he would "no longer bill under the Keystone Orthopedic Specialists tax ID number," that he would "continue to practice within the space owned by WACHN as [he would] continue to be a WACHN member," and that he would "continue to use the office equipment, including X-ray and fluoroscopy equipment, as [he had] contributed to the purchase of this equipment." [284] at 15. Plaintiff practiced in WACHN's building until approximately November 30, 2007, at which time he vacated the building. The parties dispute whether there was any agreement under which Plaintiff would pay for expenses associated with using Keystone's equipment from October 10 to November 30. Plaintiff did not provide written notice that he was dissociating from WACHN, but contends that he provided oral notice two or three weeks after he left Keystone. Hall testified at his deposition as WACHN's corporate representative that he considered Plaintiff to have dissociated himself from WACHN.

Following his dissociation, Plaintiff was not removed or released from personal liability as a guarantor of WACHN's building loan from Great Lakes Bank.

Around March 3, 2008, Hall provided Plaintiff with a hand-written tabulation showing that Plaintiff had an alleged "expense debt" to Keystone in the amount of $151,769.02. Hall

6

applied Plaintiff's $110,000 equity investment in WACHN to the alleged expense debt and offered to "forget" the remaining $40,769.02 that Plaintiff allegedly owed if Plaintiff would sign over his interest in WACHN to Hall. The parties dispute whether Hall's tabulation was "phony," as Plaintiff contends. [294] at 27. Plaintiff rejected Hall's proposal.

Sometime thereafter, Keystone issued a Form 1099-MISC for tax year 2007, which reported payment of $159,577.45 to Plaintiff. Hall gave his accountants, Green Dubin & Co., the amount to put on the tax form. Defendants contend that the payment reported in the 1099-MISC included $100,000 that Plaintiff still owed to cash reserves and $28,000 that Plaintiff still owed for his share of the WACHN down payment. Plaintiff disputes that he owed these amounts and contends that he already made all required contributions. Defendants also contend that the payment reported in the 1099-MISC included a $38,010.45 "bonus" that they chose to give to Plaintiff even though he had not earned it. Plaintiff disputes that he was ever given such a bonus and provides evidence that this amount was earned income.

On June 7, 2011, the IRS issued Plaintiff a Notice of Deficiency informing him that he had failed to pay taxes due and owing on the $159,577.45 that Keystone reported on the Form 1099-MISC for tax year 2007. Plaintiff challenged the deficiency notice in tax court. In 2012, Plaintiff and the IRS resolved the case by settlement. As part of the settlement, they agreed that of the total amount reported on the Form 1099-MISC, Plaintiff did not earn and/or receive non-employee compensation in the amount of $121,567.

In this litigation, Plaintiff and Defendants have each hired an expert to assess whether Keystone's profit and loss statements and Form 1099-MISC contained false or fraudulent information and expenses (as Plaintiff contends) or instead accurately disclosed Keystone's income and expenses and calculated Plaintiff's share of the same (as Defendants contend). It

7

appears from the parties' briefs and statements of fact that their experts disagree on nearly everything, including basic factual predicates such as whether Plaintiff contributed his $100,000 for Keystone's cash reserves. See [283] at 9; [294] at 19-20. The experts also disagree on which accounting methodology is appropriate to use, whether certain of Keystone's expenses were properly disclosed to the physicians, whether those expenses were reasonable, and whether those expenses were properly attributed to Keystone rather than the other companies owned by Hall. For instance, Plaintiff's expert contends that it was inappropriate for Hall and Keystone to charge 100% of Roalsen's salary and travel expenses to Keystone, because Roalsen also did significant work for Hall's other companies, including Hall M.D., S.C., Vertical Plus, and MedStaff. Defendant and his expert contend that Roalsen devoted substantially all of his time during the work week to Keystone (and worked for the other companies primarily on the weekends) and that his $100,000 salary was reasonable compensation for his position at Keystone. See [294] at 10-11. Similarly, Plaintiff's expert opines that it was inappropriate for Keystone to charge 90% of its expenses for a computer system ("Misys") to Keystone, despite the fact that 2/3 of the Misys licenses were issued to Keystone and 1/3 were issued to Vertical Plus MRI (a company owned by Hall and Roalsen). See [294] at 18. Defendants' expert argues that the allocation was proper because Keystone was the single largest user of the equipment. *Id.* As another example, Plaintiff's expert contends that it was inappropriate for Keystone to pay Vertical Plus MRI $600-$700 per hour for MRI time because this was higher than the rate Vertical Plus MRI charged all its other lessees. See [294] at 12-13. The experts also disagree on whether the mortgage and maintenance expenses of a house in Homewood, Illinois were properly charged to Keystone, with Defendants contending that the house was used to store medical records and Plaintiff contending that this was never disclosed to or agreed to by him. See [294] at 17.

