**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-05836 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| KEYSTONE ORTHOPEDIC SPECIALISTS, | ) | |
| S.C., WACHN, LLC, MARTIN R. HALL, | ) | |
| M.D., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS IN LIMINE**

Plaintiff Dr. Nicholas Angelopoulos responds to Defendants Keystone Orthopedic Specialists, S.C., WACHN, LLC, and Martin R. Hall, M.D.'s Combined Motion in Limine ("Def. MIL") as follows:

**A. Response to Defendants' Motion in Limine #1**

Defendants seek to exclude PX 13, which is a mortgage held by Centier Bank on the WACHN Building as being "entirely irrelevant" to Plaintiff's claim. (Def. MIL p. 3.) The fact that Hall encumbered Angelopoulos's 20% interest in WACHN is directly relevant to Angelopoulos' claims.

In 2005, Dr. Angelopoulos was required to make a $111,000 capital contribution, and guarantee a $1 million loan to Great Lakes Bank in order for WACHN to purchase Keystone's office space in Hazel Crest. In return, Angelopoulos received 20% interest in WACHN. When Angelopoulos left Keystone, Hall refused to repurchase Angelopoulos's interest. And when Great Lakes Bank offered to release Angelopoulos as a guarantor of that loan, Hall refused.

1

In 2011, Hall pledged the WACHN building as collateral to Centier Bank for one of Hall's other business ventures, further encumbering Angelopoulos's interest in WACHN, for Hall's own benefit, without Angelopoulos's knowledge or consent.

This is direct evidence of the charged scheme to defraud. There is no economic difference between Hall's having refused to pay out on Angelopoulos' share of WACHN in the first place and his subsequent decision to put Angelopoulos even more at risk by pledging it for his own purposes. Defendants' theory seems to be that it is irrelevant now because after Hall got caught (by virtue of Plaintiff's discovery in this litigation) he caused this mortgage to be released. But that means no more than it would if a Ponzi schemer who was exposed decided to give the money he had obtained back to his victims. It does not undo the fraud.

### B. Response to Defendants' Motion in Limine #2 and #3

Defendants' Motions in Limine Nos. 2 and 3 seek to exclude exhibits showing that (1) Hall filed a phony Form 1099-MISC against a former Keystone employee named George Cloud for the tax year 2007 (PX 14); and (2) Hall filed a phony Form K-1 against former employee Merritt Roalsen in 2008, after their departures from Hall's companies (PX 22). Defendants say that this evidence has no purpose other than propensity,[1] but they are wrong for the reasons discussed in great detail in Plaintiff's MIL No. 2.

Count I charges Hall with fraudulently filing a phony 1099-MISC against Dr. Angelopoulos for the tax year 2007 in retaliation for his departure from Keystone. Hall and Keystone are defending on the grounds (among others) that (a) he did not have any intent to defraud; (2) if the 1099 was inaccurate it was merely an error made in good faith; and (3) he did not file and was not responsible for filing the 1099. (*See* Defendants' Proposed Jury Instruction

---

[1] Defendants assert that plaintiff has "admitted" that this evidence is offered only to show propensity, but cites to nothing in support of that assertion and no such support exists.

No. 4; Agreed Final Instruction No. 25; Defendants' Memo in Support of Their Motion for Summary Judgment at 17-20.)

Plaintiff is entitled to respond to these defenses under Rule 404(b) with evidence of these other fraudulent filings to demonstrate Hall's fraudulent intent, to rebut any claim of mistake or accident, and to show his modus operandi and identity. These are plainly bases that do not depend on any inference of his propensity to commit bad acts, but rather go directly to the permissible purposes. They also easily meet the remaining standards for Rule 404(b) evidence, including the fact that all these filings were in the same time period and the documents at issue were all U.S. information returns on former associates. For the reasons explained in Plaintiff's MIL 2, evidence of these incidents should be admitted.

Next, Defendants argue that PX 22, in which Roalsen told Dr. Angelopoulos that "I got the same fake K 1 treatment in 2008! From my brother in law!" and that "I'm a bigger victim so I'm pissed" should not be admitted because: (1) Roalsen tried to retreat from the word "fake" at his deposition; and (2) Roalsen testified that he was "uncomfortable with any insinuation that he meant otherwise." (Def. MIL p. 5.)

