**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-5836 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| KEYSTONE ORTHOPEDIC | ) | |
| SPECIALISTS, S.C., WACHN, LLC, | ) | |
| and MARTIN R. HALL, M.D., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiff's *Daubert* motion to bar certain expert testimony by Michael Pakter [314], Defendants' *Daubert* motion to bar certain expert testimony by Jay Sanders [309], Plaintiff's motions *in limine* [326] and [339], Defendants' motions *in limine* [317], and Defendants' motion to amend the final pretrial order to include proposed supplemental agreed voir dire questions and contested jury instructions [352]. For the reasons set forth below, Plaintiff's *Daubert* motion (Plaintiff's motion *in limine* No. 1) to bar expert testimony by Michael Pakter [314] is granted in part and denied in part. Defendants' *Daubert* motion to bar certain expert testimony by Jay Sanders [309] is denied.

Plaintiff's motions *in limine* [326] are granted in part and denied in part: the Court grants Plaintiff's motions Nos. 3 and 4; the Court denies Plaintiff's motion No. 5; and the Court provisionally denies Plaintiff's motion No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted. Defendants' motions *in limine* [317] are granted in part and denied in part: the Court grants Defendants' motions Nos. 6 and 8; the Court denies Defendants' motions Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on Defendants' motion No. 4, and the Court provisionally grants

Defendants' motions Nos. 2 and 3.[1] Defendants' motion to amend the pretrial order [352] is granted, and the Court will consider the proposed voir dire questions and jury instructions that the parties submitted to the Court on May 12, 2017. The Court will issue rulings on Plaintiff's motion *in limine* No. 6 [326, at 10] and Defendants' motion *in limine* No. 12 [350] in a separate order. A final pretrial conference is set for May 18, 2017 at 10:00 a.m. This case remains set for a jury trial to commence on May 23, 2017.[2]

## I. Background

Nicholas Angelopoulos ("Plaintiff"), an anesthesiologist, brings suit against his former business associate, Martin R. Hall ("Hall"), and the two businesses in which they were associates, Keystone Orthopedic Specialists, S.C. ("Keystone"), and Wachn, LLC ("WACHN") (collectively, "Defendants"), for their alleged participation in a fraud to deprive Plaintiff of money to which he was entitled.[3] In his governing Third Amended Complaint [222], Plaintiff alleges claims against Defendants for fraudulently filing an information return in violation of 26 U.S.C. § 7432 (Count I); common law fraud (Count II); breach of fiduciary duty (Count III); breach of contract (Counts V and VI); and unjust enrichment (Count VII). Plaintiff also seeks a determination of the fair value of his distributional interest pursuant to 805 ILCS § 180/35-65 (Count Four). Defendants bring counterclaims against Plaintiff for breach of the purported WACHN Operating Agreement (Count I) and breach of contract (Count II). On September 16,

---

[1] The Court previously granted in part and denied in part Defendants' motion *in limine* No. 9 and denied as moot witness Dr. Michael Hartman's motion to quash subpoena [360]. [364.]

[2] As a reminder, the parties are to submit by 12:00 noon on May 19, 2017 a chart of objections to exhibits that takes into consideration the Court's rulings on the motions *in limine*; the chart should contain the exhibit number, a short description of the exhibit, the objection, and the response to the objection. Plaintiff is to submit a binder of Plaintiff's disputed trial exhibits; the Court already has copies of Defendants' disputed trial exhibits, so no additional copies are necessary unless new objections are raised.

[3] Ira K. Dubin and Ira K. Dubin Ltd. d/b/a Green Dubin & Co. were also named as defendants in this action, but were dismissed from the case with prejudice on September 10, 2014. [See 191.]

2016, the Court denied Defendants' motion for summary judgment, noting that many facts were in dispute.  [303.]

## II.  *Daubert* Motions [314] and [317]

### A.  Legal Standard

Federal Rule of Evidence 702[4] and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony.  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).  The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589.  The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]"  *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original).

To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a

---

[4] Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593–94; see also *Bielskis*, 663 F.3d at 893. However, the test for reliability is flexible, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable"). In addition, the touchstone of admissibility under Rule 702 is helpfulness to the jury. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion. *Id.* "An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.").

**B.     Analysis**

Many of the liability and damages issues in this case center on the accounting records kept by Defendants Keystone and WACHN under the supervision of Defendant Hall.  Plaintiff and Defendants have hired experts to assess whether Defendant Keystone's profit and loss statements and Form 1099-MISC contained false or fraudulent information and expenses, as Plaintiff contends, or instead accurately disclosed Defendant Keystone's income and expenses and calculated Plaintiff's share of the same, as Defendants contend.  As the Court noted in its summary judgment opinion, the experts disagree on almost everything, including basic factual predicates, which accounting methodology is appropriate to use, whether certain of Defendant Keystone's expenses were properly disclosed to the physicians, whether those expenses were reasonable, and whether those expenses were properly attributed to Keystone rather than the other companies owned by Defendant Hall.

**1.     Defendants' Challenge to Certain Testimony by Jay Sanders [309]**

Plaintiff retained as an expert Jay Sanders, an accountant with 30 years of experience providing accounting services to medical practices.  Defendants move to bar three of Sanders's opinions: Opinion No. 5 in Sanders's expert report, which values Plaintiff's purported interest in WACHN; Opinion No. 6, which discusses WACHN's failure to remove Plaintiff from his personal guarantees of the WACHN loan; and Opinion No. 3, which states that Plaintiff was wrongly charged $599,168 for excess overhead as compared to industry norms.

**a.     Opinion No. 5: Valuation of Plaintiff's Interest in WACHN**

In his Opinion No. 5 "Damages Associated with WACHN, LLC," Plaintiff's expert Sanders valued Plaintiff's purported interest in WACHN using three different methods: (1) the initial equity approach; (2) the income approach; and (3) the cost approach.  Defendants take

issue with Sanders's use of the income approach, arguing that for purposes of this approach, Sanders impermissibly relied on information provided by Gary Fazio, Vice Chairman of CBRE Group, Inc. According to Sanders, the "income approach is the most commonly used method for appraising commercial and industrial real estate based on the net income the property produces to an investor." [309-1 (Sanders's Expert Report), at 43.] He explained in his expert report that the income approach is computed by taking the Net Operating Income of a real estate asset (collected rent minus operating expenses) and dividing it by the capitalization rate, which is the rate of return a prospective investor is expecting given the current health of the economy, interest rates, geographical area, and other factors.

Sanders stated in his report that Fazio told him that (1) the net rental rate of the building in which WACHN is located was $15 to $17 per square foot per year, (2) the most recent operating expenses, including common area maintenance and real estate taxes, were $13 per square foot per year, and (3) the capitalization rate for medical office buildings in the Chicago area was 6%, but that the capitalization rate should be increased by 1% because the building is located in Hazel Crest, and it should be further increased by another 1% because the WACHN space is a condominium unit and not a fee simple transaction. [309-1, at 44.] Using these figures and the income approach, Sanders concluded that the equity value of the building was just under $954,000 and Plaintiff's purported interest in WACHN is worth $191,000.

First, Defendants argue that it is unclear what Fazio relied on to provide Sanders with figures for the net rental rate, recent operating expenses, and current capitalization rate for medical office buildings in the Chicago area. Defendants contend that Sanders improperly relied on Fazio's figures without doing any independent research or otherwise verifying the figures and neglected to consider differences between medical office suites. Second, Defendants argue that

Sanders impermissibly opined that the income approach is the "most widely used and accepted valuation standard for commercial real estate," but that Sanders did not explain how he reached such an opinion and admitted that he himself has never done any real estate appraisal work and does not have a real estate appraisal license. Third, Defendants challenge Sanders's conclusion that the income method he used was "based on very recent information [from Fazio] regarding the prevailing rental rates, operating expenses, and capitalization rates for that building, locale and economic environment," without indicating what dates or years the rates are based on.

The Court is not convinced by Defendants' arguments. An expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In fact, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes[.]" *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 309, 613 (7th Cir. 2002). For example, a physician, though not an expert in radiology, may rely on an x-ray in formulating a diagnosis. See *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). Further, "it is apparent from the wording of Rule 703 that there is no *general* requirement that the other expert testify as well." *Dura*, 285 F.3d at 613; see also *Walker v. Soo Line R. Co.,* 208 F.3d 581, 589 (7th Cir. 2000) (explaining that "[m]edical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions" and that "courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable").

However, expert testimony relying on the opinions of other should be rejected if the testifying expert's opinion is too speculative or if the underlying basis is faulty. *Walker*, 208 F.3d at 588. Further, "while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule." *Loeffel Steel Prods., Inc.*, 387

F.Supp.2d at 808. Thus, an expert is "not permitted to be the mouthpiece of [an expert] in a different specialty," *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d 309, or to vouch for the truth of what another expert told him, *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d at 808. Under Rule 703, an expert may rely on hearsay in formulating his opinion, but the underlying hearsay is not admissible for the truth of the matter asserted. *Loeffel Steel Prods., Inc.*, 387 F.Supp.2d 7at 808.

