**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DR. NICHOLAS ANGELOPOULOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-5836 |
| | ) | |
| KEYSTONE ORTHOPEDIC SPECIALISTS, | ) | Judge Robert M. Dow, Jr. |
| S.C., WACHN, LLC, and MARTIN R. HALL, | ) | |
| M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's motion for entry of judgment under Rule 58 [440]. The Court denied the motion without prejudice on January 18, 2018, to allow the parties time to conduct limited, targeted additional discovery concerning damages. With the benefit of the parties' supplemental submissions, the Court now proceeds to a ruling on Plaintiff's motion [440]. For the reasons explained below, Plaintiff's motion for entry of judgment under Rule 58 [440] is granted in part and denied in part. The Court awards Plaintiff $178,954.29 in compensatory damages on Count 1 and denies Plaintiff's request for equitable relief on Count 3. Consistent with the jury's verdict, the award on Count 1 operates in favor of Plaintiff and against Defendants Hall and Keystone. The Court also awards Plaintiff prejudgment interest on the remaining counts and anticipates entering a final Rule 58 judgment order at the next status hearing in this case, which is set for July 18, 2018 at 10:00 a.m. Counsel are directed to confer and submit to the Proposed Order Box a proposed final judgment order—agreed, if possible—incorporating all of the jury's and the Court's rulings no later than July 16, 2018. The Court

anticipates setting a briefing schedule on the anticipated Rule 59 motions at the July 18 status hearing.

I. **Background**

Plaintiff Dr. Nicholas Angelopoulos ("Plaintiff"), an anesthesiologist, brought suit against his former business partner, Dr. Martin Hall ("Hall"), a medical practice owned by Hall, Keystone Orthopedic Specialists, S.C. ("Keystone"), and a limited liability company formed by Plaintiff, Hall, and other physicians called WACHN LLC ("WACHN") (collectively, "Defendants") for fraudulently filing an information return in violation of the Internal Revenue Code, 26 U.S.C. § 7434 (Count 1), common law fraud (Count 2), breach of fiduciary duty (Count 3), breach of the WACHN operating agreement and Keystone Agreement (Counts 5 and 6), and unjust enrichment. These claims and their factual background are described in detail in the Court's prior rules on motions to dismiss and summary judgment, knowledge of which is assumed here. See [258], [303].

On June 6, 2017, a jury returned a verdict in favor of Plaintiff on all of the counts that proceeded to trial—Counts 1, 2, 3, 5 and 6. By agreement of the parties, the issue of damages in the event of a verdict for Plaintiff on Count 1 was reserved for determination by the Court. Plaintiff now seeks a damages award on Count 1, as well as prejudgment interest on Counts 2, 3, 5, and 6 and equitable relief on Count 3—all of which Plaintiff would like incorporated into a Rule 58 final judgment order. Defendants oppose most of the relief sought by Plaintiff.

II. **Analysis**

A. **Count 1 Damages**

In Count 1 of his complaint, Plaintiff sought recovery under 26 U.S.C. § 7434 based on allegations that Keystone and Hall caused a fraudulent IRS Form 1099 ("1099") to be filed in

Plaintiff's name reporting more than $159,000 as taxable income for tax year 2007. Plaintiff acknowledged that approximately $38,000 should have been reported on the 1099, but claimed that the excess amount was included by Keystone and Hall out of spite arising out of the larger disputes between the parties. The jury agreed with Plaintiff as to liability. By agreement of the parties, the calculation of damages will be done by the Court.

Section 7434(b) governs "damages" for the filing of a "fraudulent information return." It permits the Court to award either (1) a flat sum of $5,000 or (2) the sum of (a) "any actual damages sustained by the plaintiff as a proximate cause of the filing of the fraudulent return (including any costs attributable to resolving deficiencies asserted as a result of such filing)," (b) the "costs" of the civil action, and (c) "in the court's discretion, reasonable attorneys' fees." Defendants insist that a minimal $5,000 award is sufficient compensation, while Plaintiff seeks an award of more than $325,000. Plaintiff's requested award includes all of the attorneys' fees and accounting expert expenses that he incurred in the underlying tax court proceedings as well as roughly 25% of certain categories of attorneys' fees and expert expenses in this litigation—amounts that Plaintiff submits "fairly pertained to proving Count 1 and that would have been necessary even if Count 1 had been the only count." [440] at 12.