8

## II.     Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III.	Analysis**

    **A.	Violation of 26 U.S.C. § 7434 (Count One)**

26 U.S.C. § 7434 authorizes a plaintiff to "bring a civil action for damages" against any other person who "willfully files a fraudulent information return with respect to payments purported to be made" to the plaintiff. In this case, Plaintiff alleges that Defendants violated Section 7434 by knowingly filing a false and fraudulent Form 1099-MISC reporting that Plaintiff had earned $159,577.45 in miscellaneous income for 2007. Defendants argue that they are entitled to summary judgment on this claim because (1) the 1099-MISC is not one of the nine types of information returns listed in 26 U.S.C. § 6724(d)(1)(A) which can be remedied through a Section 7434 action; (2) the evidence establishes at most that the Form 1099-MISC contained an inaccurate amount, which is insufficient to state a claim under 26 U.S.C. § 7434; and (3) Plaintiff has no evidence that Defendants were deceitful or lacked good faith when they submitted the Form 1099-MISC to the IRS.

The Court concludes that Plaintiff is not entitled to summary judgment on this claim. First, the Court already thoroughly considered and rejected Defendants' argument that the 1099-MISC is not one of the nine types of information returns listed in 26 U.S.C. § 6724(d)(1)(A). The Court will not repeat its analysis here and refers the parties to its earlier opinion. See [82] at 10-13.

Turning to Defendants' second argument, the Court concludes that there are genuine issues of material fact in dispute concerning whether the Form 1099-MISC contained false and fraudulent information. For example, the Form 1099-MISC reported $100,000 that, according to Defendants, was forgiven debt for cash reserves that Plaintiff was required but failed to pay to Great Lakes Bank. But according to Plaintiff and his expert's analysis of Keystone's "bucket

10

reports," Plaintiff already paid the $100,000 in the first quarter of 2006. See [283] at 8. Assuming that Plaintiff's version of events is true, as the Court must for purposes of summary judgment, it supports Plaintiff's theory that the Form 1099-MISC was false and fraudulent.

Finally, the Court concludes that there are genuine issues of material fact in dispute concerning whether Defendants acted willfully when they submitted the Form 1099-MISC. Plaintiff points to circumstantial evidence that (a) he did not owe the amounts that Hall claimed he did; (b) Hall has not provided any back-up documentation for the amounts listed in the Form 1099-MISC; (c) Defendants submitted the Form 1099-MISC only after Plaintiff refused to accept Hall's offer to "forgive" Plaintiff's unpaid balance of $40,769.02 in exchange for Plaintiff signing his interest in WACHN to Hall; and (d) the IRS settlement with Plaintiff recognized that Plaintiff had not earned $121,567 of the $159,577.45 listed on the Form 1099-MISC. Construing all evidence and making all inferences in favor of Plaintiff, the Court concludes that Plaintiff has adequately identified "circumstantial evidence to support a reasonable inference of the requisite intent"—in this case, willfulness. *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1195 (N.D. Ill. 2000). Therefore, Defendants are not entitled to summary judgment on Count I of Plaintiff's Third Amended Complaint.