These arguments are based on clear misstatements of the record and a misunderstanding of the rules. Roalsen did claim that he no longer liked the term "fake" to describe the K-1 he received. But he then went on to describe why: because "it's a real document" and he would now prefer to use the words "inaccurate" and "overstated." (Roalsen Dep. 102-103.) He further explained that he typed the word "fake" probably because he did not want to spell the word "accurate." *Id.*

There are two problems with Defendants' argument. First, whether the K-1 is characterized as "fake" or "overstated" or "inaccurate," there can be no doubt from the context of Roalsen's text ("I'm a bigger victim") that a reasonable jury could infer that Hall intentionally filed false

3

information with the IRS. It thus bears directly on Hall's "lack of intent" and "mistake" defenses as to the information return he filed against Angelopoulos. Second, contrary to Defendants' suggestion, Roalsen did not say that he was uncomfortable with the term "fake" because it incorrectly insinuated that Hall had acted intentionally. Rather when pressed on why he was uncomfortable with the word "fake" now, he said "I don't know." (Roalsen Dep. 102.) So long as Hall maintains that he did not have the intent to defraud Angelopoulos in filing the information return against him, or that it was only a mistake, or that he did not do it, Angelopoulos should be permitted to introduce PX 22 and Roalsen's testimony in response.

Finally, Defendants argue that in addition to excluding PX 14 and 22 and the testimony of Cloud and Roalsen, the Court should also preclude any reference to the Cloud and Roalsen incidents. Beyond their misunderstanding of Rule 404(b), which permits both the documents and the testimony of witnesses Cloud and Roalsen, Defendants' argument ignores that Hall is a trial witness whose credibility is central to the case. Fed. R. Civ. P. 608(b) specifically permits cross-examination of a witness about specific instances of misconduct that bear on the witness' character for truthfulness or untruthfulness.

C. **Response to Defendants' Motion in Limine #4**

Defendants next seek to exclude a photograph demonstrating that Hall was present at the offices of one of the critical witnesses in the case, Dr. Mark Chang, on February 11, 2014. Defendants speculate that the purpose of introducing the photo is to show that Hall skipped out on a deposition to which he had specifically agreed and went to see Dr. Chang instead. They could not be more wrong. Plaintiff has no intention of arguing that Hall's skipping out was contumacious; indeed, that issue was already resolved by the magistrate judge. Rather, the relevance of the photo is that it corroborates Dr. Chang's testimony that Hall came to Chang's

4

office and threatened to sue Chang if Chang did not make Dr. Angelopoulos drop his lawsuit. Specifically, Chang testified as follows:

| | | |
|---|---|---|
| Q. | | Has he -- has Dr. Hall come to your office? |
| Chang: | | Oh, yes. And then, yes, he came to my office a couple of months ago, yes. He came to my office in the middle of my office hours. |
| Q. | | And did you see him? |
| Chang: | | He demanded to be seen, yes. |
| Q. | | And what did he say to you? |
| Chang: | | Basically he was there to tell me that -- to tell me that <u>unless I was able to influence Nick Angelopoulos from dropping his lawsuit that he was going to drag me in. He was going to go after me and come after me for monies that he says that I owe him.</u> |
| Q. | | Did you perceive that to be a threat? |
| Chang: | | Yes. (Chang Dep. 101-102) (emphasis added.) |

First, Hall's familiar claim that a person with whom he is at odds owes him money is relevant and admissible under Rule 404(b) to show his intent and to rebut the absence of mistake defense in connection with his demands that Angelopoulos owed him money, including his intent in filing his counterclaim against Angelopoulos.