The Court concludes that Sanders permissibly relied on figures provided by Fazio, Vice Chairman of CBRE, one of the largest commercial real estate brokers in the United States, who has participated in more than 3,000 lease transactions and whose clients include hospitals and medical staff members. See *Walker*, 208 F.3d at 589 (holding that expert physician's opinion was not rendered unreliable by her partial reliance on another doctor's work and explaining that "[t]o the degree that she might have relied on faulty information, the matter certainly could be explored on cross-examination"); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 516 (E.D. Pa. 2001) (holding that expert Certified Public Accountant's use of capitalization rate that defendant objected to did not destroy the reliability of expert's opinions that that defendant was free to challenge expert's method for calculating lost profits through cross examination and through its own damages expert). Further, Plaintiff asserts in his response that Defendant Hall and certain other witnesses affiliated with Keystone, including Renee Breese, may be able to testify to the rental income and capitalization rate of the WACHN building. Plaintiff also asserts that he will present at trial, separate from Fazio's data, evidence about WACHN's operating expenses and the rental income paid to WACHN through Keystone. If this evidence is indeed presented at trial, it may serve to either confirm or refute the figures used by Sanders for his valuation.

Sanders may use the figures provided by Fazio to offer an opinion within Sanders's domain of expertise in valuation—that is, he can testify that assuming a net rental income of $16 per square foot, operating expenses of $13 per square foot, and a capitalization rate of 8%, the equity value of the building would be just under $954,000 and Plaintiff's share would be worth $191,000. However, he cannot vouch for the accuracy of Fazio's figures for the net rental rate of the building, the most recent operating expenses, and the capitalization rate for medical office buildings in the Chicago area. In other words, Sanders cannot act as Fazio's spokesman. See *In re James Wilson Assocs.*, 965 F.2d 160, 172–173 (7th Cir. 1992) (explaining that the expert architect could use what a consulting engineer told him to offer an opinion within the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him); *Dura Automotive Sys. of Indiana, Inc.*, 285 F.3d at 613 (if affidavits of experts had timely been filed, expert hydrogeologist could have testified that well field was contaminated by volatile organic compounds and that if defendant's plastics plant was within the well field's capture zone, some of the contaminants may have come from that plant; however, hydrogeologist could not testify that plant was actually within well field's capture zone, as he was not an expert in mathematical models of groundwater flow and modeling on which he relied had been done by other non-testifying experts).

Additionally, to the extent that Defendants challenge Sanders's qualifications on the basis that he has not done real estate appraisal work and does not have a real estate appraisal license, this argument fails because Sanders is a Certified Public Accountant and a Certified Valuation Analyst. As an expert in business valuation, he is sufficiently qualified to offer an opinion as to the valuation of the WACHN business. See Fed. R. Evid. 702 (an expert may be qualified "by knowledge, skill, experience, training, or education"); *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*,

92 F. Supp. 2d 786, 794 (N.D. Ill. 2000) (certified public accountant who specialized in business valuation was qualified to testify as an expert on the issue of damages in breach of contract suit). Sanders's admitted lack of specialization in real estate appraisal work is not a disqualifying factor; rather, it is yet another subject for cross-examination. See *Walker*, 208 F.3d at 589 (holding that district court abused its discretion in excluding expert testimony that employee had suffered post-traumatic stress disorder and explaining that although expert physician was not a psychiatrist or psychologist, she was qualified as a physician); *Loeffel Steel Prod., Inc.*, 387 F. Supp. 2d at 802 (business appraiser's lack of specific experience with particular machines did not disqualify him from being considered an expert to offer opinion on economic loss).

Finally, Defendants challenge for the first time in their reply brief Sanders's use of the initial equity approach and the cost approach. However, arguments raised for the first time in a reply brief are waived. See *United States v. Hughes*, 970 F.2d 227, 235, n.6 (7th Cir. 1992) (arguments raised for the first time in a reply brief are waived); *Forsythe v. Rosen Med. Grp., LLC*, 2015 WL 127921, at *5 (N.D. Ill. Jan. 8, 2015) (denying motion *in limine* and explaining that argument raised for the first time in reply brief and not argued in initial motion was waived). Further, even if the Court were to consider these arguments on the merits, they are underdeveloped and do not cite any authority. Therefore, Defendants' motion to bar Plaintiff's expert Sanders's Opinion No. 5 "Damages Associated with WACHN, LLC" is denied.

### b.     Opinion No. 6: WACHN Guarantee

In Defendants' *Daubert* motion [309] and motion *in limine* No. 11 [317, at 12], Defendants seek to bar Opinion No. 6 of Plaintiff's expert Sanders on the ground that he uses an unreliable methodology. Defendants contend that Sanders' Opinion No. 6 attributes Great Lakes Bank's refusal to remove Plaintiff as a personal guarantor of the WACHN $1.42 million loan

balance to the actions of Defendant Hall. To reach his opinion, Sanders relies on (1) his review of two commercial guarantees signed by Plaintiff with Great Lakes Bank, (2) the bank statements of Great Lakes Bank regarding the status of the loans as of January 2, 2014; and (3) his own "involvement with other medical practices." Defendants argue that Sanders premised his opinion on the fact that Plaintiff dissociated from WACHN but that Sanders was in fact unsure if Plaintiff had actually dissociated.

Defendants' motion to bar Sanders's Opinion No. 6 is denied. The Court agrees with Plaintiff that Defendants misapprehend Sanders's opinion. Sanders did not opine that Defendant Hall "was to blame for Plaintiff not being removed from his personal WACHN guarantees." [317, at 12.] Rather, Sanders stated his opinion that (1) "a dissociated physician who is no longer entitled to the income or ownership of a medical building partnership should be released from all liabilities associated with the investments," (2) that "WACHN should have procured a release of Plaintiff's personal guaranty of the WACHN loan," and (3) "the damage to [Plaintiff] is the full extent of the available credit on the loan." Additionally, Defendants have not shown that Sanders's reliance on his review of commercial guarantees and bank statements of Great Lakes Bank amounts to improper methodology. See Fed. R. Evid 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Artunduaga v. Univ. of Chicago Med. Ctr.*, 2016 WL 7384432, at *5 (N.D. Ill. Dec. 21, 2016) ("[I]t is proper for counsel to furnish factual assumptions to experts as long as the factual assumptions are supported by the record."). Finally, Defendants' argument for excluding Sanders' testimony on the guarantee because he was unsure if Plaintiff had actually dissociated from WACHN fails, as this goes to weight and not admissibility.

### c.      Opinion No. 3: Excess Overhead Charges

In Defendants' motion No. 11, they challenge Sanders's opinion No. 3 that Plaintiff was wrongly charged $599,168 for excess overhead, as compared to industry norms.  Defendants argue that Sanders' reliance on Medical Group Management Association ("MGMA") statistics for this opinion was problematic for three reasons: (1) Sanders compared the average expenses for orthopedic surgeons in the MGMA Physicians Compensation and Production Survey for Single Specialty Practices 2008 Report to the actual expenses of Keystone from 2004 to 2007, yet Plaintiff was not an orthopedic surgeon, and pain management specialists like Plaintiff generate less revenue than orthopedic surgeons; (2) the MGMA data Sanders used was the national mean for all single-specialty orthopedic surgery practice, and the national mean will be different from an orthopedic surgery practice in Illinois; (3) the MGMA recommends using caution in interpreting its data because the data may not be representative of all providers in medical practices.  Additionally, Defendants take issue with the fact that Sanders conceded that a deviation from an industry norm is not *per se* evidence of wrongdoing or problems with the accounting systems.

Defendants' motion to bar Sanders's Opinion No. 3 is denied.  Defendants have not shown that Sanders's method in calculating Plaintiff's excess overhead charges was unreliable.  Rather, Defendants merely challenge the accuracy of the statistics on which Sanders relied.  Experts "may rely properly on a wide variety of sources," *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000), and may rely on "experimental, statistical, or other scientific data generated by others in the field," *Abbott Labs. v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 793–94 (N.D. Ill. 2010).  As the Seventh Circuit has stressed, the focus of a *Daubert* inquiry is "not the ultimate correctness of the expert's conclusions," but rather "the soundness and care with which

the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original). To the extent that Defendants disagree with the statistics used by Sanders and the outcome of his calculation, these arguments go to the weight of Sanders's testimony, and not admissibility. Thus, Defendants are free to explore these issues on cross-examination at trial. See *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

### 2. Plaintiff's Challenge to Certain Testimony of Michael Pakter [314]

Plaintiff seeks to preclude the testimony of Defendants' expert, Michael Pakter. To begin with, Plaintiff argues that much of Pakter's testimony will not provide specialized knowledge that would assist the jury in understanding the facts at issue, but rather would simply repeat the factual contentions of Defendant Hall and his associates. According to Plaintiff, Pakter's testimony purports to resolve issues of credibility of competing witness testimony, which invades the province of the jury and does not involve any expertise. In addition, Plaintiff contends that some of Pakter's testimony purports to advance legal opinions that would impinge upon the Court's role as the sole source of the relevant law in this case.