In its January 18, 2018 order [476], the Court set out four principles that it intended to use in its analysis of Plaintiff's damages. First, the Court recognized that since a taxpayer may need to initiate costly proceedings to resolve the receipt of a fraudulently inflated 1099, it would be unjust not to compensate the taxpayer for the costs incurred in connection with such proceedings. Second, because distinguishing between a proper 1099 filing and a fraudulent one may require lay taxpayers to employ both legal and accounting assistance, attorneys' fees and expert witness fees properly lie within the scope of expenses potentially reimbursable to a

wronged taxpayer.  Third, the Court will not second-guess Plaintiff's decision to retain professional assistance to sort out any alleged deficiencies associated with his return.  Fourth, the Court will use "reasonableness" as its touchstone in considering Plaintiff's request for fees.

In its January 18, 2018 opinion, the Court rejected both Plaintiff's contention that damages could be determined based on the cursory records submitted with the briefs and Defendants' position (set forth in their motion for partial findings under Rule 52(c)) that Plaintiff waived any opportunity to develop arguments for a bench trial on Count 1 damages.  Instead, the Court allowed limited and proportional discovery on Plaintiff's Count 1 damages claim, including short depositions of Plaintiff's lawyers and accountants, with a focus on justifying the reasonableness of the substantive work for which the individuals billed their time and the results achieved.  The Court advised that additional information on the reasonableness of the fees and costs incurred in the tax proceeding would be critical to the Court's ability to assess Plaintiff's claim to reimbursement of those fees and costs, which amounts to more than $90,000.  The Court further recognized that the depositions may allow the lawyers in this case to provide additional insight into the extent to which Count 1 was a "central issue in the case" as Plaintiff contended, or a more peripheral one as Defendants contended.  The Court's hope was that depositions would streamline the Count 1 bench trial considerably.  It appears that they have, as counsel have agreed the Court that the Count 1 damages can be determined based on the parties' papers (briefs, transcripts, billing records).

In cases involving the award of fees to prevailing plaintiffs in civil rights lawsuits, which guide the Court's analysis of reasonableness here, there is a "strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee." *Murphy v. Smith*, -- U.S. --, 138 S. Ct. 784, 789 (2018) (quoting *Pennsylvania v. Delaware*

*Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986)) (internal quotation marks omitted). This is the "guiding light" of the Supreme Court's "fee shifting jurisprudence." *Id.* (quoting *Burlington v. Dague,* 505 U.S. 557, 562 (1992)) (internal quotation marks omitted). Nonetheless, "the lodestar figure is just the 'starting point,'" and "though it is presumptively reasonable, the figure may be excessive when 'a plaintiff has achieved only partial or limited success.'" *Thorncreek Apartments III, LLC v. Mich*, 886 F.3d 626, 638 (7th Cir. 2018) (quoting *Hensley v. Echerhart*, 461 U.S. 424, 436 (1983)).

"A reasonable hourly rate is based on the local market rate for the attorney's services." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). "The best evidence of the market rate is the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases." *Id.* Additionally, the Laffey Matrix—a guideline the United States Attorney's Office in Washington, D.C., has created to estimate reasonable attorneys' fees—"can assist the district court with the challenging task of determining a reasonable hourly rate." *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011); see also, e.g., *McDonough v. Briatta*, 935 F. Supp. 2d 897, 903 (N.D. Ill. 2013) (plaintiff's evidence was sufficient to show that his attorneys' hourly rate in civil rights harassment suit were reasonable where he submitted hourly rates for each attorney based on years of practice, the Laffey Matrix provided suggested hourly rates based on years of practice, and the rates charged by plaintiff's counsel were equal to the rates set out in the Laffey Matrix). However, the Laffey Matrix is "only one factor in determining a reasonable rate," and "has never formally [been] adopted" in the Seventh Circuit. *Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 983–84 (N.D. Ill. 2012). "The party seeking a fee award bears the burden of establishing

the market rate for the work; if the lawyers fail to carry that burden, the district court can independently determine the appropriate rate." *Montanez*, 755 F.3d at 553.