### B. Common Law Fraud (Count Two)

The elements of fraud under Illinois common law are "'(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013) (quoting *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 591 (Ill. 1996)). Plaintiff alleges that Defendants committed common law fraud by, among other

11

things, making false statements of fact in their profit and loss statements and falsely representing to Plaintiff that he still owed $100,000 for cash reserves and other expenses following his departure from Keystone. See [222] at 31-33.

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for common law fraud because "Plaintiff has entirely failed to show any evidence of fraud against Dr. Hall, WACHN or Keystone" and has "offered no evidence as to Defendants' state of mind." [270] at 19-20.

The Court concludes that Defendants are not entitled to summary judgment on Plaintiff's claim for common law fraud because Plaintiff has identified ample evidence from which a reasonable juror could conclude that Defendants knowingly made false statements to Plaintiff in their profit and loss statements to induce Plaintiff to accept less money than he was owed under the terms of the parties' oral contract. For instance, Plaintiff identifies evidence that Hall and his family members determined the allocations to which each doctor was entitled; that Plaintiff and the other Keystone physicians were restricted from accessing Keystone's allocations; and that Hall actively concealed the backup documentation for the allocations and rebuffed the physicians' repeated requests for backup documentation. Plaintiff and his expert also identify specific charges that they believe were fake, too high, or should have been paid by Hall's other business. See [283] at 13-14. Finally, as discussed in the prior section, Plaintiff has also identified evidence from which a reasonable juror could conclude that Defendants knowingly made false statements in the Form 1099-MISC to cause Plaintiff to incur more tax liability than he should have. Therefore, Defendants have failed to demonstrate that they are entitled to summary judgment on Plaintiff's claim for common law fraud.

### C. Breach of Fiduciary Duty (Count Three)

To establish a claim for breach of fiduciary duty under Illinois law, the plaintiff "must prove the existence of a fiduciary duty, breach of that duty, and damages proximately resulting from that breach." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006). In his claim for breach of fiduciary duty against Hall, Plaintiff alleges that Hall had a fiduciary duty to operate Keystone and WACHN with honesty and fidelity for the benefit of those companies; that Plaintiff breached his duty by, among other things, mischarging and inflating Keystone and WACHN's expenses, underreporting income, commingling funds between Keystone and WACHN and Hall's other companies, concealing financial records, and withholding amounts that were due to Plaintiff when he left Keystone. Plaintiff alleges that, as a result, he "suffered damages proximately caused by these breaches in unpaid income, expenses that were wrongly charged to him; and in his interest in Keystone, including, its equipment, and its facilities, and in his interest in WACHN, for which he was not compensated." [222] at 36.

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty because the undisputed evidence shows that Plaintiff was Hall's employee—rather than a *de facto* shareholder or partner in Keystone—and "an employer does not owe a fiduciary duty to the employee in a typical employer-employee relationship." [270] at 21.

The Court concludes that Defendants are not entitled to summary judgment on the breach of fiduciary duty claim. Under Illinois law, '[t]he existence of a fiduciary relationship between all partners is well-established, and each partner is bound to exercise the utmost good faith and honesty in all matters relating to the partnership business." *Pielet v. Hiffman*, 948 N.E.2d 87, 94 (Ill. 2011). Also, under Illinois law, "[i]ndividuals who control corporations owe a fiduciary

13

duty to their corporation and its shareholders." *Donovan v. Quade*, 830 F. Supp. 2d 460, 496 (N.D. Ill. 2011). Thus, if Plaintiff is considered to be a shareholder or a partner in Keystone, then Hall owes Plaintiff a fiduciary duty as either an individual who controls Keystone or as a fellow partner in Keystone. The Court cannot resolve this issue on summary judgment because there are material facts in dispute concerning whether Plaintiff should be considered a partner or shareholder in Keystone. As discussed in Section II above, Plaintiff has identified evidence supporting his theory that Keystone was a partnership. Hall argues that Keystone cannot be considered a partnership because it is registered as an S-Corp. Assuming this is true both factually and legally, Plaintiff might still be considered a shareholder of Keystone, to whom Hall (Keystone's control person) would owe a fiduciary duty. Therefore, Hall is not entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty.