Second, the evidence that Hall directly attempted to intimidate and interfere with a witness and to threaten the witness in order to pressure Angelopoulos to drop his lawsuit is plainly relevant and admissible to show Hall's consciousness of his culpability and responsibility for the torts alleged in the case. Evidence of a defendant's attempts at intimidation of a witness is admissible to demonstrate a defendant's "consciousness of guilt." *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990). Proof of consciousness of culpability makes more likely that the person is in fact culpable, *United States v. Harmon*, 721 F.3d 877, 882 (7th Cir. 2013); *Payne v. Maher*, 2015

5

WL 4483954, at *3 (N.D. Ill. July 22, 2015), thus making the evidence relevant and admissible under Rules 401 and 402. See also *People v. Gambony*, 402 Ill. 74, 80 (Ill. 1948) (effort to suppress evidence or obstruct investigation is relevant in both civil and criminal cases).

Third, this evidence is directly relevant to establish the allegations in the Complaint regarding fraudulent concealment. *See* Third Amended Complaint ¶ 133 (alleging Hall fraudulently concealed the nature of the scheme from Angelopoulos from 2004 to November 2014).

Apparently recognizing the relevance of this testimony and knowing of both Dr. Chang's affidavit and his deposition testimony on the point, Defendants have not sought to exclude it. The photo is admissible to assist Dr. Chang in fixing the date of the events and to corroborate his testimony that Hall was in fact present on that date.

D. **Response to Defendants' Motion in Limine #5**

Defendants seek to bar the introduction *in toto* of Dr. Hall's tax returns from 2005-2007. (Def. MIL p. 7-8.) The Defendants are wrong that demonstrating Hall's financial condition for the purpose of punitive damages is the only ground for admitting the tax returns, or even that it is the principal ground.

First, the returns contain direct evidence that Hall owned, controlled, and profited from a network of companies that he used to funnel profits away from Keystone and into his own pocket.

Second, one element of Hall's scheme to defraud is that he ran nearly all of his Keystone patient billing income through his S-corporation, Martin R. Hall, M.D.S.C. Dr. Hall kept this income a secret from Plaintiff and the other Keystone partners. Dr. Hall's tax returns show that, in fact, nearly all of his income came from Martin R. Hall, M.D.S.C.

6

Third, the tax returns show that Dr. Hall received tax benefits relating to a house owned by his wife in Homewood Illinois, which was used to store Keystone records, but was also used by the Halls for personal use, including to store Dr. Hall's cars. Plaintiff and the other partners were unknowingly paying taxes and expenses of this house. The tax benefits Dr. Hall received from Plaintiff's payments are yet another element of Dr. Hall's scheme to defraud.

And fourth, contrary to Defendants' argument, the returns are admissible as evidence of his net worth, which is plainly relevant to the computation of punitive damages, and is itself sufficient to render them admissible. *Ferguson v. Lurie*, 89 C 2283, 1993 WL 68101, at *2 n. 3 (N.D. Ill. Mar. 10, 1993); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 92 C 2379, 1993 WL 34681, at *1 (N.D. Ill. Feb. 8, 1993); *Cripe v. Leiter*, 291 Ill. App. 3d 155, 160, 683 N.E.2d 516, 520 (3d Dist. 1997).

Defendants' reliance on *Arroyo v. Volvo Grp. North Am., LLC*, No. 12-cv-6859, 2016 U.S. Dist. LEXIS 102286 (N.D. Ill. Aug. 4, 2016) is misplaced. In that case, the court determined that presenting evidence of the auto company, Volvo's financial condition would be a waste of time because of its complex financial condition and because any juror would know that "Volvo is capable of paying any possible award of compensatory or punitive damages that they might decide to award." *Id*. at *4. Here, where the Defendant, Dr. Hall, is an individual, and not a multi-billion dollar corporation whose financial status is widely known, evidence of Dr. Hall's financial condition is relevant and necessary for the jury to consider an appropriate amount of punitive damages should it decide that punitive damages are warranted.

E. **Response to Defendants' Motion in Limine #6**

PX 15 are bills from Dr. Angelopoulos' accountant, Vranas & Vlahos Accountants, and his former attorneys at Jenner & Block. These bills are only relevant to the issue of whether Dr.

7

Angelopoulos will be awarded fees in connection with the filing of the 1099-MISC under Count I, which alleges a violation of 26 U.S.C. § 7434.