The Court agrees with Plaintiff that many of Pakter's proffered opinions merely parrot what Defendants have told him about disputed facts or offer opinions that state legal conclusions. As explained above, an opinion witness cannot simply vouch for the testimony of a fact witness. Nor can an opinion witness interview various fact witnesses, sift through their statements, and then purport to tell the jury what those witnesses meant, understood, believed, or agreed to. And the Seventh Circuit has explained that in considering whether an expert witness's testimony

will improperly invade the judge's role as the sole source of the relevant law at a trial, courts and parties must recognize the difference between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007); *Bone Care Intern., LLC v. Pentech Pharma., Inc.*, 2010 WL 3928598, at *14 (N.D. Ill. Oct. 1, 2010). As set out below in detail, in numerous instances the opinions expressed in Pakter's report, if repeated in court, would infringe upon the role of the jury, the Court, or both.

However, some of the challenged portions of Pakter's report properly provide the factual assumptions on which Pakter relies for his expert opinions and thus provide context for presenting those opinions for the jury's consideration. The Court sets out below its rulings on the specific challenges:

- Plaintiff's objection No. 1 (page 16) is overruled.[5] Plaintiff takes issue with part of Pakter's rebuttal of Sanders Opinion No. 1 in which Pakter states: "The revenues and expenses of the MDSC were purposely and deliberately disclosed to [Plaintiff] and other physicians when they were included in the Bucket Reports. * * * Based on my Interviews, [Plaintiff] and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports provided." However, this statement provides part of the factual assumptions on which Pakter relied for his conclusion that followed: "Consequently, when presented quarterly to Hall, [Plaintiff] and others [the Bucket Reports] disclosed reliably, openly and completely all the revenues and expenses of the 'consolidated entity' for that financial quarter." These statements provide context for Pakter's explanation of his opinion that "Sanders elected to call certain deliberate and necessary differences between QuickBooks and the Bucket Reports errors when they were purposefully only reconciling items." [314 Exhibit A (Pakter's Expert Report), at 13.]

- Plaintiff's objection No. 2 (page 17) is overruled. Plaintiff challenges Pakter's statement that "Hall represented to me that [Plaintiff] was provided with all of the information and/or documentation he requested." However, this statement supports Pakter's opinion that "Sanders failed to acknowledge that [Plaintiff] and others were provided access to the accounting system and proper summaries thereof," [314 Exhibit A, at 13]. Further, it was in response to Sanders's opinion that "[t]here was also a lack of transparency in the accounting in that the other physicians were not provided backup for the items in the

---

[5] The Court is referring to the numbered objections attached as Exhibit 1 to this opinion.

Bucket Report and did not have access to this information as the majority of Keystone's financial records and invoices were maintained at [Defendant Hall's] personal residence rather than at the Keystone's offices." [301-1 (Sanders's Expert Report), at 16.] As noted above, the experts in this case may only testify as to the facts on which they relied in formulating their opinions; they may not vouch for the accuracy of those facts. Presumably, each side will call fact witnesses (including Defendant Hall), who will testify to (and be cross-examined on) these underlying facts.

- Plaintiff's objection No. 3 (page 18) is sustained. These statements do no more than parrot facts that Defendants provided to Pakter. Additionally, Pakter's conclusion that "there are no assertions that [Plaintiff] was not credited with his revenues and billings" is improper, as that is an issue for the jury to decide at trial based on the testimony of the fact witnesses.

- Plaintiff's objection No. 4 (page 20) is sustained. These statements simply parrot what Pakter was told in interviews and do not apply any expertise. See *Benson*, 941 F.2d at 604–05 (concluding that the district court abused its discretion in admitting testimony of expert who "did not give helpful expert testimony that cast another witness's testimony in good or bad light [and] instead [ ] simply told the jury whom to believe").

- Plaintiff's objection No. 5 (page 20) is overruled, provided that the basis of Pakter's opinion is his analysis of accounting records and does not simply repeat what others may have told him about the Bucket Reports.

- Plaintiff's objection No. 6 (page 21) is sustained. Pakter cannot give an expert opinion that Plaintiff was an employee of Defendant Keystone, as that is a legal conclusion about a contested fact for the jury to decide at trial. Plaintiff contends that he was a shareholder or partner of Keystone, whereas Defendants contend that he was an employee. However, Pakter may opine on the extent to which Plaintiff's compensation was calculated in a manner consistent with how other employees and/or partners were compensated at Keystone. Pakter also may critique Sanders's understanding of the economic structure at Keystone.

- Plaintiff's objection No. 7 (page 23) is sustained in part. Pakter cannot opine that the "the employment compensation formula" was "agreed" as that is a disputed fact issue for trial. However, Pakter can give a variation of his proposed opinion: he can testify that based on his review of the Bucket Reports and other information and documentation in discovery, the compensation formula to which Defendants' fact witnesses testified was consistently followed and that the Bucket Reports were accurately designed and implemented to specifically follow that employment compensation formula.

- Plaintiff's objections Nos. 8 and 9 (page 27) are sustained, as Pakter merely restates contested facts. To the extent that Pakter offers his opinion on these contested facts to contradict the factual assumptions underlying Sanders's opinion, the Court notes that challenges to the factual basis of Sanders's opinion are better suited for cross-examination. See *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929–30 (8th Cir.

2001) (explaining that it is up to the opposing party to examine the factual basis of an expert opinion in cross-examination).

- Plaintiff's objection No. 10 (page 28) is sustained, as whether Plaintiff agreed to Defendant Hall's "management" or "franchise' fee is an issue to be resolved at trial based on fact witness testimony, and Pakter did not draw on any expertise to offer his opinion that based on his interviews, Plaintiff agreed with this fee arrangement.

- Plaintiff's objection No. 11 (page 30) is sustained. Pakter offered these statements as proposed reasons for why Sanders was incorrect that Plaintiff was wrongly charged for Roalsen's payroll and travel expenses. However, Pakter offered no expertise in stating what Plaintiff purportedly agreed to regarding an arrangement to pay Roalsen or in repeating what interviewees told him about Roalsen's work.

- Plaintiff's objections Nos. 12 (page 32), 13 (page 33), and 14 (page 35) are sustained. Whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

- Plaintiff's objection No. 15 (page 35) is sustained. Whether there was an agreement to increase Plaintiff's percentage of Keystone's expenses is a disputed fact for trial.

- Plaintiff's objection No. 16 (page 36) is sustained. Pakter did not draw on any expertise to offer his opinion that Plaintiff as covered by two medical malpractice policies at his own specific request.

- Plaintiff's objections Nos. 17 (page 38), 18 (page 40), 19 (page 42), 20 (page 43), 21 (page 44), 22 (page 45), 23 (page 46), and 24 (page 47) are sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

- Plaintiff's objection No. 25 (page 28) is sustained, as whether Plaintiff was an employee or partner of Defendant Keystone is a contested issue for trial. However, to the extent that Pakter can apply specialized knowledge to explain to the jury ways in which the accounting records that he examined suggest that Plaintiff was treated as (or compensated as) an employee and not a partner, he may offer those opinions.

- Plaintiff's objection No. 26 (page 50) is sustained, as whether Plaintiff agreed to certain fee arrangements is a disputed fact for trial.

- Plaintiff's objection No. 27 (page 54) is sustained, as whether Plaintiff contributed the $100,000 relating to cash reserves is a disputed issue for trial.

- Plaintiff's objections Nos. 28 (page 55) and 29 (page 55) are sustained, as whether Plaintiff agreed to certain arrangements is a disputed fact for trial.

- Plaintiff's objections Nos. 30 (page 60) and 31 (page 63) are sustained, as Pakter offered no specialized knowledge or expertise to form these opinions and merely parroted what he was told by Defendants in interviews. See *Stachniak v. Hayes*, 989 F.2d 914, 925 (7th

Cir. 1993) ("We have stated that "[c]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." (citation and internal quotation marks omitted).

- Plaintiff's objection No. 32 (page 70) is sustained, as whether Plaintiff signed the Operating Agreement dated January 1, 2005 is a disputed fact for trial and Pakter is not being offered as a handwriting expert.

- Plaintiff's objection No. 33 (page 78) is sustained, as Pakter offered no specialized knowledge or expertise to form this opinion and merely parroted what he was told by Defendants in interviews.

Plaintiff also argues that Pakter improperly seeks to offer legal opinions by stating that Defendant Hall is completely innocent of any fraudulent conduct, that there is no evidence of fraud, and that Defendants made a "good faith effort" to account for the amounts that Plaintiff allegedly failed to pay Defendant Keystone when he disassociated. As noted above, the Seventh Circuit has stressed that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Further, expert testimony that an individual did or did not act fraudulently is inadmissible, as the fact finder, not the expert, must determine whether Plaintiff has offered sufficient evidence to show that Defendants acted fraudulently. See *Apotex Corp. v. Merck & Co.*, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006), aff'd, 507 F.3d 1357 (Fed. Cir. 2007) (holding expert testimony inadmissible under Rule 702 where expert report stated that "[i]t is my opinion based on the evidence that [defendant's conduct was] a fraud on the courts"); *Ass'n Ben. Servs., Inc. v. AdvancePCS Holding Corp.*, 2005 WL 2335484, at *4 (N.D. Ill. Sept. 23, 2005) (holding that expert's testimony that defendant committed fraud "extends beyond the permissible scope of expert testimony"). Again, the key distinction is between "stating a legal conclusion" (which is not permitted) and "providing concrete information against which to measure abstract legal concepts" (which is permitted). *Blount*, 502 F.3d at 680.