The Seventh Circuit has "rejected the notion that the fees must be calculated proportionally to damages." *Sommerfield v. City of Chicago*, 863 F.3d 645, 651 (7th Cir. 2017) (quoting *Anderson v. AB Painting & Sandblasting, Inc.*, 578 F.3d 542, 545 (7th Cir. 2009)) (internal quotation marks omitted). It has also rejected the argument that a "prevailing party can never have a fee award that is greater than the damages award." *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 857 (7th Cir. 2009) (quoting *Deicher v. City of Evansville*, 545 F.3d 537, 546 (7th Cir. 2008)) (internal quotation marks omitted). But while there "is not a categorical ban on considering proportionality," proportionality is one of the factors that the Court *may* consider in determining a reasonable fee. *Sommerfield*, 863 F.3d at 651.

The case law is well established on how district courts should determine which "legal services [were] reasonably devoted to the successful portion of the litigation." *Richardson v. City of Chicago*, 740 F.3d 1099, 1103 (7th Cir. 2014). The Court is guided by this case law in determining which legal services were reasonably devoted to Count 1, which is the only claim for which Plaintiff is entitled to seek attorneys' fees as a component of its damages award. "If an attorney's billing records permit the calculation of the hours devoted to the claims on which the plaintiff prevailed, then all a judge need do is determine the market rate for an hour of the lawyer's time and whether the fee generated by multiplying the hours by the rate is reasonable in relation to the value of the case[.]" *Id*. "But when the lawyer's billing records do not permit time to be allocated between winning and losing claims, estimation is inevitable." *Id*. Where "the plaintiff's claims for relief *** involve a common core of facts or [are] based on related

legal theories," "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley*, 461 U.S. at 435. Such lawsuits "cannot be viewed as a series of discrete claims" and "[i]nstead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*.

With these principles in mind, the Court turns to Plaintiff's fee request. Plaintiff seeks compensation for all of the expenses he incurred in the tax court proceeding, 25% of the expenses he incurred in this litigation through trial, 100% of the expenses he incurred post-trial on Count 1, and 25% of the expenses he incurred post-trial on mixed claims, minus 25% of the amount that Plaintiff was awarded as a discovery sanction. In particular, Plaintiff requests a total of $369,466.13, composed of the following:

| Fee Type | Amount Billed | Damages Requested |
|---|---|---|
| Tax court attorneys' fees (Jenner) | $49,758.75 | $49,758.75 (100%) |
| Tax dispute accountants' fees (Vlahos) | $40,875.00 | $40,875 (100%) |
| Litigation attorneys' fees through trial (Jenner) | $143,438.27 | $35,859.57 (25%) |
| Litigation attorneys' fees through trial (Gair) | $764,627.82 | $191,156.96 (25%) |
| Litigation attorneys' fees post-trial on Count 1 (Gair) | $32,767.50 | $32,767.50 (100%) |
| Litigation attorneys' fees post-trial on mixed claims (Gair) | $36,847.02 | $9,211.76 (25%) |
| PBC expert fees | $64,521.40 | $16,130.25 (25%) |
| Less amount awarded as discovery sanction | ($25,175.00) | $6,293.75 (25%) |
| | Total: $1,107.660.76 | **Total: $369,466.13** |

7

Beginning with the fees associated with the tax court proceeding, the Court concludes that Plaintiff is not entitled to an award of 100% of his fees because in his settlement with the IRS he agreed to pay taxes on a portion of the amount reported on the 1099. Instead, the Court will award Plaintiff 76% of the amount he requests, given that Plaintiff obtained the IRS's agreement that 76% of the amount reported on the 1099 should not have been included ($121,567 out of the $159,577 reported).

Other than that reduction to account for Plaintiff's partial success in the tax court, the Court is not persuaded by Defendants' arguments for further reducing the award of fees associated with the tax court proceeding. Gail Morse, an experienced tax attorney at Jenner & Block ("Jenner"), represented Plaintiff in the tax court and charged Plaintiff her standard rate. Defendants argue that, "[o]ther than Ms. Morse's justification of her own particular work in this case, there is absolutely no objective evidence to suggest that her approach is reasonable or standard in tax court, or that the rates charged are within the industry norm for this type of case." [488] at 8. However, Ms. Morse charged her standard rates, which is the best evidence of the market rate, *Montanez*, 755 F.3d at 553, and Jenner's rates were 87% of the Laffey Matrix rates. Further, despite being given the opportunity to conduct targeted discovery and depose Ms. Morse, Defendants do not point to any work that she did that was unnecessary or took an unreasonably long time to complete.