### D. Breach of Contract (Counts Five and Six)

"Under Illinois law, to sustain a breach of contract claim a plaintiff must prove: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 863 (7th Cir. 2016) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.,* 814 N.E.2d 960, 967 (Ill. App. 2004)). In his Third Amended Complaint, Plaintiff alleges two claims for breach of contract, Counts Five and Six.

In Count Five, Plaintiff alleges in the alternative that, if the Court finds the WACHN Operating Agreement to be valid in whole or part, then WACHN and Hall breached the Agreement by failing to purchase Plaintiff's shares within sixty days of his dissolution from WACHN. Defendants argue that they are entitled to summary judgment on Count Five because Plaintiff cannot satisfy Section 9.1(a) of the WACHN Operating Agreement, which requires

members to provide notice of their withdrawal. Defendants contend that Plaintiff's resignation letter to Keystone showed that Plaintiff would "continue to be a WACHN member," and therefore there is no evidence that Plaintiff gave notice that he was withdrawing from WACHN. [270] at 26. The Court concludes that this argument is underwhelming. While Plaintiff did not provide written notice that he was dissociating from WACHN, he contends that he provided oral notice two or three weeks after he left Keystone. Also, Hall testified at his deposition as WACHN's corporate representative that he considered Plaintiff to have dissociated himself from WACHN. Therefore, Hall and WACHN have failed to demonstrate that they are entitled to summary judgment on Count Five.

In Count Six, Plaintiff alleges that Keystone breached its oral agreement with him by (a) failing to include non-patient income in his 25 percent share of income for 2004; (b) underpaying him by $150,000 in 2004; (c) overcharging him for expenses well in excess of the $250,000 agreed to and underreporting his income through false and fraudulent profit and loss statements; (d) reporting to the IRS that Hall was the 100 percent shareholder of Keystone after agreeing to make Plaintiff a 25 percent partner; (e) unilaterally increasing Plaintiff's share of expenses from 26.5 percent to 34.8 percent in the third quarter of 2007; and (f) failing to pay him amounts due and owing to him when he left Keystone.

Keystone argues that it is entitled to summary judgment on Count Six because Plaintiff has no evidence that his oral contract "entitled him to a payout including the full amount of his contribution to cash reserves, any accounts receivable from Plaintiff's patient care or other sources that had not been paid to him, equivalent value for funds invested by Plaintiff in any of Keystone's equipment and any other funds due and owing from Keystone to Plaintiff." [270] at 28. Keystone also argues that it is entitled to summary judgment on Count Six because

"Keystone's expert . . . opines that . . . Plaintiff consented to all specific allocations of income and expenses when disclosed to and reported to him in bucket reports" and that when Plaintiff left Keystone, "it was Plaintiff who owed Keystone money which offset any alleged amount owed by Plaintiff." [270] at 28. Therefore, Keystone asserts, "Plaintiff is unable to prove a breach by Keystone of any terms that were agreed upon, nor is Plaintiff able to prove performance." [270] at 28.

The Court concludes that these arguments are non-starters as well. Since Plaintiff is asserting that he had an oral contract with Keystone, Plaintiff's own testimony as to the terms of the contract is sufficient "evidence" to withstand summary judgment absent a legal impediment to an oral contract (such as the statute of frauds). Moreover, Plaintiff has come forth with ample evidence that Keystone breached the terms of the parties' oral agreement, including the contents of his own expert report. The Court cannot resolve dueling accounting expert analyses on summary judgment. Therefore, the Court denies Keystone's motion for summary judgment on Count Six.

      E.      **Buyout Pursuant to 805 ILCS § 180/35-65 (Count Four)**

805 ILCS § 180/35-60 provides that "[a] limited liability company shall purchase a distributional interest of a member for its fair value determined as of the date of the member's dissociation if the member's dissociation does not result in a dissolution and winding up of the company's business[.]" In Count Four of the Third Amended Complaint, Plaintiff alleges that WACHN, an LLC, has never made an offer to purchase his distributional interest. Plaintiff asks the Court to determine the fair value of his interest and the terms of WACHN's repurchase. Plaintiff also seeks an order requiring WACHN to refinance its loan or otherwise have his name

removed as a guarantor for the Great Lakes Bank loan or, alternatively, a personal indemnification from the members of WACHN.