There is no need for a motion in limine on this exhibit. Fees under the statute are only granted "in the court's discretion." 26 U.S.C. § 7434. Thus, if the jury finds that Defendants are liable under Count I, the issue of whether attorneys' fees should be granted will be presented to this Court <u>after the trial</u>. Plaintiff will, at that time, present the bills of Vranas & Vlahos, Jenner & Block, and of Plaintiff's current counsel, Gair Eberhard Nelson Dedinas, Ltd. Because PX 15 will not be used with the jury, Plaintiff submits that there is no reason to bar it. [2]

### F. Response to Defendants' Motion in Limine #7

PX 28 consists of documents showing Hall's income from Hind Hospital – income which Hall hid from his partners at Keystone. The documents from Hind reveal that Hall received a salary from Hind in excess of $300,000 each year in 2006 and 2007.

PX 28 is relevant as part of the story that shows that he breached his fiduciary duty to his partners in charging them a management fee of $140,000 (three times the normal amount). With his duties at Hind, his busy private practice, and the demands of his other businesses, he could not possibly have earned the excessive management fee—particularly given that the partners were also charged another $140,000 a year for the management services of his brother-in-law and his wife.

### G. Response to Defendants' Motion in Limine #8

Plaintiff does not presently intend to offer PX 27. If at trial there arises cause to use it, Plaintiff will raise the issue with the Court outside the presence of the jury.

---

[2] Plaintiff's counsel apologizes to the Court that counsel did not appreciate at the Parties' meet and confer that the matter upon which Defendants seek a ruling through this motion in limine is not actually in dispute.

H. **Response to Defendants' Motion in Limine #9**

Defendants next move to bar testimony from former Keystone doctors Pitchford, Rhode and Hartman, arguing that testimony about their "disputes" with Dr. Hall are irrelevant under Rule 402 and unfairly prejudicial under Rule 403.

As to Drs. Pitchford and Rhode, Defendants simply mistake the nature of the testimony to be offered.[3] These witnesses are not being called to testify to their disputes with Dr. Hall. Rather, both are witnesses whose testimony is plainly admissible under Rules 405 and 608(a). Rule 405(a) establishes that a person's relevant character trait may be proved by way of reputation or opinion evidence. Rule 608(a) establishes that character for truthfulness is always a relevant character trait of a witness: "A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a).

Thus, all that will be elicited on direct examination of these two witnesses is that they have a foundation for having an opinion and knowledge of Hall's reputation for truthfulness (that is, they worked for him and practice in the same field in the same area), what their opinion of his character for truthfulness is, and what his reputation in the community for truthfulness is. Dr. Hall's credibility is a central issue in the case, and there is no basis for excluding this evidence. It certainly cannot be considered "unfairly prejudicial" under Rule 403 because "unfair prejudice" means "an undue tendency to suggest a decision on an improper basis." Adv. Comm. Note to Rule 403. The key witness's credibility is, by definition, a proper basis for decision.

---

[3] The Defendants' sensitivity to these witnesses is hardly surprising. Dr. Pitchford has testified under oath in another lawsuit that he went to the FBI to report Dr. Hall's practice of fraudulently up-coding and billing insurers for procedures that were not performed. Plaintiff will not elicit any such testimony from Dr. Pitchford unless Defendants open the door on cross.

9

Dr. Hartman is also a Rule 608(b) witness. He has advised counsel for the Plaintiff that when he left Keystone, Hall falsely claimed that Hartman owed him money and threatened to sue him. That testimony is admissible under Rule 404(b) to establish that Hall's claim that Angelopoulos owed him money after leaving was not a mistake, but in fact was done with fraudulent intent.

### I. **Defendants' Motion in Limine 10**

As explained in responses to Defendants' MILs No. 2 and 3, and for the reasons stated in Plaintiff's MIL No. 2, Plaintiff is not offering any evidence of Dr. Hall's prior alleged bad acts to show propensity or bad character. Thus, the motion should be denied as moot.