More specifically, Plaintiff challenges Pakter's statement that "I can and have concluded that there is no proof or support for the assertion that [Plaintiff] was defrauded. Sanders has not shown—nor could he show—any evidence of fraud." [314 Exhibit A (Pakter's Expert Report), at 18.] Defendants argue that Pakter made this statement in response to Sanders's opinion that "The accounting system set up across [Defendant] Hall's various companies was not consistent with Generally Accepted Accounting Principles, was unreliable, and lacked appropriate transparency." Defendants also argue that this opinion is proper since Pakter is a Certified Fraud Examiner. Plaintiff also challenges Pakter's statement that: "As part of my review and analyze [sic] of these issues, I analyzed the above-listed financial elements of the 1099-MISC and concluded there was a good faith effort to account for the amounts that [Plaintiff] failed to pay [Defendant] Keystone when he disassociated from [Defendant] Keystone." [*Id.* at 83.] Defendants argue that this statement is in response to Sanders's statement that in his opinion, "the 1099-MISC was improperly issued."

The Court agrees with Plaintiff that, with one minor exception discussed below relating to Pakter's criticism of Sanders's work, these statements improperly offer legal conclusions as to whether or not Defendants committed fraud and whether Defendants acted in good faith. See *Richman v. Sheahan*, 415 F. Supp. 2d 929, 950 (N.D. Ill. 2006) (holding that expert was not permitted to testify that defendants "were carrying out there [sic] lawful duties" because "[t]hat conclusion does not put the facts in context or assist the jury in understanding the facts at issue"); *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005) (holding that expert could not testify that defendants committed fraud and stating that "proffered expert assertions about another's subjective intent or knowledge are not helpful to the jury"); *Dahlin v. Evangelical Child & Family Agency*, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18,

2002) (holding that expert could not testify that defendant's actions constituted fraud and explaining that "[t]his is a quintessential jury determination on which the Court will instruct a jury concerning the factors it is to consider"). Here is the exception: to the extent that Pakter wishes to respond to Sanders's statements, he can testify that Sanders's opinions are unsupported or testify that "there is sufficient accounting support for the inclusion of the underlying components of the $159,577.45 contained in the 1099-MISC," without using legal terms such as "fraud" and "good faith." Plaintiff also challenges Pakter's statement that "[t]here is nothing in the record in this litigation that contradicts that [sic] the overall reliability of the Bucket Reports." However, this is not a legal conclusion and Plaintiff certainly is welcome to try to establish the opposite proposition at trial.

In sum, Pakter is permitted to testify about disputed facts in order to provide the factual assumptions on which he relies for his expert opinions and thus provide helpful context for presenting his opinions to the jury. Pakter must then apply his expertise to these disputed facts in a way that is helpful to the jury. However, he is not permitted to simply recapitulate what Defendants have told him about disputed facts or endorse the testimony of a fact witness, as "the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *Benson*, 941 F.2d at 604. Nor is Pakter permitted to opine on whether or not there is evidence of fraud or offer any other opinions that state legal conclusions. See *id.* (explaining that an expert's opinion must be "an opinion informed by the witness' expertise[ ] rather than simply an opinion broached by a purported expert").

Finally, Plaintiff objects to Pakter's opinion that Sanders's testimony would "not help the trier of fact to determine the facts at issue," is "not based on sufficient facts or data," is "not the

product of reliable principles and methods," and that Sanders "has not reliably applied the principles and methods to the facts of the case." Plaintiff contends, without citing any relevant authority, that this testimony usurps the Court's role as the gatekeeper of expert opinions. Defendants agree that Pakter will not testify in front of the jury that Sanders's opinions "will not help the trier of fact to determine the facts at issue." The Court agrees with Plaintiff that arguing the legal standard under *Daubert* to the jury would be improper; indeed, the Court already has rejected that argument in overruling Defendants' motion to exclude portions of Sanders's testimony. Nevertheless, Pakter remains free to criticize Sanders's methodology, factual assumptions, and conclusions.

## III.    Motions *in Limine*

### A.    Legal Standard

A motion *in limine* is a motion made "at the outset" or "preliminarily." BLACK'S LAW DICTIONARY 803 (10th ed. 2014). Motions *in limine* may be used to eliminate evidence "that clearly ought not be presented to the jury because [it] clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997). The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose." *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009). The power to rule on motions *in limine* inheres in the Court's role in managing trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Because motions *in limine* are filed before the Court has seen or heard the evidence or observed the trial unfold, rulings *in limine* may be subject to alteration or reconsideration during the course of trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

**B.** **Defendant Hall's Alleged Prior Bad Acts (Plaintiff's Motion No. 2 and Defendants' Motions 2, 3, 8, 9, and 10)**

**1.** **Cloud 1099-MISC and Roalsen K-1**

The Court will first address Plaintiff's motion *in limine* No. 2 and Defendants' motions *in limine* Nos. 2, 3, 8, 9, and 10, which deal with related issues. Plaintiff moves to allow Rule 404(b) evidence of Defendant Hall's prior bad acts in retaliating against former business associates. In the current action, Plaintiff alleges that Defendants filed a fraudulent 1099-MISC with the IRS and falsely claimed that Plaintiff owed Defendants money, when, according to Plaintiff, Defendants actually owed Plaintiff money. Plaintiff claims that these allegations are relevant to Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432) and Count II (common law fraud), which both require proof of intent. Plaintiff intends to offer evidence that Defendant Hall subjected other former business associates to "strikingly similar fraudulent filings in retaliation for their defections from Keystone right around the same time." [326, at 2.] This evidence includes an allegedly false 1099-MISC issued to former Keystone employee George Cloud and Cloud's trial testimony concerning the incident, and an allegedly false Schedule K-1 issued to Defendant Hall's brother-in-law Merritt Roalsen and Roalsen's deposition testimony concerning the incident. On the other side of the coin, Defendants' motion No. 2 seeks to exclude the 1099-MISC issued by Keystone to Cloud (Plaintiff's Exhibit No. 14), and Defendants' motion No. 3 seeks to exclude a text message from Roalsen to Plaintiff about the Schedule K-1 issued by Defendant Hall (Plaintiff's Exhibit No. 22).

Rule 404(b) prohibits the introduction of evidence of other crimes or bad acts when such evidence is offered to prove the character of a person in order to show "conduct in conformity therewith." *United States v. Robinson*, 161 F.3d 463, 466 (7th Cir. 1998); Fed. R. Evid. 404(b). That is, evidence of prior bad acts is not admissible for an impermissible propensity inference.

However, Rule 404(b) expressly permits evidence of prior bad acts to be introduced for purposes other than to establish a propensity for wrongdoing, including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, *or modus operandi*. Fed. R. Evid. 404(b); *Robinson*, 161 F.3d at 466. Both parties rely on a four-part test formerly used by the Seventh Circuit to determine the appropriateness of admitting evidence of prior bad acts. However, the Seventh Circuit explicitly abandoned this four-part test in *United States v. Gomez*, in favor of a more straightforward rules-based approach.[6] 763 F.3d 845, 853 (7th Cir. 2014) ("This change is less of a substantive modification than a shift in paradigm that we hope will produce clarity and better practice in applying the relevant rules of evidence.").

Under *Gomez*, the proponent of the evidence must first show "that the other act is relevant to a specific purpose other than the person's character or propensity to behave in a certain way." 763 F.3d at 860 (citing Fed. R. Evid. 401, 402, 404(b)). Although other-act evidence need not be excluded whenever a propensity inference can be drawn, its relevance to a permitted purpose "must be established through a chain of reasoning that does not rely on the forbidden [propensity] inference." *Id.* Thus, courts must ask not just "*whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose." *United States v. Anzaldi*, 800 F.3d 872, 882 (7th Cir. 2015) (citing *Gomez*, 763 F.3d at 856). The district court must assess whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice. *Gomez*, 763 F.3d at 860.