Defendants also argue that Ms. Morse spent a portion of her time on issues that were unrelated to Plaintiff's employment with Defendants, including the sale of some property that Plaintiff owned individually. As support, they cite to an "Information Document Request" that the IRS sent Plaintiff, [486] at 9. In addition to documents pertaining to WACHN, the form also requests information relating to "Form 4797 Sale of Business Property." *Id*. This document

does not support Defendants' argument. It is not clear what the business property is, whether it had anything to do with the 1099, or whether any of Ms. Morse's billings were attributable to the business property. Defendants could have asked Ms. Morse about this issue in a deposition, but there is no indication that they made any effort to do so. Moreover, Defendants make no effort to calculate how much the Jenner tax court bill should be reduced to account for time spent on the business property.

Defendants also criticize how Plaintiff allocated Jenner's bills between the tax court case and this litigation. Ryan Laurie of the Gair firm reviewed Jenner's bills and allocated costs between the tax court case and other litigation. First he looked at the biller on the file with the understanding that tax lawyer Ms. Morse was primarily working on the tax court case and the other attorneys were primarily working on the federal court litigation. Second, he read each billing entry to determine which entries related to tax court issues. Defendants argue that this allocation was inappropriate because Jenner does not delineate between the two proceedings in its bills and Mr. Gair testified that efforts to distinguish between the work creates a "false dichotomy." [488] at 9. The Court concludes that Mr. Laurie's method of allocating costs was reasonable. It is not disputed that Ms. Morse worked primarily on the tax court case. And Defendants did not identify any items allocated to the tax court case that they believe should have been attributed to this litigation. As Plaintiff points out, "[d]uring Laurie's deposition, counsel for Hall reviewed only a single entry on the Jenner bills identified by Laurie to the tax court case, which in fact reflected on its face that it dealt with that matter." [482] at 4.

The Court now turns to the bills of Plaintiff's accountant in the tax court proceeding, Mr. Vlahos. Vlahos billed $40,875 at his normal hourly rate of $150 per hour for four types of work: 1) dealing with the 1099 in connection with filing the 2007 tax return, 2) handling the IRS audit

9

initiated because of the 1099, 3) preparing schedules and forms in conjunction with Jenner for presentation to the tax court, and 4) preparing four years of amended returns that had to be fixed after the tax court's favorable ruling. Defendants criticize Mr. Vlahos' bills because they are not itemized and "note[] work on an additional issue not included in Count 1, namely a Form 1065 K-1." [488] at 9. Regardless of whether Mr. Vlahos' bills were itemized to Defendants' satisfaction, he also submitted his underlying time sheets, he kept both the time sheets and billing records in the ordinary course of business, and he testified that the $40,875 fairly and accurately captured the fees he charged for his work in connection with the 1099. [484-1] at 117. As to the Form 1065 K-1, Defendants did not ask Vlahos at his deposition about any work on that form; the only mention of the Form 1065 K-1 is in part of a bill quoted during the deposition, which stated in one paragraph: "For Professional Services Rendered in Regards To *** Compilation and review of data to prepare the 2007 Individual Tax Return Forms U.S. 1040 and·IL-1040 as it relates to questionable 1099-MISC and 1065 K-1 received from Keystone Orthopedic Specialist, S.C. and WACHN, LLC and proper disclosure of such on the returns." [484-1] at 115. Based on this very limited information, it appears that the 1065 K-1 was another "questionable" form received from Keystone with the 1099. All of the work that Vlahos described in his deposition related to the 1099. To the extent he spent any time on a 1065 K-1, there is no indication that it was a significant amount or is separable from the work related to the 1099.

In sum, the Court concludes that Plaintiff is entitled to damages equal to 76% of the total amount he spent on attorneys and his accountant pursuing the tax Court case, or $68,881.65.

The Court next considers the fees that Plaintiff incurred pursuing this litigation. Jenner handled the litigation until late 2013, when the Gair firm took over. Matthew Devine was the lead litigation partner for Jenner. Mr. Devine states in his declaration that he was extremely

10

careful about the bill to Plaintiff and wrote off some time and did not record other time. Jenner's attorneys charged their standard rates, which were 87% of the Laffey Matrix rates. In total, Jenner charged Plaintiff $300,471.66. Plaintiff paid $198,197.02 and Jenner agreed to write off the remainder. Subtracting the amount paid on the tax court matter and the write-offs, Jenner's bill for litigation was $143,438.27. Plaintiff is seeking compensation for 25% of this amount, or $35,859.57.