Defendants argue that they are entitled to summary judgment on Count Four because "Plaintiff cannot point to a date when he gave notice to WACHN of his express will to dissociate from WACHN or actually dissociated from WACHN," and "as such has no evidence that he dissociated from WACHN" and "cannot satisfy 805 ILCS 180/35-65(3)." [270] at 24. As explained above on Count Five, even Hall has recognized that Plaintiff has dissociated from WACHN. Therefore, the Court denies Defendants' motion for summary judgment on Count Four.

### F.     Unjust Enrichment (Count Seven)

"To state a claim for unjust enrichment in Illinois, 'a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Williams v. Nat'l Hous. Exch. Inc.*, 949 F. Supp. 650, 652 (N.D. Ill. 1996) (quoting *HPI Health Care v. Mt. Vernon Hosp.,* 545 N.E.2d 672, 679 (Ill. 1989)). However, if "the parties have an express contract which governs their relationship, a claim for unjust enrichment may not be maintained," even if the "express contract does not cover the specific subject upon which the unjust enrichment claim is based." *Id.*

In his unjust enrichment claim, Plaintiff alleges in the alternative to his breach of contract claims that: (1) Keystone and Hall were unjustly enriched by Plaintiff's payment of an unfairly large share of Keystone's and Hall's expenses and by their withholding moneys contributed or earned by Plaintiff which were not distributed to him; (2) WACHN and Hall were unjustly enriched by retaining Plaintiff's shares of WACHN and his capital contributions; and (3)

17

WACHN and Hall were unjustly enriched by retaining Plaintiff's personal guaranty of the WACHN loan to Great Lake Banks after he dissociated from WACHN.

Defendants argue that they are entitled to summary judgment on Plaintiff's unjust enrichment claim, but their motion addresses only Plaintiff's third theory of unjust enrichment. Defendants argue that WACHN and Hall were not unjustly enriched by retaining Plaintiff's personal guarantee because Plaintiff signed the guarantee to borrow money from Great Lakes Banks and WACHN and Hall had no right to remove Plaintiff as a guarantor on the loans. Defendants also point to evidence that Great Lakes Banks' policy is to not release any guarantor until the underlying loan has been fully satisfied.

The Court concludes that Defendants are not entitled to summary judgment on Plaintiff's unjust enrichment claim. As an initial matter, the motion fails to address two of Plaintiff's three theories of unjust enrichment, which itself is sufficient reason to deny Defendants' motion on this count. As to the merits of Defendants' argument, the Court agrees with Plaintiff that Defendants have not demonstrated that they lack any way to obtain Plaintiff's release from the guarantee, including by refinancing the loan and obtaining new guarantors. Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff's unjust enrichment claim.

### G. Defendants' Counterclaim for Breach of Contract (Count II)

The Court denies, with minimal further discussion, Defendants' motion for summary judgment on its counterclaim against Plaintiff for his alleged breach of his oral contract with Keystone. Defendants' motion addresses only a portion of the total amount that Defendants claim Plaintiff owes Keystone—$225,000 for equipment that Plaintiff used while working at Keystone but abandoned to the practice when he left in November 2007. And this portion of Defendants' counterclaim is disputed. Plaintiff presents evidence that the other physicians also

used the equipment and that he left the equipment at Keystone and argues that it would therefore be inappropriate to charge him with the full cost of the equipment. The Court agrees with Plaintiff that no part of Defendants' counterclaim can be resolved on summary judgment.

## IV. Conclusion

For the reasons stated above, the Court denies Defendants' motion for summary judgment [269] in full. This case is set for further status on September 20, 2016 at 9:15 a.m. Plaintiff's motion to set a trial date [300] will be heard at the same time.

Dated: September 16, 2016

_____
Robert M. Dow, Jr.
United States District Judge