### J. **Defendants' Motion in Limine 11**

Defendants seek to bar certain opinions of Plaintiff's damages and accounting expert, Jay Sanders, on the basis that the facts and data he relies on somehow make his opinions "unreliable." (Def. MIL p. 12-15.).[4]

#### 1. Sanders' Opinion No. 6 Is Admissible

Defendants first seek to bar Sanders' Opinion No. 6 by mischaracterizing it. Defendants state that in Opinion No. 6, Sanders "attributes Great Lakes Bank's refusal to remove Plaintiff as a personal guarantor of the WACHN $1.42 million loan balance as being Dr. Hall's fault." (Def. MIL p. 12.) This is not what Sanders opined. Sanders' Opinion 6 is that 1) "a dissociating physician who is no longer entitled to the income or ownership of a medical building partnership should be released from all liabilities associated with the investment and that WACHN should have procured a release of Dr. Angelopoulos's personal guaranty of the WACHN loan," and 2) that "the damage

---

[4] This is the second motion Defendants have made seeking to bar the testimony of Mr. Sanders; they have also made a *Daubert* motion. (Dkt. No. 309.) Plaintiff is responding separately to the *Daubert* motion as Defendants filed it separately.

to Dr. Angelopoulos is the full extent of the available credit on the loan." (Sanders Report, attached to Def. MIL at Ex. O, p. 46.)

In order to reach this opinion, Mr. Sanders was "advised" by counsel for Plaintiff that "Dr. Angelopoulos was not released from his obligation guaranteeing the WACHN loan" and that Great Lakes Bank "declined WACHN's request to have Dr. Angelopoulos removed as a personal guarantor." (*Id.*). "[I]t is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record." *Artunduaga v. Univ. of Chicago Med. Ctr.*, 2016 WL 7384432, at *5 (N.D. Ill. Dec. 21, 2016). Fed. R. Evid 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.") Here, these assumptions Mr. Sanders was provided by Plaintiff's counsel are supported by the record. For example, on JX 29, which is a document produced by Great Lakes Bank and which reflects the approval of various Great Lakes officers to releasing the guarantees, there is a handwritten note that reads: "Release of Gtys not Agreed to by all parties – Not completed. ARC." (JX 29). Gtys refers to the WACHN guarantees. ARC is Anthony Carollo, who was the Great Lakes Bank loan officer at that time and is on the witness lists of Plaintiff and Defendants. The evidence will show that the "party" referenced in the note who did not agree to the release of the guarantees was Dr. Hall.

Defendants are wrongly accusing Mr. Sanders of doing precisely what <u>Defendants'</u> expert, Michael Pakter did: rather than draw expert conclusions from facts provided by counsel, Mr. Pakter presented the factual assumptions that he obtained from Dr. Hall and Dr. Hall's associates as expert opinions.[5] This is <u>not</u> what Mr. Sanders has done or will do at trial. Defendants cite the deposition transcript of Mr. Sanders in which <u>Defendants'</u> counsel asked Mr. Sanders about the

---

[5] This is one of the bases of Plaintiff's Motion in Limine to Preclude Certain Testimony of Defendants' Expert Michael Pakter (Dkt. No. 314.)

11

bases of his factual assumptions. (Def. MIL p. 12.) Plaintiff has no intention of asking Mr. Sanders these questions at trial because they are entirely inappropriate for an expert witness. Rather, Mr. Sanders will testify to his expert conclusions and will plainly state that he made certain factual assumptions in arriving at those conclusions. This is proper under the Federal Rules of Evidence and *Daubert*. *Artunduaga,* 2016 WL 7384432, at *5; *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (expert calculations based on "assumptions given him by counsel" permissible under *Daubert*.)