---

[6] Under the old four-prong test, the admissibility of evidence of prior bad acts was dependent upon whether: (1) the evidence is direct towards establishing a matter in issue other than the defendant's propensity to commit the act accused of; (2) the evidence the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Robinson*, 161 F.3d at 467. The fourth prong of this test incorporated Rule 403. *Id.*

The court's Rule 403 balancing should take into account the extent to which the non-propensity fact for which the other-act evidence is offered is actually contested in the case. *Id.*

Plaintiff argues that he offers the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show identity, *modus operandi*, intent, and absence of mistake. First, Plaintiff argues that Defendant Hall put his identity at issue by taking the position that if anyone filed the false 1099-MISC, it was not him personally. Plaintiff relies on Defendants' Proposed Final Jury Instruction No. 4, which states, in relevant part: "[Defendant Hall] denies that he filed any Form 1099-MISC regarding [Plaintiff]." However, in their response brief, Defendants take the position that identity is *not* in dispute here.[7] [331, at 3.] To the extent that identity is not in dispute, Plaintiff's argument that the evidence is relevant to show identity fails. Additionally, if identity is not in dispute, Plaintiff's argument that the evidence is relevant to show *modus operandi* also fails, as *modus operandi* evidence is generally admissible only to prove the identity of the defendants. See *Robinson*, 161 F.3d at 467 ("[evidence of *modus operandi*] may be properly admitted pursuant to Rule 404(b) to prove identity"); *Goldberg v. 401 North Wabash Venture LLC*, 2013 2013 WL 1499043, at *6 (N.D. Ill. Apr. 11, 2013) (holding that evidence was not admissible to establish *modus operandi* and explaining that *modus operandi* evidence "is generally only admissible to prove the identity of the defendants, which here is not in dispute").

Further, based on the current record, the Court is not convinced that the acts in question are similar enough to the case at bar for a *modus operandi* rationale to apply. Evidence of *modus operandi* shows a defendant's "distinctive method of operation." *Robinson*, 161 F.3d at 467. The Seventh Circuit has cautioned that "[i]f defined broadly enough, modus operandi evidence

---

[7] The Court will further explore this issue with counsel at the final pre-trial conference on May 18 to ensure a consistency of approach in regard to any issues relating to identity and the related issue of who was responsible for the filing of 1099-MISC forms on behalf of the corporate Defendants in this case.

can easily become nothing more than the character evidence that Rule 404(b) prohibits." *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996). Thus, the similarities between the crimes must be "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468 (citation and internal quotation marks omitted). Generic patterns are insufficient for purposes of *modus operandi* because allowing such evidence "would gut the Rule, rending it useless as a check on character evidence that would otherwise be inadmissible." *United States v. Thomas*, 321 F.3d 627, 635 (7th Cir. 2003).

Here, Defendants issued a 1099-MISC that reported payment of $159,577.45 to Plaintiff. Defendants contend that the payment reported in the 1099-MISC included $100,000 that Plaintiff owed to cash reserves and $28,000 that Plaintiff owed for his share of the WACHN down payment. Plaintiff disputed that he owed these amounts and contended that he had already made all required contributions. The parties also dispute whether $38,010.45 included in the 1099-MISC was a bonus that Defendants chose to give Plaintiff or earned income. [See 303 (Summary Judgment Opinion), at 7.] In contrast, the 1099-MISC issued to Cloud was, according to Defendants, in relation to a 2001 Dodge Ram Van that Defendants Keystone and Hall gave to Cloud, who was at the time a Keystone staff employee. Other than the fact that a 1099-MISC was used in both scenarios, the scenarios appear to be quite different from one another based on the record before the Court. The other Rule 404(b) issue involves an allegedly fake K-1 issued to Roalsen by MedStaff, a company that is not party to this lawsuit and in which Defendants allege that Defendant Hall owns no interest. Plaintiff does not provide enough detail from which the Court can conclude that these past acts are similar enough to the case at hand (or sufficiently idiosyncratic) that they "permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468.

Plaintiff also proposes to offer the evidence involving the 1099-MISC issued to Cloud and the K-1 issued to Roalsen to show intent and absence of mistake. Plaintiff contends that Defendants are taking the position that if the filing was false, it was not intentional, and thus Plaintiff should be able to rebut this defense with evidence of Defendant Hall's prior bad acts involving information returns. However, Plaintiff does not satisfactorily explain why Defendant Hall's prior bad acts relating to the allegedly false information returns to Cloud and Roalsen are relevant to proving Defendant Hall's intent and lack of mistake as to Plaintiff's 1099-MISC. To differentiate between the "illegitimate use of a prior [bad act] to show propensity and the proper use of a prior [bad act] to prove intent, the [proponent of the evidence] must affirmatively show why a particular prior [bad act] tends to show the more forward-looking fact of purpose, design, or volition to commit the new crime." *Miller*, 673 F.3d at 699 (citation and internal quotation marks omitted). Here, Plaintiff has not shown a link between Defendant Hall's alleged involvement in issuing false information returns in the past and his state of mind was when issuing Plaintiff's 1099-MISC. Cf. *Anzaldi*, 800 F.3d at 881–82 (in tax fraud prosecution, evidence of defendant's attempt to structure her fees in a way she believed would circumvent government attention was admissible for propensity-free chain of reasoning: evidence tended to prove intent to defraud and helped negate defendant's asserted good faith defense because she would not have attempted to hide her fee activity from the government if she truly believed her tax positions were legitimate); *United States v. Urena*, 844 F.3d 681, 684 (7th Cir. 2016) (evidence of defendant's seven prior removals from U.S. was admissible in prosecution for being alien found in U.S. after deportation for non-propensity purpose: evidence was probative of defendant's knowledge that he could not lawfully reenter U.S. without permission).

The evidence involving the Cloud 1099-MISC and the Roalsen K-1 also presents a Rule 403 issue. There is a high risk of confusing of the issues and wasting time, which may outweigh the probative value of such evidence. The Court will not permit a lengthy sideshow on these issues or "time consuming mini-trials regarding the merits of these other allegations." *Patterson v. City of Chicago*, 2017 WL 770991, at *4 (N.D. Ill. Feb. 28, 2017); see also Fed. R. Evid. 403, 611. The jury is not being asked to decide the propriety of Defendant Hall's issuance of the 1099-MISC for Cloud's car or MedStaff's issuance of the K-1 to Roalsen, as these events are not at issue in this trial. Further, the evidence Plaintiff offers has a high risk of undue prejudice, as it may invite the jury to infer that Defendant Hall is the type of person who commits fraud against his business partners and employees using tax forms, and thus Defendant Hall is more likely to have subjected Plaintiff to fraud in the case at hand. See *United States v. Stacy*, 769 F.3d 969, 974 (7th Cir. 2014) (in prosecution for conspiracy to manufacture methamphetamine, district court erred in admitting evidence of defendant's prior possession of methamphetamine and pseudoephedrine pills because government's argument that evidence was probative of defendant's intent to use pseudoephedrine to make methamphetamine and his knowledge of the process for making methamphetamine relied on a forbidden propensity inference: that defendant's history of involvement with methamphetamine manufacturing makes it more likely that he intended to use the pseudoephedrine pills to make methamphetamine); *Gomez*, 763 F.3d at 863 (district court erred in admitting evidence that a small user quantity of cocaine of a different purity of that in the conspiracy was found in defendant's bedroom after conspiracy ended, as government's theory—that because defendant possessed a small quantity of cocaine at the time of his arrest, he must have been involved in the cocaine-distribution conspiracy—rested

on pure propensity); *Miller*, 673 F.3d at 698 ("[I]ntent is the exception most likely to blend with improper propensity uses.").

Thus, the Court provisionally excludes any evidence pertaining to the 1099-MISC issued to Cloud and the K-1 issued to Roalsen. If Defendants put identity at issue, then Plaintiff may present to the Court (outside the presence of the jury) an offer of proof with additional details as to how the proposed evidence is relevant to showing identity and *modus operandi*. See *United States v. Miller*, 673 F.3d 688, 696 (7th Cir. 2012) ("The district court wisely waited until after opening statements and cross-examination of a key witness to learn the defense theory before deciding whether to admit the details under Rule 404(b)."). If the Court does decide to admit this evidence at trial, the Court will consult with counsel about whether and when to give a limiting instruction to minimize the prejudicial effect. The Seventh Circuit has noted that appropriate jury instructions may help to reduce the risk of unfair prejudice inherent in other-act evidence, but has also cautioned against "judicial freelancing in this area," as a defendant may prefer to go without a limiting instruction to avoid highlighting the evidence. See *Gomez*, 763 F.3d at 860. Finally, the Court notes that even if this evidence does not come in as substance evidence under Rule 404(b), Plaintiff may be permitted to cross-examine Defendant Hall about the allegedly false tax returns he issued to Cloud and Roalsen under Rule 608(b) because these specific instances of conduct goes to Defendant Hall's character for truthfulness. The Court reserves ruling on this issue as well. However, to the extent that the Court may allow such cross-examination, Plaintiff would not be allowed to introduce extrinsic evidence. See Fed. R. Evid. 608(b).

### 2. Tom Boecker

Turning to Defendants' related motions *in limine*, Defendants' motion No. 8 seeking to bar reference to documents subpoenaed from Tom Boecker is granted, as Plaintiff asserts that he does not intend to offer Plaintiff's Exhibit 27, which consists of the documents subpoenaed from Boecker. Boecker was a part owner of Midwest Diagnostics, a company in which Defendant Hall had an interest, and he worked with Defendant Hall during the same period that Plaintiff was with Keystone. Plaintiff asserts that he intends to call Boecker to testify that when he left Midwest Diagnostics to start his own company, Defendant Hall told him that he owed him money which he did not actually owe, and that according to Boecker, this was Defendant Hall's *modus operandi* with many former business associates.