Chris Gair was the lead litigation partner for the Gair firm. His normal hourly rate was $550. He discounted his rate to $425 until February 2018. He took over as lead attorney for another partner, Vilia Dedinas, whose rate was $325 per hour. The Gair firm rates were 54% of the Laffey Matrix rates and 70% of Gair's normal rates. By the conclusion of the trial, the Gair firm billed Plaintiff $764,627.82 for work on the litigation. Plaintiff seeks compensation for 25% of this amount, or $191,156.96.

Plaintiff also hired an expert, Jay Sanders of PBC Advisors. Sanders has more than thirty years of experience providing accounting services to medical practices. Sanders prepared an expert report with eight opinions, including one opinion (No. 7) directly addressing the 1099-MISC. Sanders also testified at trial. Sanders charged Plaintiff his standard hourly rate of $320 for trial preparation and a discounted rate of $320 for trial testimony, for a total bill of $64,521.40. Plaintiff seeks compensation for 25% of that amount, or $16,130.25.

Defendants do not challenge the reasonableness of the rates charged or number of hours worked by Plaintiff's litigation attorneys and expert. See, e.g., [460] at 13-14 (statement by Defendants that they "are not contesting the Gair firm's billing rates. . . [or] the number of hours that the Gair firm put into this litigation."). Based on the undisputed records submitted by

11

Plaintiff, the Court concludes that both firms' fees were reasonable when compared to the attorneys' standard rates and the Laffey Matrix rates.

The primary dispute concerning the litigation-related fees is the portion of the fees that are attributable to Count 1. Plaintiff contends that the 25% he requests is reasonable—even conservative—because it is impossible to divide pre-verdict work on the lawsuit between Count 1 and the other counts of his complaint. According to Plaintiff: "[J]ust about all the work on the case, and the whole trial, was devoted to proving that while Hall claimed on the bucket reports and 1099 that Angelopoulos owed him hundreds of thousands of dollars, it was actually the other way around. Hall's fraudulent figures were contained in the bucket reports, and he then carried those phony numbers directly into his 'calculation' of the 1099 and the 1099 itself." [482] at 12. Plaintiff also points out that Section 7434 does not create liability for one who issues an incorrect 1099 but only someone who issues one that is intentionally fraudulent, and argues that the whole panoply of proof was offered and necessary to show fraudulent intent on Count 1. Plaintiff further argues that 25% is reasonable given his success on all claims and counterclaims and large jury award of approximately $2 million, the settlement history, in which Defendants never offered more than $87,000, and the hard-fought nature of the case.

Defendants disagree that Plaintiff's claims are inextricably intertwined. They explain that, "[p]rior to ever filing this lawsuit, Plaintiff was well aware of the particular bases for each and every number" included on the 1099, "even conceding that $38,010.45 of it was right." [488] at 13. Defendants also assert that the fees requested are unreasonable because Plaintiff made the case more complicated than necessary, Plaintiff's counsel "fostered an environment in which counsel could not expect to reach certain agreements or engage in routine practice that

they may otherwise in other cases," [488] at 21-22, and some allocation must be made for the Dubin Defendant's settlement with Plaintiff.

Taking into account all of the parties' arguments, the Court concludes that Plaintiff is entitled to a substantial award, but not the entire 25% of litigation-related fees that he requests. This case was hotly litigated for many years, with the parties filing five motions to dismiss, five motions to compel, a summary judgment motion, numerous motions in limine, at least two post-trial motions, and preparing for and conducting an 8-day jury trial with over a dozen witnesses and 174 exhibits. While the parties might have streamlined the proceeding and reduced their costs by being more cooperative, the Court cannot say that this was Plaintiff's fault, such that his damages award should be reduced. Defendants certainly contributed to the high volume of work necessary to resolve this case, for instance by filing a summary judgment motion on claims for which there were numerous disputed questions of material fact. Plaintiff's counsel also obtained an excellent result for their client. Plaintiff prevailed on every count of his complaint and on Defendants' counterclaim, obtaining a jury verdict of $990,000 in compensatory damages, $1 million in punitive damages, and $200,000 in interest. This result also supports Plaintiff's position that he was not unreasonable in refusing to settle for the much lower amount that Defendants offered.