    **2. Sanders' Reliance on the MGMA Data Is Appropriate**

Next, Defendants seek to bar Sanders' from offering testimony at trial that relies on the Medical Group Management Association ("MGMA") Physician Compensation and Production Survey for Single Specialty Practices 2008 Report (the "MGMA Survey") (Def. MIL p. 13-15.). Among the statistics the MGMA tracks is a) annual revenue for medical specialists, and b) overhead expenses as a percentage of income by area of specialization. (*See* Sanders Report pp. 33-34.) As Mr. Sanders sets forth in his report, compared to these industry benchmarks, Dr. Angelopoulos was an above-average producer for a pain management specialist whose expenses at Keystone as a percentage of his patient billing income were grossly out of line with industry averages. (*Id.*) Sanders used this data as an alternative method of determining how much Dr. Angelopoulos was overcharged for expenses while at Keystone. The first method he used was to go through the Keystone accounting records, identifying overcharges in the records. (*Id.* at 22-32.) Because of the lack of back-up date for these expenses, however, it was not possible to make a comprehensive determination of these overcharges. Using the industry norms both confirmed his findings from the first method that there were substantial overcharges and demonstrated that there

12

were likely still further overcharged expenses that could not be identified through the extant accounting records.

At the outset, the MGMA data is independently admissible under Federal Rule of Evidence 803(17) as a data compilation. Fed. R. Evid. 803(17). It would come into evidence even without an expert to employ it. Moreover, the MGMA Survey is the most comprehensive and widely-used benchmarking data among medical practices nationwide. The Seventh Circuit is clear that "experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1020 (7th Cir. 2000). Experts may rely on "experimental, statistical, or other scientific data generated by others in the field." *Abbott Labs. v. Sandoz, Inc.,* 743 F. Supp. 2d 762, 793–94 (N.D. Ill. 2010). The MGMA Survey is precisely the sort of statistical data upon which experts routinely rely.

Defendants make the preposterous argument that Mr. Sanders should be barred from relying on the MGMA Survey because "deviation from an industry norm is not per se evidence of wrongdoing or problems with the accounting system." (Def. MIL at 13.) Under this logic, no piece of evidence would be admissible unless, by itself, it proved a plaintiff's claim, in which case there would never be any need for a trial since each piece of admissible evidence would require the entry of summary judgment in plaintiff's favor. This is, of course, not the law.

The Defendants next argue that comparing Plaintiff's expenses as a percentage of income to the national average for orthopedic specialists is "irrelevant to Plaintiff's claims" because Dr. Angelopoulos was a pain management specialist and not an orthopedic surgeon. (Def. MIL p. 13.) Mr. Sanders concluded that, using the orthopedic surgeon national average, Dr. Angelopoulos paid $598,204.73 more in expenses at Keystone from 2004 to 2007 than the average orthopedic surgeon

13

would have paid in the same time frame. (Sanders Report p. 36.) As Sanders stated in his report, he used the orthopedic surgeon benchmark rather than the pain management benchmark "because Dr. Angelopoulos was practicing within an orthopedic surgery practice." (Sanders Report at 35.) Sanders was being conservative in using this benchmark. Because pain management specialists consume so much <u>less</u> in expenses than orthopedic surgeons do, had Sanders used the pain management benchmark, the difference between what Dr. Angelopoulos paid at Keystone and the national average for pain management specialists in that same time frame is **$1,653,504.25**. Plaintiff would be happy to stipulate that this is the correct benchmark to use.

Defendants finally make a number of arguments about the "limitations" of the MGMA data, including that the Survey is for single-specialty practices and the national mean may be different for an orthopedic practice in which a pain management specialist practices. Like the data on expenses as a percentage of income, the fact that a pain management specialist worked in an orthopedic practice means only that the Keystone expenses should have been even <u>lower</u> than the average for an orthopedic-only practice. Defendants also assert that the Survey is potentially limited because it "is based on a voluntary response by primarily MGMA member practices and data may not be representative of all providers in medical practices." (Sanders Report p. 14.) What Defendants fail to do is explain how these "limitations" make Sanders' use of the data inadmissible. They, of course, do not. They go merely to weight and not admissibility. *Smith v. Ford Motor Co*., 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

                                      Respectfully submitted,
                                      */s/ Chris Gair*

                                                            Chris Gair
                                                            One of Plaintiff's attorneys

Dated: April 17, 2017

Chris Gair (ARDC # 6190781)
Thomas R. Heisler (ARDC # 6296712)
Ryan P. Laurie (ARDC # 6318306)
Gair Eberhard Nelson Dedinas Ltd.
1 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900