The Court concludes that Plaintiff has not demonstrated how Boecker's testimony would be relevant for a specific purpose other than propensity. Boecker's testimony is not relevant to *modus operandi* because identity is not at issue (Defendant Hall is not asserting as a defense that someone else told Plaintiff that Plaintiff owed him money), and *modus operandi* evidence is generally only admissible to prove the identity of the defendants. See *Robinson*, 161 F.3d at 467; *Goldberg*, 2013 WL 1499043, at *6. Further, without additional detail, the general act of telling someone he owes money that he does not actually owe is not "sufficiently idiosyncratic to permit an inference of pattern for purposes of truth." *Robinson*, 161 F.3d at 468 (citation and internal quotation marks omitted); *Miller*, 637 F.3d at 699 (explaining that prior conviction "cannot be admissible merely because it was for the same crime" and that "[p]attern evidence *is* propensity evidence, and it is inadmissible unless the pattern shows some meaningful specificity or other feature that suggest identity or some other fact at issue").

Plaintiff seems to be offering Boecker's testimony to suggest that Defendant Hall "made up phony debts" in the past and thus he is the type of person who makes up phony debts. This is an impermissible propensity inference, and thus Boecker's testimony is not admissible for this purpose. However, under Rule 608(a), Boecker may testify may testify as to opinion or reputation evidence about Defendant Hall's character for untruthfulness pursuant. Additionally, under Rule 608(b), Plaintiff may be permitted to cross-examine Defendant Hall about the alleged fraud against Boecker without introducing extrinsic evidence because the specific instance of conduct goes to Defendant Hall's character for truthfulness. This Rule 608(b) issue, too, is reserved at this time.[8]

## C. Plaintiff's Motions *in Limine*

### 1. Plaintiff's Motion No. 3 to Exclude Defendants' Exhibit No. 6 and Reference to a Prescription Written to Merritt Roalsen

Plaintiff seeks to exclude Defendants' Exhibit No. 6, which is a record of a pain medication prescription written in 2006 by Plaintiff to Merritt Roalsen, Defendant Hall's former brother-in-law and business manager. Defendants contend that Plaintiff testified at his deposition that Roalsen was not his patient and that he wrote him a prescription of Ultram as a courtesy. According to Defendants, the American Medical Association prohibits physicians from writing prescriptions for controlled-substances to non-patients, and thus they should be able to introduce the prescription at trial. Plaintiff argues that any reference to this prescription should be barred as irrelevant because there is no evidence that the prescription was not medically justified, and Defendants are improperly attempting to use the prescription as propensity evidence to show bad character.

---

[8] Defendants' motion *in limine* No. 10 seeks generally to exclude prior bad acts evidence under Rule 404(b). Given the specific rulings made above, the Court denies Defendants' motion *in limine* No. 10 without prejudice to either side making a contemporaneous Rule 404(b) objection if any particularized disputes of that nature arise at trial.

Plaintiff's motion is granted. Even assuming that Plaintiff's writing this prescription for a non-patient was improper under the standards of the American Medical Association, Rule 404(b) excludes evidence of prior bad acts if the purpose is to show a person's propensity to behave in a certain way. Fed. R. Evid. 404(b); *Gomez*, 763 F.3d at 855. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Rule 403 provides an alternative basis for this ruling, as the probative value of any evidence about the Roalsen prescription would be minimal and the potential for prejudice to Plaintiff, as well as a distracting but unfruitful sideshow for the jury, would be significant. Fed. R. Evid. 403; 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's writing a prescription is not probative of his character for truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the prescription itself cannot be admitted, as extrinsic evidence is not admissible to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. *Id.*; *United States v. Holt*, 486 F.3d 997, 1001 (7th Cir. 2007). Defendants' Exhibit No. 6 is excluded, and Defendants are not to reference Roalsen's prescription.

### 2. Plaintiff's Motion No. 4 to Exclude Defendants' Exhibit No. 8 and Preclude Mention of an Alleged Disciplinary Hearing

Plaintiff moves to exclude Defendants' Exhibit No. 8, which is a "Notice of a Disciplinary Hearing" and attached complaint issued by the State of Illinois Department of Professional Regulation to Plaintiff in 2004. Plaintiff also seeks to bar any reference to this alleged disciplinary hearing. Plaintiff contends that the complaint relates to his allegedly not having completed required "Continuing Medical Education," but that he simply had to provide evidence that he had in fact completed his continuing medical education and that there was never

a hearing or a sanction. Defendants argue that Plaintiff has not offered evidence of a dismissal order and that Plaintiff became employed with Keystone in 2004, thus this notice of a disciplinary hearing is relevant.

Plaintiff's motion is granted. Defendants have not shown that this evidence is relevant for any purpose other than for an impermissible propensity inference. Moreover, the allegations regarding this alleged disciplinary hearing have little probative value, since there is no evidence that Plaintiff was ultimately subject to a disciplinary hearing or sanction, yet have high prejudicial value and risk creating an unnecessary sideshow. See Fed. R. Evid. 403, 611. Additionally, although Rule 608(b) permits cross-examination on specific instances of conduct if the conduct is probative of the character for truthfulness or untruthfulness of the witness, Plaintiff's receipt of this "Notice of a Disciplinary Hearing" is not probative of truthfulness or untruthfulness. See Fed. R. Evid. 608(b). Further, the notice itself cannot be admitted, as Rule 608(b) prohibits the use of extrinsic evidence to prove specific instances of a witnesses' conduct in order to attack the witnesses' character for truthfulness. *Id.*; *Holt*, 486 F.3d at 1001.

### 3. Plaintiff's Motion No. 5 to Exclude Defendants' Exhibit No. 42: WACHN's 2008 Amended Operating Agreement

Plaintiff seeks to bar Defendants' Exhibit No. 42, which purports to be WACHN's Amended Operating Agreement dated January 2008. Plaintiff alleges that by January 2008, he had left WACHN, along with Dr. Marc Chang and Dr. Daniel Weber, and thus the Amended Operating Agreement is signed only by Defendant Hall and one of the other WACHN doctors, Dr. Phillip Narcissi. Plaintiff contends that in January 2008, Defendants Hall and WACHN had not paid him for his interest in WACHN, including his $111,000 cash contribution. According to Plaintiff, the Amended Operating Agreement provides that any member "vacating" the WACHN premises and "failing to monetarily contribute to the financial responsibility of WACHN * * *

31

shall immediately forfeit any cash contribution and any share ownership set forth in this agreement. The redistribution of ownership shall be decided by remaining members." [326, at 9–10 (quoting Defendants' Exhibit 42, Article 9).] Plaintiff argues that the Amended Operating Agreement was intended to illegally divest Plaintiff of his interest but that without Plaintiff's written consent, the document is null and void according to the WACHN Operating Agreement's Section 13.10, which provides that "Amendments hereto shall require the written consent of the Members."

Plaintiff argues that the Amended Operating Agreement should be barred because it has no legal force and would mislead and confuse the jury. However, Plaintiff asserts that he should be able to inquire on cross-examination of Defendant Hall about his attempt to alter the agreement retroactively since it bears on Defendant Hall's credibility and on Plaintiff's claims that Defendant Hall retaliated against him for resigning from Keystone and withdrawing from WACHN. Defendants, for their part, argue that WACHN continued to operate after Plaintiff ceased being a member and that the corporate records of WACHN are relevant to its operations.

The Court concludes that the alleged Amended Operating Agreement is relevant to WACHN's operations and notes that the evidence can cut both ways. On one hand, Defendants may use the Amended Operating Agreement to argue that Plaintiff forfeited his cash contribution. On the other hand, Plaintiff may argue that Defendant Hall attempted to alter the agreement retroactively to deprive Plaintiff of his cash contribution. To the extent Plaintiff believes that the Operating Agreement was not validly amended and that it does not apply to Plaintiff, he is free to explore these issues at trial. Further, Plaintiff has not shown that the introduction at trial of the Amended Operating Agreement would be unduly prejudicial. Thus, Plaintiff's motion is denied.

### 4. Plaintiff's Motion No. 7 [339] to Exclude Defendants' Exhibit No. 32 and No. 33

Plaintiff moves to exclude Defendants' Exhibit Nos. 32 and 33, which are purportedly equipment leases for medical equipment leased by Keystone. Defendants offer these exhibits to support Defendant Hall's counterclaim that Plaintiff still owes him money for this equipment (including an OEC C-arm, C-arm radiolucent procedure table and a Smith and Nancy radio frequency ablator, which cost Defendant Keystone approximately $225,000, according to the counterclaim). Plaintiff contends that he requested production of these documents on July 3, 2013, by requesting all documents relating to the expenses that Defendant Hall claimed Plaintiff owed him, as well as all documents reflecting Keystone's purchase of medical equipment or other assets from 2001–2007. However, Defendants did not produce the documents until April 4, 2017, more than a year after fact discovery had closed.