Nonetheless, Plaintiff's award of compensatory damages should be limited to those fees that are reasonably attributable to the litigation work on Count 1. There is no easy way to determine this, given that some of the work supported multiple claims and Plaintiff's counsel (like Defendants' counsel) did not note in their billing entries the particular claims on which they were working. The Court does not fault counsel for this, nor does it expect them to be able to separate out the bills now. Instead, the Court must make its best estimate of the fees that are

reasonably attributable to Count 1. Only a handful of the entries on Defendants' "bucket reports" were at issue in Count 1: $100,000 was for money Plaintiff had already paid, two $6,061 payments for loan payments after his resignation, and $9,445 for funds Plaintiff did not owe to Midwest Diagnostics. As Defendants point out, proving that these entries were false did not require a "full rehashing of industry standards and recalculation of all bucket reports." [488] at 13. And while Plaintiff's discovery and evidence concerning other items on the bucket list provided additional support for Plaintiff's argument that Defendants acted with fraudulent intent, it was not necessary to prevail on Count 1. The Court therefore is not convinced that Plaintiff's attorneys would have done 25% of the total work if Count 1 were the only issue in the case. Instead, the Court concludes that 10% is a reasonable estimate of the time that should be attributed to Count 1.

In addition, Plaintiff is not entitled to compensation for the fees that it incurred litigating claims against the Dubin Defendants given that those claims were settled. Defendants raise the issue of a setoff for work done on claims against the Dubin Defendants in their supplemental brief, but make no attempt to even estimate how much time Plaintiff spent litigating against those defendants. Comparing the confidential settlement figure to the amount that Plaintiff won from Defendants at trial, and taking into account that the Dubin Defendants were dismissed two and half years before the case went to trial, the Court concludes that a small "Dubin discount"—5% off the top of the total amount that Plaintiff incurred litigating this case through trial—is appropriate. The total amount billed for the litigation, minus the amount Plaintiff was awarded as a discovery sanction, is $947,412.49. Reduced by 5%, the amount is $900,041.87. Taking 10% of that, Plaintiff is entitled to damages in the amount of $90,004.19 for the litigation-related fees incurred through trial.

That leaves the litigation-related fees that Plaintiff has incurred since the trial ended. Post-trial, the Gair firm billed Plaintiff $32,767.50 for work that it attributes to Count 1 and $36,847.02 for work on "mixed" claims. The Court will award Plaintiff damages equivalent to 50% of the post-trial work on Count 1 ($16,383.75)—as both sides could have taken more reasonable positions on those issues—and 10% of the post-trial work on mixed claims ($3,684.70) for a total award of $20,068.45 for post-trial work.

In total, the Court awards Plaintiff $178,954.29 as compensatory damages on Count 1, composed of the following amounts:

| Fee Type | Amount Awarded (% of amount billed) |
| --- | --- |
| Tax court-related (Jenner and Vlahos) | $68,881.65 (76%) |
| Litigation-related, through trial | $90,004.19 (9.5%) |
| Post-trial, Count 1 | $16,383.75 (50%) |
| Post-trial, mixed claims | $3,684.70 (10%) |
| **Total** | **$178,954.29** |

### B. Prejudgment Interest on Plaintiff's State Law Claims

The Court determined in its January 18, 2018 order that Plaintiff was entitled to an award of prejudgment interest, at a market rate and without compounding, from the date on which Plaintiff first made a formal demand on Defendants—November 8, 2011. See [476] at 9-11. As noted above, the Court requests that, by July 16, 2018, the parties work together on a proposed final judgment order incorporating this and all of the other jury and court rulings.

### C. Equitable relief on Count 3

Plaintiff's request for equitable relief on Count 3 is denied for the reasons explained in the Court's January 18, 2018 order. See [476] at 11-12.

### III. Conclusion

For these reasons, Plaintiff's motion for entry of judgment under Rule 58 [440] is granted in part and denied in part. The Court awards Plaintiff $178,954.29 in compensatory damages on Count 1 and denies Plaintiff's request for equitable relief on Count 3. Consistent with the jury's verdict, the award on Count 1 operates in favor of Plaintiff and against Defendants Hall and Keystone. The Court also awards Plaintiff prejudgment interest on the remaining counts and anticipates entering a final Rule 58 judgment order at the next status hearing in this case, which is set for July 18, 2018 at 10:00 a.m. Counsel are directed to confer and submit to the Proposed Order Box a proposed final judgment order—agreed, if possible—incorporating all of the jury's and the Court's rulings no later than July 16, 2018. The Court anticipates setting a briefing schedule on the anticipated Rule 59 motions at the July 18 status hearing.

Date: July 23, 2018

_____
Robert M. Dow, Jr.
United States District Judge