Federal Rule of Civil Procedure 26(a) requires a party to disclose all documents that the party has in its possession, custody, or control and my use to support its claim. F.R.C.P. 26(a). A party cannot offer evidence that was not produced during discovery unless the failure to produce was harmless or substantially justified. Fed. R. Civ. P. 37(c)1); *United States Sec. & Exch. Comm'n v. Berrettini*, 2015 WL 5159746, at *1 (N.D. Ill. Sept. 1, 2015). The determination of "whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003) (citation and internal quotation marks omitted). The following factors guide the Court's discretion: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Here, Plaintiff has been prejudiced by Defendants' late disclosure of these documents because Plaintiff has not had an opportunity to explore this new evidence through depositions, interrogatories, or supplemental document requests. Plaintiff has not had an opportunity to inquire about whether these equipment expenses were paid, by whom they were paid, where and how the equipment was used, or what efforts Defendants made to sell, lease, or use the equipment. Further, Defendants cannot cure this prejudice without delaying trial, and Defendants have not made any argument that their failure to disclose these documents earlier was substantially justified.

Defendants argue that the late disclosure is harmless because at Defendant Hall's deposition, Defendant Hall raised the topic of the equipment in response to a question about office expenses and Plaintiff's counsel asked Defendant Hall some questions about the equipment. According to Defendant, Plaintiff's counsel could have asked additional questions at that time but chose not to, thus demonstrating that Plaintiff had "minimal interest in the allegations regarding the equipment" in the counterclaim. These arguments are unavailing. As Plaintiff points out, Defendant Hall's deposition occurred eight days after the counterclaim was filed, which was the first time Defendants claimed that Plaintiff owed Defendant Keystone money for this equipment. And because Defendants had not produced any evidence supporting these allegations, Plaintiff's counsel did not ask Defendant Hall many questions about the equipment at his deposition. Plaintiff's strategy may have been different if Defendants had properly disclosed the documents. Thus, Plaintiff's motion is granted.

### D.     Defendants' Motions *in Limine*

#### 1.     Defendants' Motion No. 1 to Exclude Plaintiff's Exhibit No. 13: Centier Mortgage/Lien on the WACHN Property

Defendants move to exclude Plaintiff's Exhibit No. 13, which is a mortgage between Centier Bank and WACHN.  Defendants argue that this exhibit is irrelevant because the Center mortgage/lien was placed on the WACHN property in 2011, which is after Plaintiff allegedly disassociated with WACHN in 2007, and because a release of mortgage was entered into between Centier Bank and WACHN in 2016.

Plaintiff argues that this exhibit is relevant to the alleged scheme to defraud.  According to Plaintiff, he was required in 2005 to make a $111,000 capital contribution and guarantee a $1 million loan to Great Lakes Bank in order for WACHN to purchase Keystone's office space in Hazel Crest, in exchange for 20% interest in WACHN.  Plaintiff contends that when he left Keystone, Defendant Hall refused to purchase Plaintiff's interest in WACHN and prevented Great Lakes Bank from offering to release Plaintiff as a guarantor of the loan.  Plaintiff further contends that in 2011, Defendant Hall pledged the WACHN building as collateral to Centier Bank for one of Defendant Hall's other business ventures, further encumbering Plaintiff's interest in WACHN for Defendant Hall's benefit, without Plaintiff's consent.  The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 13 is relevant, and thus Defendants' motion is denied.

#### 2.     Defendants' Motion No. 4 to Exclude Plaintiff's Exhibit No. 19: Surveillance Photos of Defendant Hall

Defendants seek to exclude Plaintiff's Exhibit No. 19, which are surveillance photos dated February 11, 2014, of Defendant Hall in the parking lot and lobby of the medical practice where former Keystone physician, Dr. Chang, is employed.  Defendants argue that the photos are irrelevant.  Plaintiff argues that the photos corroborate Dr. Chang's deposition testimony that

Defendant Hall came to Dr. Chang's office and threatened to sue Dr. Chang if he did not make Plaintiff drop his lawsuit against Defendant Hall. Dr. Chang testified in his deposition that Defendant Hall threatened to "drag [Dr. Chang] in" and "come after [him] for monies" that Defendant Hall claimed Dr. Chang owed him, if he did not convince Plaintiff to drop the lawsuit.

The Court reserves ruling at this time on Defendants' motion *in limine* No. 4. To be sure, the Seventh Circuit has explained, "evidence of a defendant's attempts at intimidation of a witness * * * is admissible to demonstrate a defendant's 'consciousness of guilt[.]'" *United States v. Balzano*, 916 F.2d 1273, 1281 (7th Cir. 1990). Nevertheless, provided that Defendant Hall does not deny going to Dr. Chang's offices on the date that the photographs were taken, the photos themselves would add little or nothing of probative value to Dr. Chang's testimony. If Plaintiff still wishes to admit the photographs during or at the close of Dr. Chang's direct testimony, Plaintiff may request a brief sidebar and the Court will address the issue at that time.

### 3. Defendants' Motion No. 5 to Exclude Plaintiff's Exhibit No. 1: Defendant Hall's Personal Tax Returns

Defendants seek to exclude Plaintiff's Exhibit No. 1, which consists of Defendant Hall's and his wife's personal federal and state tax returns for years 2005–2007. Defendants argue that this exhibit is irrelevant. Plaintiff argues that the returns contain relevant evidence that Defendant Hall owned, controlled, and profited from a network of companies that he used to funnel profits away from Keystone and into his own pocket. Plaintiff further contends that Defendant Hall's scheme to defraud involved running nearly all of his Keystone patient billing income through his S-corporation, Martin R. Hall, M.D.S.C. According to Plaintiff, Defendant Hall kept this income a secret from Plaintiff and the other Keystone partners, and the tax returns show that nearly all of Defendant Hall's income came through Martin R. Hall, M.D.S.C. Plaintiff also argues that the tax returns show that Defendant Hall received tax benefits relating

36

to a house owned by his wife in Homewood, Illinois, which was used to store Keystone records and for the Halls for personal business, and that these tax benefits are part of the alleged scheme to defraud.   The Court concludes that Plaintiff has shown that Plaintiff's Exhibit No. 1 is relevant, and thus Defendants' motion is denied.[9]

> ### 4.    Defendants' Motion No. 6 to Exclude Plaintiff's Exhibit No. 15: Jenner & Block Invoices

Defendants move to exclude Plaintiff's Exhibit No. 15, which consists of bills from Plaintiff's accountant, Vranas & Vlahos Accountants, and his former attorneys at Jenner & Block.  Plaintiff asserts that he does not seek to introduce evidence of attorney's fees to the jury and only seeks to present this issue to the Court after trial, if the jury finds that Defendants are liable under Count I (fraudulently filing an information return in violation of 26 U.S.C. § 7432). Given that attorneys' fees will be a matter for the Court to address in the event that the jury returns a verdict for the Plaintiff and the Court cannot envision any scenario in which it would be proper for either side to raise the subject of attorneys' fees in the presence of the jury, Defendants' motion is granted.

> ### 5.    Defendants' Motion No. 7 to Exclude Plaintiff's Exhibit No. 28: Defendant Hall's Affiliation with Hind General Hospital, LLC

Defendants move to exclude Plaintiff's Exhibit No. 28, which consists of documents showing Defendant Hall's income from Hind Hospital.  Defendants argue that these documents are irrelevant.  Plaintiff argues that the documents show income that Defendant Hall hid from his partners at Keystone and are relevant to Plaintiff's claim that Defendant Hall breached his fiduciary duty to his partners in charging them an inflated management fee of $140,000.

---

[9] Plaintiff also argues that the tax returns are admissible as evidence of Defendant Hall's net worth, which is relevant to the computation of punitive damages.  Whether or not tax records from more than a decade ago would be admissible on that basis alone is not clear to the Court without a better appreciation for the totality of Defendant Hall's financial records, which will be explored at trial.

Plaintiff contends that with Defendant Hall's "duties at Hind, his busy private practice, and the demands of his other businesses, [Defendant Hall] could not possibly have earned the excessive management fee. The Court concludes that Plaintiff has shown that the documents are relevant to Plaintiff's claims and Defendants have not shown that the documents are unduly prejudicial. Thus, Defendants' motion is denied.

## IV.      Conclusion

For the reasons set forth above, Plaintiff's *Daubert* motion (Plaintiff's motion *in limine* No. 1) to bar expert testimony by Michael Pakter [314] is granted in part and denied in part. Defendants' *Daubert* motion to bar certain expert testimony by Jay Sanders [309] is denied. Plaintiff's motions *in limine* [326] are granted in part and denied in part: the Court grants Plaintiff's motions Nos. 3 and 4; the Court denies Plaintiff's motion No. 5; and the Court provisionally denies Plaintiff's motion No. 2. Plaintiff's motion *in limine* No. 7 [339] is granted. Defendants' motions *in limine* [317] are granted in part and denied in part: the Court grants Defendants' motions Nos. 6 and 8; the Court denies Defendants' motions Nos. 1, 5, 7, 10, and 11; the Court reserves its ruling on Defendants' motion No. 4, and the Court provisionally grants Defendants' motions Nos. 2 and 3.[10] Defendants' motion [352] is granted, and the Court will consider the proposed voir dire questions and jury instructions that the parties submitted to the Court on May 12, 2017. The Court will issue a ruling on Plaintiff's motion *in limine* No. 6 [326, at 10] and Defendants' motion *in limine* No. 12 [350] in a separate order. A final pretrial conference is set for May 18, 2017 at 10:00 a.m. This case remains set for a jury trial to commence on May 23, 2017.

---

[10] The Court previously granted in part and denied in part Defendants' motion *in limine* No. 9 and denied as moot witness Dr. Michael Hartman's motion to quash subpoena [360]. [364.]

Dated: May 16, 2017

Robert M. Dow, Jr.
United States District Judge

## Exhibit 1: Plaintiff's Objections to Conclusions and Opinions of Michael Pakter

| Objection No. | Page of Report | Inadmissible Conclusion |
|---|---|---|
| No. 1 | 16 | The revenues and expenses of the MDSC were purposely and deliberately disclosed to Angelopoulos and other physicians when they were included in the Bucket Reports. Based on my Interviews, Angelopoulos and other physicians routinely reviewed the Bucket Reports and requested adjustments, which they were then made with revised Bucket Reports provided…Consequently, when presented quarterly to Hall, Angelopoulos and others they disclosed [sic] reliably, openly and completely all the revenues and expenses of the 'consolidated entity' for that financial quarter. |
| No. 2 | 17 | Hall represented to me that Angelopoulos was provided with all of the information and/or documentation he requested. |
| No. 3 | 18 | It is my understanding that Angelopoulos did indeed raise questions on the quarterly Bucket Report and was provided information and/or documentation responsive to his questions. During my interview of Keystone's accounting personnel, they advised me that they provided Angelopoulos with copies of all EOBs supporting patient billing…It is my understanding that Sanders was provided all of the EOBs supporting Angelopoulos' billings…Accordingly, I can conclude and have concluded that there are no assertions that Angelopoulos was not credited with all his revenues and billings between 2004 Q1 and 2007 Q3. |
| No. 4 | 20 | Based on my interviews, Angelopoulos agreed with his employee compensation formula arrangement and contemporaneously consented to all specific allocations of income and expenses when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 5 | 20 | Hall was credited in the Bucket Reports with all his patient billings and Angelopoulos was credited in the Bucket Reports (and his calculation of employee compensation) with all his patient billings. |
| No. 6 | 21 | Sanders failed to understand and acknowledge Angelopoulos' agreed upon economic arrangement with Keystone. Angelopoulos was an employee of Keystone, an entity wholly owned by Hall. Angelopoulos' compensation, as an employee, followed a specific formula agreed upon by the parties - an agreement specifically described by Sanders in his Expert Report. |
| No. 7 | 23 | Based on my review of the Bucket Reports and other information and/or documentation in discovery in this litigation, this system [Pakter's characterization of the contract between Plaintiff and Keystone] was consistently followed from 2004 to 2007. The Bucket Reports were accurately designed and implemented to specifically follow the agreed employment compensation formula. |
| No. 8 | 27 | Based on my Interviews, Angelopoulos agreed with these [contractual] arrangements and contemporaneously consented to all allocations of income |

| | | and expenses when presented, disclosed and reported to him in the Bucket Reports. |
|---|---|---|
| No. 9 | 27 | Defendants imposed no restrictions on Angelopoulos' access to back-up data including but not limited to Angelopoulos' expenses. |
| No. 10 | 28 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding Hall's "management fee"] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 11 | 30 | Based on my Interviews, Angelopoulos agreed with all arrangement regarding [Merritt 'Bear'] Roalsen and consented to these specific charges when it was clearly disclosed and reported to him in the Bucket Reports…Based on my Interviews, Roalsen devoted the bulk of his efforts to Keystone, especially finding physicians to join the practice and managing Keystone's employees and facilities. |
| No. 12 | 32 | Based on my Interviews, Angelopoulos consented to this specific charge [for the 2007 Q3 Facility Fee] when it was clearly disclosed and reported to him in the Bucket Report. |
| No. 13 | 33 | Based on my Interviews, Angelopoulos agreed with the arrangement that Keystone would pay all of WACHN's expenses and consented to these specific WACHN charges when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 14 | 35 | Based on my interviews, Angelopoulos agreed with this arrangement [as to the increase in 2007 Q3 expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports in 2007 Q3. |
| No. 15 | 35 | Angelopoulos' compensation agreement contemplated that Angelopoulos' percentage of Keystone's expenses would fluctuate over time depending on the number of physicians. When Dr. Change left Keystone, Angelopoulos' percentage of Keystone's expenses increased. Soon thereafter, Angelopoulos also left Keystone. |
| No. 16 | 36 | Based on my Interviews, Angelopoulos was covered by two medical malpractice policies beginning in or around 2005 at his own specific request. As this was Angelopoulos' direct expense under his employee compensation arrangement with Keystone, he consented to and was charged this amount. |
| No. 17 | 38 | Based on my Interviews, Angelopoulos agreed with the annual allocations of the costs of MedStaff employees to Keystone and non-Keystone companies including the related medical insurance and other costs of the employees when these were disclosed and reported to him in the Bucket Reports. |
| No. 18 | 40 | Based on my interviews, Angelopoulos agreed with this arrangement [as to paying for the expenses relating to Hall's home in Homewood, Illinois] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports from 2005 to 2007. |
| No. 19 | 42 | Based on my Interviews, Angelopoulos agreed to pay the costs of the Qualified Retirement Plan, as part of the overall costs of Roalsen's employment compensation package, when these were disclosed and reported to him in the Bucket Reports. |

| | | |
|---|---|---|
| No. 20 | 43 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding office function expenses] and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Report during 2004 to 2007. |
| No. 21 | 44 | Hall represented that Angelopoulos specifically agreed to absorb these expenses of Dr. Narcissi and consented to these charges when they were disclosed and reported in the Bucket Reports. |
| No. 22 | 45 | Based on my Interviews, Angelopoulos agreed with the then-existing allocations of Misys expenses and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Reports. |
| No. 23 | 46 | Based on my Interviews, Angelopoulos agreed with hourly rates at which Keystone was billed for MRI services and consented to this specific charge when it was clearly disclosed and reported to him in the Bucket Report. |
| No. 24 | 47 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the asset acquisition expenses] and consented to these specific charges when they were clearly disclosed and reported to him in the Bucket Reports from 2004 to 2007. |
| No. 25 | 48 | Angelopoulos was an employee of Keystone. |
| No. 26 | 50 | Based on my Interviews, Angelopoulos agreed with Keystone's (and not the MGMA's) levels of expenses and consented to pay the agreed-upon percentages of Keystone's expenses when these were clearly disclosed and reported to him in the Bucket Report for 2004 to 2007. |
| No. 27 | 54 | Based on my Interviews, while Angelopoulos agreed to contribute the $100,000 cash reserves, he never did and Hall contributed on his behalf. |
| No. 28 | 55 | Based on my Interviews, Angelopoulos agreed to the 2004 financial arrangements and was aware there was little or no shared income to be had between July and December 2004. |
| No. 29 | 60 | Based on my Interviews, Angelopoulos agreed with this arrangement to account for patient receipts when collected (and not when billed) and to base Angelopoulos' employee compensation formula on collected payment receipts. |
| No. 30 | 62 | Based on my Interviews, Angelopoulos agreed with this arrangement [regarding the physical therapy adjustments] and consented to this specific adjustment when it was clearly disclosed and reported to him in the Bucket Reports…Based on my Interviews, the process the [sic] culminated with that income adjustment for physical therapy income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for physical therapy income. After the re-analysis specifically requested by Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for physical therapy income. |
| No. 31 | 63 | Based on my Interviews, the process the [sic] culminated in that income adjustment for MRI income was begun at the specific request of Angelopoulos who believed, mistakenly, that he was not given sufficient credit for MRI income. After the re-analysis specifically requested by |

| | | |
|---|---|---|
| | | Angelopoulos was completed, adjustments were made to Keystone's Bucket Reports. These adjustments, however, resulted in Angelopoulos receiving less credits than he previously received for MRI income. |
| No. 32 | 70 | I have seen the original Operating Agreement dated January 1, 2005, which Angelopoulos claims he never signed, although to my eyes his signature is apparent from the face of the original Operating Agreement. Even if that were true (which Defendants dispute), Angelopoulos appeared to have participated in "ordering" a special meeting on June 29, 2007 for the purpose of, among other things, amending the original Operating Agreement. It is my understanding and I have assumed that it would make little sense that Angelopoulos would order a meeting to amend the original Operating Agreement and agree on how to amend it, if he believed there was never an enforceable Operating Agreement to begin with. Angelopoulos signed the Summary of the WACHN meeting dated June 29, 2007 which contained the amendments to the Operating Agreement discussed above. |
| No. 33 | 78 | [B]ased on my Interviews, all the other items [in the 1099-MISC] are merely charges to Angelopoulos that he should have repaid, but did not. |